UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by and through its Attorney General Keith Ellison, and Shireen Gandhi, in her official capacity as the Commissioner of the Minnesota Department of Human Services, | Civ. No.: _____ |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| Dr. Mehmet Oz, in his official capacity as Administrator for the Centers for Medicare and Medicaid Services; the Centers for Medicare and Medicaid Services; Robert F. Kennedy, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services; U.S. Department of Health and Human Services, | |
| Defendants. | |

**INTRODUCTION**

1.    Congress designed Medicaid to be a "cooperative program of shared financial responsibility" between the states and the federal government.   Recently in Minnesota, however, the federal government has instead weaponized Medicaid against Minnesota as political punishment.

2.    As to Minnesota's Medicaid program, this began on January 6th, 2026, when the Administration announced that more than $2 billion annually would be withheld from Minnesota based on vague assertions of "noncompliance."   Minnesota appealed and, to this date, has not yet been told how it is noncompliant or what it can do remedy the

Administration's concerns.  Impatient that it cannot withhold the $2 billion until Minnesota is provided a hearing and other due process, the Administration "deferred" $243 million from the State on February 25, 2026.

3.      Deferral is an auditing tool that is employed to question "a claim or a portion of a claim" for which there is a lack of supporting documentation showing that payment to a Medicaid provider is warranted.  Deferral has never been used to categorically deny funds to a state across entire service areas, as is being done here.  By immediately denying Minnesota substantial Medicaid dollars for the very Medicaid services for which it is challenging the federal government's January 6 claim of "noncompliance," the deferral effectively denies Minnesota the due process it is entitled to prove that no withholding is warranted.

4.      Unless the deferral is quickly reversed, the state will be irreparably harmed. The Administration has already stated that the deferral will recur every quarter, crippling the state budget.  The immediate withholding of federal funding, especially if funding is delayed or denied for a protracted period or assuming Dr. Oz follows through with his promise to defer every quarter, would require Minnesota Management and Budget and the Department of Human Services to identify potential cuts to services absent a legislative appropriation that covers this shortfall.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this Complaint under 28 U.S.C. §§ 1331 and 1346.  The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

6.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1).  Defendants are United States agencies or officers sued in their official capacities.  The State of Minnesota is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

## PARTIES

### I.    Plaintiffs.

7.      Plaintiff State of Minnesota is a sovereign state of the United States of America.  Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison, who is authorized to sue on the State's behalf.

8.      Shireen Gandhi is the Commissioner of the Minnesota Department of Human Services ("DHS"), an agency within the executive branch of Minnesota state government. DHS administers Minnesota's Medicaid program, which it refers to as "Medical Assistance," or "MA."

### II.    Defendants.

9.      Defendant Dr. Mehmet Oz is the Administrator of the Centers for Medicare and Medicaid Services, which is a part of the United States Department of Health and Human Services. He is charged with the supervision and management of all decisions and actions of that agency.  He is sued in his official capacity.  42 U.S.C. §§ 3501a, 3502.

10.      Defendant Centers for Medicare and Medicaid Services is a part of the United States Department of Health and Human Services, a department of the executive branch of the United States government.  42 U.S.C. §§ 3501, 3501a.

3

11.     Defendant Robert F. Kennedy, Jr., is the Secretary of the Department of Health and Human Services, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.  42 U.S.C. §§ 3501a, 3502.

12.     Defendant the United States Department of Health and Human Services is a cabinet agency within the executive branch of the United States government. 42 U.S.C. §§ 3501, 3501a.

## FACTUAL ALLEGATIONS

### I.    MINNESOTA'S MEDICAL ASSISTANCE PROGRAM.

13.     Medicaid is Spending Clause legislation, "much in the nature of a contract." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S.320, 332 (2015).

14.     The federal government shares the cost of providing medical assistance with states, like Minnesota, that elect to participate in the Medicaid program.  *See* 42 U.S.C. §§ 1396a, 1396b; 42 C.F.R. § 430.0.  In return, states must comply with the requirements of the federal statutes and rules of the United States Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS"), which is responsible for implementing the Medicaid program.  *See* 42 U.S.C. § 1396a; *Shagalow v. State Dep't of Human Servs.*, 725 N.W.2d 380, 385 (Minn. Ct. App. 2006); *see also Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985).

15.     Since Medicaid's inception, Minnesota has elected to participate in the Medicaid program.  To participate, Minnesota, like other states, must obtain approval of a

state plan by CMS.  CMS has approved Minnesota's state plan, with waivers, including its most recent plan amendment.

16.    According to CMS's most recent published data (November 2025 Medicaid & CHIP Enrollment Data Highlights), 1,164,771 Minnesotans are enrolled in the state's Medicaid program.  As of fiscal year 2024, the State spent $18.9 billion in total MA expenditures, and 42% of children in the state have their health care covered by MA.

17.    The federal government provides approximately 54% of funds for the MA program.  DHS and policymakers rely on this federal share when setting the state's budget, forecasts, and appropriations.

18.    In 2022 and 2025 payment error rate measurement reports, CMS reported a national rolling average of 15.62% and 6.2%, respectively.  According to CMS, Minnesota's payment error rate, however, was 2.2% in both years, dramatically lower than the national average, based on CMS's own reporting.

## II.    DHS AND CMS COLLABORATE ON MEDICAID ADMINISTRATION UNTIL THE FEDERAL GOVERNMENT'S "RECKONING AND RETRIBUTION" AGAINST MINNESOTA.

19.    Until recently, DHS and CMS have worked cooperatively administering the MA program.  To the best of DHS's knowledge, information, and belief, CMS has never determined DHS in substantial noncompliance with Medicaid regulations; throughout its working relationship, DHS proactively identified and discussed issues and vulnerabilities with CMS, and when CMS raised similar issues, the parties worked together on solutions.

20.    Recently this changed.  On January 13, 2026, President Trump posted on TruthSocial.com that he would bring "reckoning and retribution" to Minnesota:

Minnesota Democrats love the unrest that anarchists and professional agitators are causing because it gets the spotlight off of the 19 Billion Dollars that was stolen by really bad and deranged people. FEAR NOT, GREAT PEOPLE OF MINNESOTA, THE DAY OF RECKONING AND RETRIBUTION IS COMING!

21.    Defendant Oz, on December 5, 2025, further threatened DHS of "not taking fraud seriously" and demanded that "Minnesota must take additional steps now," including submitting a corrective action plan by December 31, 2025.

22.    Despite this rhetoric, DHS for its part tried to keep working collaboratively with CMS.  DHS took all of the steps requested by Defendant Oz on December 5, including weekly updates to CMS, imposing a six-month enrollment moratorium on high-risk providers, and conducting off-cycle provider enrollment revalidations.

23.    DHS also attempted to work with CMS on its corrective action plan, which DHS submitted by Defendant Oz's requested deadline of December 31, 2025.  To that end, CMS and DHS met virtually on December 30, 2025, to discuss the corrective action plan.

24.    On January 5, 2026, DHS disenrolled roughly 4,300 out-of-network and out-of-state managed care providers, consistent with CMS direction.  At their standing weekly meeting, DHS asked CMS to provide feedback on the corrective action plan and requested guidance on any modifications CMS believes necessary.  CMS did not provide any substantive feedback or guidance but instead expressed willingness to work with DHS after reviewing the plan DHS submitted the week before in detail.  At no time did CMS suggest that the corrective action plan—which was drawn from previous recommendations by, and discussion with, CMS—was deficient or would form the basis for withholding federal financial participation.

6

25.    Yet the very next day, CMS provided notice that it considered Minnesota in noncompliance with the Social Security Act, section 1902(a)(64) and 42 CFR 455, Subpart A.  CMS said it would withhold more than $515 million quarterly, which it said was the quarterly "total paid expenditures for the fourteen high risk services."

26.    Defendant Oz declared DHS's corrective action plan deficient because it did not include certain topics that CMS believed was necessary.  CMS, however, had never raised, requested, or discussed those topics with DHS.

27.    DHS appealed Defendant Oz's January 6, 2026 noncompliance notice on January 9, 2026.  That administrative proceeding is underway, although CMS has asked DHS to agree to a 45-day extension to provide its administrative record, even after it told the hearing officer on January 20, 2026, that it would produce the administrative record to DHS within 45 days.  CMS claims that it has not been able to obtain documents from higher ranking employees within the agency.  It is therefore unclear on what timeline the parties will be able to litigate the matter, given the parties' stated desire to conduct discovery.  No hearing has yet been scheduled.

28.    CMS, through its attorneys, indicated that it hoped it could negotiate a suitable corrective action plan in parallel and that these proceedings could be accomplished "with as little administrative burden as possible."  CMS would not withdraw the January 6 notice while DHS and CMS continued work on a corrective action plan because CMS believed it needed the litigation to pressure Minnesota into negotiating a corrective action plan that is acceptable to CMS.

29.     DHS has also asked CMS to tell it how it is noncompliant with federal statutes or regulations given the vagueness of the January 6, 2026 notice.  DHS asked for an amended notice, but CMS's hearing officer denied the request.  CMS counsel also refused to provide additional information, stating as recently as February 27, 2026, that the agency is still developing its litigation strategy.

30.     The January 6 notice also required DHS submit "a revised comprehensive corrective action plan."  In its weekly meetings with CMS during January, DHS again asked CMS for input on a revised corrective action plan to ensure it would address all of the issues of which CMS was concerned.

31.     On January 30, 2026, DHS submitted its revised corrective action plan. Since then and at each of its weekly meetings with CMS in February, DHS asked CMS for its reaction and comments to the revised plan.  Many of the initiatives in the corrective action plan are time sensitive (i.e., with deadlines as early as March 1), or require an enormous outlay of time, effort, or resources to accomplish.  At the parties' February 25, 2026 meeting, CMS told DHS that it continued to have no information for Minnesota about its revised corrective action plan.

## III.    CMS DEFERS $259 MILLION AND THREATENS MORE WITHHOLDINGS.

32.     On February 25, 2026, CMS notified DHS that it would immediately defer approximately $259 million in Medicaid funding for fourth quarter 2025 expenditures.  Of this, approximately $243 million was deferred for provider payments made in the fourteen services that DHS identified as "high-risk" and which are the subject of CMS's January 6 noncompliance action.  Of that, CMS stated $164,198,916 was "for other practitioner,

personal care, and home and community-based services lines that have questionable variances and raise concerns about allowability of the claimed expenditures." The remaining $79,591,344 was "associated with reimbursement claims submitted by the state by specific providers that [CMS has] identified as high-risk for fraud or aberrant billing practices based on historically billing and CMS data analytics."

33.    At a February 25, 2026, press conference announcing CMS's deferral, Defendant Oz said CMS wanted a corrective action plan from DHS, but what DHS submitted was "inadequate." Defendant Oz said CMS alerted DHS to the inadequacy of the corrective action plan and "issued guidance that we were going to defer income based on an audit of last quarter's money." Dr. Oz further explained that the only way Minnesota could receive the deferred funds was by providing, and complying with, a corrective action plan he deemed sufficient: "[W]e will give them the money, but we're going to hold it and only release it after they propose and act on a comprehensive corrective action plan to solve the problem." Dr. Oz also warned that there would be future deferrals: "If Minnesota fails to clean up the systems, the state will rack up a billion dollars of deferred payments this year." The Vice President further expressed that "if Minnesota had done a better job of combating the fraud, we would not be here at this press conference today." He added that the federal government "decided to temporarily halt certain amounts of Medicaid funding that are going to the State of Minnesota in order to ensure that the State of Minnesota takes its obligations seriously."

34.    The purpose of a deferral is to allow CMS to obtain additional information from a state for "a claim or any portion of a claim," when CMS "needs additional

information to resolve" a concern.   42 C.F.R. 430.40(a).   The notice of deferral was supposed to have "specifie[d] the reason for the deferral" and to specify "the documents and materials…necessary to determine the allowability of the claim."  42 C.F.R. 430.40(b). Minnesota has 60 days from the date of the notice to respond with the specified documents. 42 C.F.R. 430.40(c).

35.    CMS's February 25, 2026 overbroad deferral is unprecedented, premature, and improper for a number of reasons.  First, it is more than fifteen times larger than any past deferral Minnesota has been issued.

36.    Second, the deferral is premature because CMS has not had a chance to completely review the information Minnesota has already provided related to these claims earlier in February and therefore CMS has not yet evaluated and cannot yet know whether there is a lack of documentary substantiation for any claim or portion of a claim.

37.    Third, the deferral lacks specificity that would allow the State to respond within 60 days.  Minnesota does not understand what "variances" justify a $164 million deferral, what claims are at issue, or what documents are needed for CMS to determine the allowability of the claim.  Similarly, Minnesota does not know who the "specific providers" are for which CMS's data analytics found "aberrant billing."  Again, Minnesota does not know what claims are at issue or what documents CMS needs that it does not already have.

38.    Fourth, the deferral is an end-run around the hearing process in the noncompliance case.   The deferral targets the same Medicaid payments as the noncompliance case, for the fourteen high-risk services.  Whereas CMS cannot withhold money for noncompliance until it conducts a hearing and proves non-compliance, CMS is

effectively extinguishing Minnesota's rights to a hearing by immediately depriving Minnesota of that same money through deferral.

39.    The administrative process provides no avenue to Minnesota for relief. Although, in theory, CMS has only 90 days to decide whether to pay a claim, CMS regularly evades the 90-day deadline by claiming that the state's submissions are insufficient or by demanding additional information so that the 90-day deadline never begins.  If this Court forces Minnesota to go through the administrative process, Minnesota will not be able to effectively challenge these improper and arbitrary withholdings in federal court for many months, or even years.  If federal financial participation is not available until the administrative process is complete, CMS would already have withheld— as it has already promised to do—several hundred million, or billions of dollars in quarterly deferrals.

**CAUSES OF ACTION**

**COUNT I**

**Procedural Due Process Violation**
**Under the Fifth Amendment of the United States Constitution**
**(Against all Defendants)**

40.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

41.    "No person shall be . . . deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V.

42.    The government fails to provide adequate due process when it (1) deprives a party of a protected life, liberty, or property interest, and (2) fails to provide adequate

11

procedural rights before impinging upon the protected interest.  *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 817 (8th Cir. 2011).  Courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials*."  Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

43.     A liberty interest can arise from two sources: the Constitution or a federal statute.  *See United States v. Johnson*, 703 F.3d 464, 469 (8th Cir. 2013).  Plaintiffs have a protected liberty interest in the process they are provided in the compliance matter under 42 C.F.R. § 430.35 and 42 C.F.R. Part 430, Subpart D, before Defendants immediately withhold $243,790,260 in deferred money from Plaintiffs.  Defendants deprived Plaintiffs of the process they are afforded in the compliance proceeding under 42 C.F.R. Part 430, Subpart D in violation of the procedural due process clause by targeting the same funding presently at issue in the compliance matter through its purported deferral action under 42 C.F.R. § 430.40.

44.     When "refusal of [federal financial participation] touches on matters of far-reaching importance, affecting the overall Medicaid program," courts "treat the dispute as involving compliance" and not as a disallowance.[1] *Massachusetts v. Departmental Grant Appeals Bd.*, 698 F.2d 22, 27 (1st Cir. 1983). To decide whether a claim is a disallowance or functionally a compliance matter, courts look at: (1) whether the matter might have "fit

---

[1] If a State cannot substantiate a deferred claim, it can result in a disallowance. 42 C.F.R. § 430.40(c)(5) ("The current Designee has 90 days, after all documentation is available in readily reviewable form, to determine the allowability of the claim."), (e)(1) ("The Administrator or current Designee gives the State written notice of his or her decision to pay or disallow a deferred claim.").

comfortably" within the noncompliance statute, (2) whether the matter "is of such a character, by reason of its generality and importance, as to point towards inclusion under the compliance rather than the disallowance rubric," and (3) the government's chosen procedures and label, though that is not dispositive. *Id.*

45.    Defendants' deferral action is a compliance matter because it fits in the noncompliance statutory scheme, a substantial amount of money is at issue making it deserving of inclusion under the compliance proceeding rather than a disallowance, and even though Defendants have labelled this new action as a "deferral," Defendant Oz revealed that while Plaintiffs can show they properly paid the deferred money, Plaintiffs will still not receive the funds until it "propose[s] and act[s] on a comprehensive corrective action plan to solve the [fraud] problem."  A corrective action plan's compliance with Medicaid regulations is, however, the purpose of a compliance action, not a deferral. *Compare* 42 C.F.R. §§ 430.353, 430.60, *with id.* §§ 430.40, 430.42; *see also* 42 C.F.R. § 430.35(a).

46.    Defendants' deferral of over $243 million dollars violates the procedural due process clause because Defendants are evading the procedures Plaintiffs are entitled to by immediately taking hundreds of millions of dollars without having to prove noncompliance after discovery and an evidentiary hearing.  Plaintiffs also have a protected property interest in the $243 million, which was also deprived by Defendants by their improper use of the deferral.

47.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' immediate withhold of $243,790,260 without any process to Plaintiffs violates

the procedural due process clause of the Fifth Amendment of the United States Constitution.

48.    Plaintiffs are further entitled to an immediate injunction barring Defendants' withholding of $243,790,260 from Plaintiffs, as well as an order vacating Defendants' deferral notice.

## COUNT II

### Arbitrary, Capricious, and Contrary to Law
### in Violation of the Administrative Procedure Act
### (5 U.S.C. § 706(2)(A))
### (Against all Defendants)

49.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

50.    Defendants include "agenc[ies]" as defined by the Administrative Procedure Act (APA). *See* 5 U.S.C. § 551(1).

51.    Defendants' immediate withhold of $243,790,260, as implemented through their deferral notice, constitutes final agency action, because it marks "the consummation" of agency decision making and determines "'rights or obligations'. . . from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

52.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary

and capricious if it "has relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Missouri ex rel. Bailey v. U.S. Dep't of Interior, Bureau of Reclamation*, 73 F.4th 570, 576–77 (8th Cir. 2023); *see Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (the agency must provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made'").

53.    A deferral notice must, among other things, ask the State "to make available all documents and materials the regional office then believes are necessary to determine the allowability of the claim." 42 C.F.R. § 430.40(b)(1)(ii). It is ultimately "the responsibility of the State to establish the allowability of a deferred claim." *Id.* § 430.40(b)(2). On its face, Defendants' deferral notice appears to instruct Minnesota to provide "all documents and materials that it believes support the allowability of the [claims at issue]," but the problem is that Minnesota has already provided this documentation to Defendant CMS and the Notice does not provide sufficient specificity for Minnesota to understand what additional documentation CMS will deem sufficient. And as Defendant Oz and Vice President Vance admitted, this deferral has nothing to do with obtaining documentation to verify claims as required for a deferral action. Rather, Defendant Oz and Vice President Vance made clear that the only way for Plaintiffs to recoup the withheld money is for Plaintiff DHS to act on a corrective action plan that meets their approval, with

CMS deferring a billion dollars this year if Defendants withhold their approval. Defendant Oz's and Vice President Vance's statements show the deferral notice is in fact prospective which conflicts with the true retrospective nature of a deferral action. *Compare* 42 C.F.R. § 430.40(a), (b), *with id.* §§ 430.35, 430.60.

54. Because Defendant Oz and Vice President Vance have made clear this deferral has nothing to do with the purpose of substantiating claims with documentation, Defendants' agency action is arbitrary, capricious, and contrary to the regulatory scheme. *See Motor*, 463 U.S. at 52 (agency action must be supported by a "rational connection between the facts found and the choice made" (quotation omitted)). The pretextual reason for immediately withholding funds makes the decision arbitrary and capricious.

55. This action is also part of the Administration's pattern and practice of political punishment against the State. Since December 2025, the Administration has threatened withholding of SNAP-related administrative funding tied to accelerated verification demands, resulting in a court injunction; actions to halt or suspend SBA-related funding streams affecting Minnesota partners and borrowers; attempted freezing of more than $10 billion in federal child-care and family-assistance funding administered through HHS/ACF (enjoined); termination or threatened clawback of CDC public-health infrastructure grant funding affecting Minnesota (enjoined or challenged); litigation and demands seeking unredacted voter-registration data from Minnesota; and threatened or initiated federal civil-rights enforcement actions in other program areas, including Title IX-related enforcement steps against Minnesota education entities, and more.

56.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' immediate withhold of $243,790,260 under the purported deferral action is arbitrary, capricious, and contrary to 42 C.F.R. § 430.40 and in violation of the APA.

57.     Plaintiffs are also entitled to a preliminary injunction barring Defendants' immediate withhold of $243,790,260 from Plaintiffs, as well as an order vacating Defendants' deferral notice.

## COUNT III

**Without Observance of Procedure
in Violation of the Administrative Procedure Act
(5 U.S.C. § 706(2)(D))
(Against all Defendants)**

58.     Plaintiffs reallege and incorporate by reference the allegations set forth above.

59.     The APA requires that a court to set aside an agency action that is "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(D).

60.     42 C.F.R. § 430.40(b)(1)(i) require a notice of deferral to "identif[y] the type and amount of the deferred claim and specif[y] the reason for deferral." A deferral notice must also provide Plaintiffs with sufficient information so they can "make available all the documents and materials" necessary for Defendant CMS to determine whether the claim is allowable, as it "is the responsibility of the State to establish the allowability of a deferred claim." 42 C.F.R. § 430.40(b)(1)(ii), (b)(2).

61.     Defendants' deferral notice fails to provide the State with sufficient information about the particular "claim or potion of a claim" at issue or the "specific[]

reason" for the deferral. See 42 C.F.R. 430.40(a) & (b). As to the $243 million deferred, the only information Defendants' deferral notice provided was that it was "attributable to CMS's ongoing review of state expenditures." It does not identify what those "state expenditures" are, nor does it provide any information about particular claims that could be at issue. It only states that the "focus" was on "fourteen high-risk Medicaid service areas [DHS] identified as particularly vulnerable to fraud or abuse," but it does not state that the deferred dollars only come from those programs. Defendants' breakdown of the $243 million is equally vague.

62.    Defendants' deferral notice does not provide Plaintiffs with specific information about the particular claims at issue. The "questionable variances," "specific providers," and "aberrant billing practices" all of which apparently led to the deferral are not identified, forcing DHS to guess at what documentation CMS leadership would deem acceptable to resolve the unspecified issues. Because of the vagueness of the notice, Plaintiffs are blocked from establishing whether the "claims" at issue are allowable under the regulatory scheme.

63.    Defendants' deferral notice is without observance of procedure because it does not identify the type and amount of the deferred claims and does not specify the reason for denial and therefore violates the APA.

64.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' immediate withhold of $243,790,260 under the purported deferral action is without observance of procedure in violation of the APA.

18

65.     Plaintiffs are also entitled to a preliminary injunction barring Defendants' immediate withhold of $243,790,260 from Plaintiffs, as well as an order vacating Defendants' deferral notice.

## COUNT IV

### Spending Clause Violation
### Under the United States Constitution
### (Defendants all Defendants)

66.     Plaintiffs reallege and incorporate by reference the allegations set forth above.

67.     "The Congress shall have Power To . . . provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Legislation establishing the federal funding for the Medicaid program was pursuant to the Spending Clause.

68.     Congress may impose conditions on states' acceptance of federal funds, but "the conditions must be set out unambiguously," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006),[2] so that states can "exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). "Though Congress' power to legislate under the spending power is broad, it

---

[2] Spending Clause limitations apply to the Executive Branch. *See, e.g., Santa Clara v. Noem*, No. 25-CV-08330-WHO, 2025 WL 3251660, at *34 (N.D. Cal. Nov. 21, 2025); *California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316, 322–23 (D.R.I. 2025); *see also Cit of Los Angeles v. Barr*, 929 F.3d 1163, 1176 (9th Cir. 2019) (holding that the Spending Clause "appl[ies] to agency-drawn conditions on grants to states and localities just as they do to conditions Congress directly places on grants," and there is "no reason why the addition of an agency middleman either expands or contracts Congress's power to provide for the . . . general Welfare").

does not include surprising participating States with post acceptance or retroactive conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981).

69.     Defendants' immediate deferral of $243,790,260 for every quarter with no due process to Plaintiffs and based purely on Defendants' order for Minnesota to create, and comply with, a corrective action plan that meets its ever-changing standards and regardless of Minnesota's relentless efforts to collaborate with Defendant CMS in accordance with 42 C.F.R. §§ 430.35(a), 430.60(b), violates the Spending Clause of the United States Constitution because the withhold imposes post-acceptance or retroactive conditions on Plaintiffs' Medicaid funding when none of those conditions were contemplated when Plaintiffs elected to participate in the Medicaid program. *See Pennhurst*, 451 U.S. at 25; *Arlington*, 548 U.S. at 296.

70.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' immediate withhold of $243,790,260 and coercion violates the Spending Clause of the United States Constitution.

71.     Plaintiffs are further entitled to a preliminary injunction barring Defendants' immediate withhold of $243,790,260 from Plaintiffs and other coercive tactics, as well as an order vacating Defendants' deferral notice.

### COUNT V

### Ultra Vires Violation
### (Against all Defendants)

72.     Plaintiffs reallege and incorporate by reference the allegations set forth above.

73.     Courts recognize "a right to equitable relief where an agency's action was ultra vires—that is, unauthorized by any law and . . . in violation of the rights of the individual." *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665, 665 (2025); *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949) (ultra vires actions "may be made the object of specific relief").

74.     Defendants' action challenged here is contrary to law and beyond their authority because 42 C.F.R. § 430.40(a) prohibits Defendants from conditioning the lifting of a deferral on anything other than the Plaintiffs providing documentation for the claims.

75.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' immediate withhold of $243,790,260 under these circumstances is outside Defendants' statutory authority.

76.     Plaintiffs are further entitled to a preliminary injunction barring Defendants' immediate withhold of $243,790,260 from Plaintiffs under these circumstances because their deferral action is unauthorized by law, as well as an order vacating Defendants' deferral notice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and grant the following relief:

1.     Pursuant to 5 U.S.C. § 706, an order vacating Defendants' deferral notice and its immediate withholding of $243,790,260 from Plaintiffs;

2.     An emergency hearing on Plaintiffs' Motion for a Temporary Restraining Order;

3.    Preliminary and permanent injunctive relief enjoining Defendants from immediately withholding $243,790,260 from Plaintiffs;

4.    A declaration that Defendants' action is unlawful;

5.    Award Plaintiffs their fees, costs, and expenses, including attorney's fees, to the extent permitted by law; and

6.    Grant other such relief as this Court deems just and appropriate.

Plaintiffs demand a jury trial on all issues triable.

Dated:  March 2, 2026

KEITH ELLISON
Attorney General
State of Minnesota

**s/ Scott H. Ikeda**
NATE BRENNAMAN
Assistant Attorney General
Atty. Reg. No. 0331776

SCOTT H. IKEDA
Assistant Attorney General
Atty. Reg. No. 0386771

BRANDON BOESE
Assistant Attorney General
Atty. Reg. No. 0396385

EMILY DOYLE
Assistant Attorney General
Atty. Reg. No. 0403550

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1112 (Voice)
(651) 282-5832 (Fax)
Nate.Brennaman@ag.state.mn.us
scott.ikeda@ag.state.mn.us
brandon.boese@ag.state.mn.us
Emily.Doyle@ag.state.mn.us

*Attorneys For Plaintiffs*