UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by and through its Attorney General Keith Ellison, and Shireen Gandhi, in her official capacity as the Commissioner of the Minnesota Department of Human Services, | Civil File No. 26-cv-1701 |
| Plaintiffs, | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| vs. | |
| Dr. Mehmet Oz, in his official capacity as Administrator for the Centers for Medicare and Medicaid Services; the Centers for Medicare and Medicaid Services; Robert F. Kennedy, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services; U.S. Department of Health and Human Services, | |
| Defendants. | |

## INTRODUCTION

Congress designed Medicaid to be a "cooperative program of shared financial responsibility" between the states and the federal government. Lately, however, the federal government has instead weaponized Medicaid against Minnesota as political punishment. This unfortunately comes as no surprise, as President Trump promised in early January "reckoning and retribution" against "Minnesota Democrats":

> Minnesota Democrats love the unrest that anarchists and professional agitators are causing because it gets the spotlight off of the 19 Billion Dollars that was stolen by really bad and deranged people. FEAR NOT, GREAT

PEOPLE OF MINNESOTA, THE DAY OF RECKONING AND RETRIBUTION IS COMING!

Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 13, 2026, at 7:40 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115888070937502023 (emphasis in original).

The threats have become reality. In addition to the Immigration and Customs Enforcement "Surge"—which terrorized Minnesotans for weeks on the feeble pretense that noncitizens were to blame for Medicaid fraud in the State—the Trump Administration is now improperly withholding hundreds of millions of Medicaid dollars from the State.

It started on January 6th, when the Administration announced that more than $2 billion annually would be withheld from Minnesota based on the State's purported "noncompliance" with the Medicaid Act. Minnesota has initiated the administrative appeal process, but it still has not, to date, been told how it is noncompliant or what it can do to remedy the Administration's concerns. While that is a problem in and of itself, it is not the subject of this lawsuit. What the Administration did next, however, is.

Impatient that the mechanism it chose to withhold the $2 billion from Minnesota afforded the state due process, the Administration "deferred" $259,505,491 of the State's fourth-quarter Medicaid payment on February 25th. Centers for Medicare and Medicaid Services ("CMS") Administrator Oz further boasted that if "Minnesota fails to clean up the systems," it would "rack up a billion dollars of deferred payments this year." Medicaid deferrals have never been used in this way and do not grant CMS the authority to categorically deny Minnesota Medicaid dollars across entire service areas, as is being done

here; rather, it is an auditing tool CMS employs to question "a claim or any portion of a claim" for which there is a lack of supporting documentation showing that payment to a Medicaid provider is warranted.

This deferral came one day after President Trump named Vice President Vance as his "anti-fraud czar" and gave him a convenient action on which to hold a press conference in which he could be seen to "turn the screws" on Minnesota—as he put it. By immediately denying Minnesota substantial Medicaid dollars for the very Medicaid services for which it is challenging the federal government's January 6 claim of "noncompliance," the deferral effectively denies Minnesota the due process it is entitled.

Unless the deferral is quickly reversed, the State will be irreparably harmed. The Administration has already stated that the deferral will recur every quarter, and a recurring deferral at this scale will cripple the state budget and require the State to make cuts to Medicaid services, which would directly harm Minnesotans unable to receive necessary medical care. Minnesota therefore asks this Court for a Temporary Restraining Order blocking the deferral and restoring federal Medicaid funding to the State.

## FACTUAL BACKGROUND

The Administration's actions precipitating this lawsuit and motion do not sit in isolation; they lie atop an extensive statutory, regulatory, and administrative foundation. This includes the cooperative federal–state nature of Medicaid and the methods the federal government can use to ensure compliance with the Medicaid Act (as well as those methods' limitations). Accordingly, the State begins by laying out this foundation before turning to the Administration's unprecedented actions.

I.    **MEDICAID IS DESIGNED TO BE A COOPERATIVE FEDERAL–STATE PROGRAM.**

The federal–state Medicaid relationship has routinely been very cooperative.  Even a few months ago, the Administration's recent conduct toward Minnesota would have been unthinkable.

A.    **The Medicaid Program.**

The Medicaid program provides funding for states to furnish medical assistance on behalf of individuals "whose income and resources are insufficient to meet the costs of necessary medical services."  42 U.S.C. § 1396-1.  Medicaid is a jointly funded federal–state program that is administered by the states in accordance with federal requirements and under the oversight of the Centers for Medicare and Medicaid Services ("CMS").  *See Ark. Dep't of Health & Hum. Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006).  It was designed as a "cooperative program of shared financial responsibility," and nothing in the Medicaid Act "suggests that Congress intended to require a participating State to assume the full costs of providing any health services in its Medicaid plan."  *Harris v. McRae*, 448 U.S. 297, 308, 309 (1980).  The public assistance programs authorized under a State's Medicaid program are "intended to operate as partnerships between the states and the federal government."  *Dep't of Soc. Servs., Div. of Fam. Servs. v. Bowen*, 804 F.2d 1035, 1041 (8th Cir. 1986) (Heaney, J., dissenting).

B.    **Consistent with this intent, CMS has historically worked cooperatively with the State on concerns over compliance or documentation.**

While a state's participation in Medicaid is optional, states electing to participate must comply with Title XIX of the Social Security Act and all applicable federal

regulations.  If a state does not do so, it jeopardizes its federal funding.  *See* 45 C.F.R. § 75.371; 42 C.F.R. § 430.35.

Historically, if CMS had concerns with claim documentation or a state's compliance with applicable Medicaid statutes or regulations, it would work directly with the state to cure any deficiencies.  Hultman Decl., ¶ 6.  This process may take months or even years. *Id*.  It has always been a collaborative process, involving myriad conversations with representatives of both agencies and exchanges of documents.  *Id*.  If, after these attempts to resolve the issue, CMS continues to have concerns, it has three options available (relevant to this lawsuit): deferral, disallowance, or a finding of noncompliance.

1. *Deferral*.  If CMS questions whether a claim submitted by a state is an allowable reimbursement, CMS can defer payment and ask the State for additional documentation to substantiate the claim.  42 C.F.R. § 430.40.  If CMS defers payment, it must "identif[y] the type and amount of the deferred claim and specif[y] the reason for deferral."  *Id.*, § 430.40(b)(1)(i).  Based on the information it receives from the State, CMS will determine whether to pay the claim or to disallow it.  *Id.*, § 430.40(e)(1).

2. *Disallowance*.  Relatedly, if CMS determines that a claim submitted by a State is not allowable under the Medicaid Act, it will issue to the State a disallowance letter.  42 C.F.R. § 430.42(a).  The State is then expected to adjust future expenditures to account for the amount that was disallowed.  *Id.*, § 430.42(a)(7).  A State has administrative appeal rights available to it, which ultimately are reviewable in federal district court.  *Id.*, § 430.42(f).  Deferrals and disallowances are intended to address "a narrow item or class of items" that "do not, in some general sense, affect the working of the program or federal–

state cooperation." *Massachusetts v. Departmental Grant Appeals Bd.*, 698 F.2d 22, 25 (1st Cir. 1983).

3. *Noncompliance.*  Finally, if CMS concludes a State's Medicaid plan does not comply with the Medicaid Act or that a state has failed to substantially comply with any provision, it can withhold payments to the State, but only after providing the State with reasonable notice and an opportunity for a hearing.  42 C.F.R. § 430.35(a).  In other words, issues of compliance "touch[] on matters of far-reaching importance, affecting the overall Medicaid program." *Departmental Grant Appeals Bd.*, 698 F.2d at 27.

## II.  CONSISTENT WITH MEDICAID'S FEDERAL–STATE PARTNERSHIP, MINNESOTA HAS MADE MASSIVE EFFORTS TO IDENTIFY AND ADDRESS FRAUD, IN COORDINATION WITH CMS.

On September 17, 2025, Governor Walz issued Executive Order 25-10, which directed DHS and other state agencies to implement a wide range of anti-fraud directives, including:

- Establishing a proactive, data-driven post-payment review program for Medicaid providers and claims and deploying advanced analytics and risk-scoring models to identify high-risk providers, claims, and service patterns for targeted review.

- Identifying programs that present a high risk of fraud, waste, and abuse and recommending programmatic changes, including termination of the HSS program;

- Implementing a temporary licensing moratorium as authorized under state law and requesting that CMS allow MDHS to implement moratoria;

- Subjecting providers who present identified risk factors to prepayment review;

- Immediately disenrolling all Minnesota Health Care Program enrolled providers who have not billed Medicaid in the last 12 months;

- Submitting a request for funds from any available state accounts to modernize systems to better prevent and detect fraud, waste, and abuse;

- Requesting any and all assistance from CMS and other federal partners to ensure that MDHS's program integrity measures are in line with national program integrity standards; and

- Hiring an external consultant to assess MDHS and make recommendations on reorganization to more effectively serve as the State's Medicaid agency, with a focus on program integrity and anti-fraud efforts, including through suggested policies, procedures, systems changes, structural changes, staffing levels.

Connolly Decl., ¶ 5; Brennaman Decl., Ex. 1.

Minnesota then identified providers of fourteen service types as high-risk based on programmatic vulnerabilities, investigations, and analysis. Connolly Decl., ¶ 6. The agency initiated enhanced prepayment review for all fee-for-service claims involving these fourteen services, a twenty-four-month licensing moratorium for Home and Community Based Service providers, an additional moratorium for Adult Day services, and it ended enrollment of new autism service providers. *Id*. In October 2025 alone, DHS also disenrolled over 800 inactive healthcare providers to further protect against fraudulent billing. *Id*.

### III. IN THE FACE OF MINNESOTA'S SIGNIFICANT EFFORTS TO COMBAT FRAUD, THE ADMINISTRATION HAS CARRIED OUT THE PRESIDENT'S PROMISE OF "RECKONING AND RETRIBUTION" AGAINST MINNESOTA.

On January 13, 2026, President Trump posted to Truth Social a promise that "reckoning" and "retribution" was coming to Minnesota:



Do the people of Minnesota really want to live in a community in which there are thousands of already convicted murderers, drug dealers and addicts, rapists, violent released and escaped prisoners, dangerous people from foreign mental institutions and insane asylums, and other deadly criminals too dangerous to even mention. All the patriots of ICE want to do is remove them from your neighborhood and send them back to the prisons and mental institutions from where they came, most in foreign Countries who illegally entered the USA though Sleepy Joe Biden's HORRIBLE Open Border's Policy. Every place we go, crime comes down. In Chicago, despite a weak and incompetent Governor and Mayor fighting us all the way, a big improvement was made. Thousands of Criminals were removed! Minnesota Democrats love the unrest that anarchists and professional agitators are causing because it gets the spotlight off of the 19 Billion Dollars that was stolen by really bad and deranged people. FEAR NOT, GREAT PEOPLE OF MINNESOTA, THE DAY OF RECKONING & RETRIBUTION IS COMING!

**9.3k** ReTruths  **35.3k** Likes                    Jan 13, 2026, 7:40 AM

Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 13, 2026, at 7:40 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115888070937502023.   Since then, Minnesota has been subject to the ICE Surge, a continuing litigation over a threatened quarterly Medicaid withholding of $515 million, and now a Q4 2025 Medicaid deferral of

$259 million.[1]   In short, just as President Trump promised would happen, the federal government has weaponized Medicaid as political punishment and coercion.

**A.   CMS threatens withholding of federal Medicaid dollars despite Minnesota taking all steps recommended by CMS.**

On December 5, 2025, Dr. Oz sent Minnesota a letter accusing the State of "not taking fraud seriously" and demanding that "Minnesota must take additional steps now," including submitting a Corrective Action Plan to the federal government by the end of the year.  Brennaman Decl., Ex. 2.

While Minnesota disagreed that it was not taking fraud seriously, it nevertheless agreed to take all the steps required in Dr. Oz's letter.  This included providing weekly updates to CMS, imposing a six-month enrollment moratorium on high-risk providers, and enacting off-cycle revalidation[2] for all provider enrollments.  Connolly Decl., ¶ 8.

Moreover, throughout December and early January, Minnesota consulted with CMS about what it wanted addressed in a Corrective Action Plan and whether its Plan—which

---

[1] That is not all. Since December 2025, the Trump Administration has undertaken a pattern or practice of punitive actions directed at Minnesota across multiple agencies.  *See, e.g.,* threatened withholding of SNAP-related administrative funding tied to accelerated verification demands, resulting in a court injunction; actions to halt or suspend SBA-related funding streams affecting Minnesota partners and borrowers; attempted freezing of more than $10 billion in federal child-care and family-assistance funding administered through HHS/ACF (enjoined); termination or threatened clawback of CDC public-health infrastructure grant funding affecting Minnesota (enjoined or challenged); litigation and demands seeking unredacted voter-registration data from Minnesota; and threatened or initiated federal civil-rights enforcement actions in other program areas, including Title IX-related enforcement steps against Minnesota education entities, and more.

[2] Providers of Medicaid services are periodically reviewed and revalidated by the state to ensure that they continue to be eligible for receipt of Medicaid dollars.  Off-cycle revalidation simply means that such review is happening now—not on the normal cycle.

the State submitted to CMS on December 31, 2025—could be improved. *Id.* ¶¶ 9–10; *see also* Brennaman Decl., Ex. 8. On January 5, 2026, DHS disenrolled roughly 4,300 out-of-network and out-of-state managed care providers, pursuant to CMS's direction. Connolly Decl., ¶ 8. The next day, January 6, the parties had their first weekly standing meeting, at which DHS actively invited feedback from CMS on the Corrective Action Plan and requested guidance on any modifications CMS believed was necessary. *Id.* ¶ 9. CMS representatives offered no substantive comments at that time but expressed willingness to work with the State after reviewing the plan in detail. *Id.* The parties also discussed the rollout of the provider enrollment moratorium, with CMS requesting operational details, giving advice on timing, and offering to assist where needed. *Id.*

At no time did CMS staff suggest that the Corrective Action Plan—which was drawn from previous statements by, and discussions with, CMS—was deficient or would form the basis for withholding federal financial participation, absent any notice to the State of alleged deficiencies. *Id.* ¶ 10.

### B. CMS Finds Minnesota Noncompliant With Medicaid Act On January 6, 2026.

Later that same day, Dr. Oz provided notice to Minnesota that CMS considered the State in violation of certain provisions of the Medicaid Act related to fraud, waste, and abuse. Brennaman Decl., Ex. 3 (the "compliance action"). The action targeted 14 Medicaid service areas that Minnesota had identified as "high-risk" for fraud in October of 2025, and which the state was already taking intensive action to remedy, as noted above. Connolly Decl., ¶ 11. Despite the fact that Minnesota had already identified these areas as

having vulnerabilities, and was taking action—in coordination with CMS—to address the vulnerabilities, CMS indicated it would withhold more than $515M quarterly, which it stated was the entire quarterly "expenditures for the fourteen high risk services" by the federal government. *Id*. Dr. Oz declared Minnesota's Corrective Action Plan "deficient" for failing to include topics that were never requested of, or discussed with, CMS. *Id.* ¶ 12.

Minnesota appealed the noncompliance decision on January 9, 2026. *Id*. ¶ 13; Brennaman Decl., Ex. 4. CMS cannot withhold the federal dollars from the State until after that appeal process is complete, and the process gives Minnesota substantial process to contest the finding. 42 C.F.R 430.35(a). That includes receiving CMS's entire administrative file on which it based its noncompliance allegation, a hearing at which the State can present evidence and cross-examine witnesses, discovery to the full extent allowed under the Federal Rules of Civil Procedure, and post-hearing briefing. *See, generally,* 42 C.F.R. §§ 430.60 – 430.104. Minnesota has not yet received CMS's administrative file, and to date no hearing has been scheduled.[3] Brennaman Decl., ¶ 6.

---

[3] Minnesota has not been told how it is noncompliant with federal statutes or regulations. The "Factual Findings" in the January 6, 2026, Notice do not demonstrate, or even suggest, noncompliance with any of the requirements of 1902(a)(64) or 42 CFR 455, Subpart A. Brennaman Decl., Ex. 3, at 2. Minnesota asked for an Amended notice to remedy this defect, but this request was denied by the administrative hearing officer. *Id*. ¶ 7. Minnesota has asked CMS repeatedly for information and detail regarding the claimed noncompliance, but CMS has refused to provide any information. *Id.*

**C.   DHS Submitted A Revised Corrective Action Plan on January 30, In Collaboration With CMS.**

The January 6, 2026 Notice of Noncompliance required Minnesota to submit to CMS "a revised comprehensive corrective action plan" by January 30, 2026. *Id.* at Ex. 3. Throughout January, during its weekly meetings with CMS, Minnesota attempted to coordinate with CMS about the Corrective Action Plan to ensure the revised plan would address all the issues of which CMS was concerned. Connolly Decl., ¶ 15.

Minnesota submitted its revised and more detailed Corrective Action Plan on January 30, 2026. *See id.* ¶ 16; Brennaman Decl., Ex. 5. Since that date, at each of the weekly meetings DHS had with CMS, Minnesota asked CMS for its reaction and comments to the revised plan. Connolly Decl., ¶ 16. Many of the initiatives in the Corrective Action Plan are time sensitive, or require an enormous outlay of time, effort, or resources to accomplish, and so Minnesota has wanted to ensure, throughout the month of February (including at a meeting it had with CMS the morning CMS issued the deferral notice at issue in this lawsuit), that CMS was not going to have major problems or revisions to the Corrective Action Plan. *Id.* At the February 25 meeting, CMS told Minnesota Medicaid Director John Connolly that CMS had no feedback, but that written feedback would be forthcoming at some point in the future. *Id.*

### D.      CMS Defers $243 million[4] in Medicaid from Minnesota.

Later that same day, CMS served Minnesota with a sweeping and unprecedented Notice of Deferral (the "Deferral"), Brennaman Decl., Ex. 6, the effect of which immediately denies the State $243 million by reducing the State's federal funds account by that amount.  Hultman Decl., ¶ 2.

### 1.      Dr. Oz stated the Deferral was due to Minnesota's failure to enact an acceptable Corrective Action Plan.

Vice President Vance and Dr. Oz held a press conference on February 25, 2026— the day after the President appointed the Vice President as his antifraud czar—to announce the deferral.  Neither the Vice President nor Dr. Oz stated anything about deficiencies with particular claims or a lack of documentation, which is the purpose of deferral actions. Instead, Dr. Oz said the deferral was issued because Minnesota failed to provide an adequate corrective action plan:

> So on December the 7th, we sent a letter to Governor Walz asking for a corrective action plan, which is a mechanism for us to extract from the state what they think they can do to fix the problems.  The answer we got back at the end of the month, which was what the deadline was, was inadequate.

The White House, *Vice President Vance and Administrator Oz Announce Actions to Address Fraud, Waste, and Abuse*, at 21:27 (YouTube, Feb. 25, 2026), https://www.youtube.com/watch?v=mRJN72K2lYw [hereinafter Deferral Press Conference].  Dr Oz added, "This quarter-billion-dollar deferment is hopefully going to

---

[4] The Deferral defers a total of $259,505,491, but the State's lawsuit specifically challenges only $243,790,260 of that deferral (hereafter, the "$243 million"), relating to the 14 services identified as "high-risk."  *See generally* Complaint.  The State does not concede that the remainder of the deferral is proper, but it is not subject to this litigation.

get on the radar screen for the State of Minnesota and make sure they are responsive to our requests." *Id.* at 11:24. Dr. Oz further explained that the only way Minnesota could receive the deferred funds was by providing, and complying with, a corrective action plan he deemed sufficient: "[W]e will give them the money, but we're going to hold it and only release it after they propose and act on a comprehensive corrective action plan to solve the problem." *Id.* at 11:37.

Dr. Oz also warned that there would be future deferrals: "If Minnesota fails to clean up the systems, the state will rack up a billion dollars of deferred payments this year." *Id.* at 11:46. Vice President Vance stated that the deferral was done to "turn the screws" on Minnesota "so that they take this fraud seriously." *Id.* at 19:01. The Vice President further expressed that "if Minnesota had done a better job of combating the fraud, we would not be here at this press conference today." *Id.* at 31:35. He added that the federal government "decided to temporarily halt certain amounts of Medicaid funding that are going to the State of Minnesota in order to ensure that the State of Minnesota takes its obligations seriously." *Id.* at 0:53.

### 2.    The Deferral is ultra-vires, premature, and unsubstantiated.

Under 42 C.F.R. § 430.40, a deferral grants CMS the authority to temporarily pause payment of a specific claim or portion of a claim for Federal Financial Participation (FFP) if the Administrator questions its allowability and requires additional information for resolution. This action is taken by excluding the amount from the state's quarterly grant award within 60 days of receiving the state's quarterly expenditure report. *Id.* A deferral does not trigger the same formal due process protections as a withholding—such as the

right to a prior evidentiary hearing. *Id.* To be valid, the written notice of deferral must satisfy a three-part test by (1) identifying the specific type of claim, (2) stating the exact amount being deferred, and (3) specifying the reason for the deferral. *Id.*

CMS's February 25, 2026, deferral is remarkable in several ways. First, the size of the deferral is unprecedented. The largest prior quarterly deferral Minnesota recalls is $10,966,609. Hultman Decl., ¶ 2. Second, the deferral process is an auditing measure that focuses on a "claim or any portion of a claim" and provides a process whereby CMS can obtain "documents and materials the regional office then believes are necessary to determine the allowability of the claim." 42 C.F.R. § 430.40(a), (b)(1)(2). It is not a basis for CMS to withhold wide swaths of Medicaid funding unrelated to specifically questioned claims, and it has not been used in that way in the past by another administration. *See* Hultman Decl., ¶ 5.

Third, the deferral notice provides no detail regarding the bases for the deferral. *See* Brennaman Decl., Ex. 6. CMS breaks down the $243 million into two buckets. CMS is withholding $164 million from the State because of "questionable variances." *See* Hultman Decl., ¶ 4. Minnesota does not understand what claims are at issue, or what documents are needed to resolve CMS's questions with respect to these "variances." *Id.* ¶ 7. The same is true for the remaining $79.5 million, which CMS states is "associated with reimbursement claims submitted to the state by specific providers that [CMS has] identified as high-risk for fraud or aberrant billing practices based on historical billing and CMS data analytics." Brennaman Decl., Ex. 6. But Minnesota does not know what "specific providers" CMS is referring to or what CMS's "data analysis" uncovered. Hultman Decl., ¶ 7. It also does not

understand of what "claims or parts of claims" are at issue and what information CMS would need to "determine the allowability of the claim." 42 C.F.R. § 430.40(a), (b)(1)(2).

Fourth, CMS already has information from the State and is withholding money from the State before it has finished conducting a review, Hultman Decl., ¶ 3, making the whole deferral a sham—there is no reason CMS cannot take the time it needs to review the information and make a disallowance later (following the due process required). DHS provided CMS with data it requested related to the issues that ultimately formed part of the basis for the deferral on February 5, and CMS admitted it has not had time to review it. *Id*. The regulatory basis for a deferral is for CMS to obtain missing information to substantiate a claim, 42 C.F.R. § 430.40(b)(1)(ii), but CMS concedes that it has not reviewed the information that Minnesota has provided and that, instead, its review is "ongoing." *See* Brennaman Decl., Ex. 6. Indeed, under normal circumstances, the concerns raised in the deferral notice would be the basis for CMS to conduct a review or an audit to investigate. Hultman Decl., ¶ 4. The effect is that CMS is depriving Minnesota of Medicaid dollars while it reviews information already in its possession to see whether any problem actually exists. *Id*. ¶¶ 5–6. Again, nothing prevents CMS from making a disallowance after it takes the time it needs to do its investigation into the "variances" and "aberrant billing practices" for specific providers, to see whether there is a real problem. *See* 42 C.F.R. 430.42.

Finally, Administrator Oz's requested cure—an acceptable corrective action plan— is not consistent with CMS's deferral authority. CMS deferral authority is about clarifying audit detail, not a corrective action plan. This further illustrates that this deferral is a pretext

and a sham, and was done in order to withhold federal funds before proving Minnesota's

alleged noncompliance with federal statutes and regulations in a hearing, as required.

### 3.    The deferral process provides no recourse to Minnesota.

The deferral process can be, and often is, dragged out indefinitely by CMS.

Specifically, once Minnesota provides documents and materials to substantiate the claim,

CMS has 90 days to "determine the allowability of the claim." 42 C.F.R. § 430.40(c)(5).

In practice, however, CMS often evades this deadline by claiming that the state's

documentation is insufficient, or that more documents are needed.  Hultman Decl., ¶ 8.

This can, and in the past has, often led to long delays in obtaining deferred funding that is

later determined by CMS to have been allowable. *Id*.  Also, even aside from these delays,

there is a lengthy administrative appeals process to the Departmental Appeals Board within

CMS if it ultimately disallows the claims.  42 C.F.R. § 430.42(f).  In short, if this Court

forces Minnesota to exhaust administrative remedies, Minnesota will not be able to

effectively challenge these improper and arbitrary withholdings in federal court for many

months, or even years, by which point CMS could defer—as it has already promised to

do—several hundred million, or billions of dollars.  Hultman Decl., ¶ 9.  Between this and

Administrator Oz's public statements that he has no intention of releasing funds based on

documentation alone—but instead that an acceptable corrective action plan is needed—the

deferral process is futile.

IV.    **UNLESS QUICKLY REVERSED, THE DEFERRAL WILL IRREPARABLY HARM MINNESOTA.**

To state the obvious, $243 million per quarter is a lot of money for a state the size of Minnesota, and it is an amount of money that provides support to a large number of Minnesotans who rely on Medicaid. Connolly Decl., ¶ 18.  That number represents, for example, the equivalent to complete quarterly federal defunding for Assertive Community Treatment Mental Health Services, Adult Rehabilitative Mental Health Services, Intensive Residential Treatment Services, and Nonemergency Medical Transportation Services.  *Id*. These programs provide services to 160,000 Minnesotans, many with significant needs. *Id*.  These are important services that provide intensive nonresidential treatment and rehabilitative mental healthcare; services that help mentally ill individuals develop and enhance psychiatric stability; services providing stability and support to prevent hospitalization; and transportation services to get to and from nonemergency medical service appointments.  Cuts to these or similar Medicaid programs will severely impact Minnesotans who rely on these services.

The withholding of federal funding will require—in particular if funding is delayed or denied for a protracted period, or if the withholdings occur quarterly, as has been threatened—the State to make cuts to Medicaid services.  *Id.*  The Legislature funds Medicaid based on the then-current state budget forecast and assumes it is fully reimbursed for those services as agreed upon between the federal government and the Minnesota Department of Human Services ("DHS").  Minge Decl., ¶¶ 2–3.  The State's loss of $243 million in fourth quarter Medicaid expenditures related to fourteen service areas that it

already made will have significant impacts on the state's budget and forecast.  *Id.* ¶ 3.  This amount represents 7.2% of the projected federal share that Minnesota receives each quarter and would require Minnesota Management and Budget and DHS to identify cuts to services absent a legislative appropriation that covers this shortfall.  *Id*.

While Dr. Oz has repeatedly claimed the State can use a "rainy day fund" to cover this loss in federal funds, that is simply not true.  *See* Deferral Press Conference at 12:00– 12:12.  Assuming he is referring to the budget reserve account found in Minnesota Statutes section 16A.152, the State may only use the budget reserve "when a negative budgetary balance is projected and when objective measures, such as reduced growth in total wages, retail sales, or employment reflect downturns in the state's economy."  Minge Decl., ¶ 4. None of those circumstances is presented by the Administrator's determination in CMS's February 25, 2026 letter to State Medicaid Director John Connolly.  *Id*.

## V.    THE PRESENT LAWSUIT.

Minnesota filed this lawsuit to protect the vulnerable people of Minnesota who rely on Medicaid for their health care, and to prevent the federal government from end-running the process to which Minnesota is entitled to challenge the Administration's erroneous belief that the State is not in compliance with Medicaid statutes and regulations.  It seeks a temporary restraining order or preliminary injunction on an expedited basis[5] to ensure

---

[5] Plaintiffs do not seek an *ex parte* temporary restraining order, and they do not object to Defendants responding before a hearing on the motion.  Plaintiffs do, however, ask that the Court hear this matter on an expedited basis due to the serious consequences of Defendants' actions.

Defendants follow the law before depriving the state of hundreds of millions, if not billions, of dollars in federal Medicaid funding.

## STANDARD OF REVIEW

In deciding whether to issue a preliminary injunction,[6] the Court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys. Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).[7]  While no factor is determinative, the probability of success is the most significant.  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).  Generally, courts require a movant to show it has a "fair chance of prevailing" on the merits of a claim.  *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  A movant "need not show that it has a greater than fifty per cent likelihood of success."  *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1017 (8th Cir. 2022).

---

[6] Minnesota seeks either expedited handling of its preliminary injunction motion or a temporary restraining order. *See* L.R. 7.1(d). "[T]he standard for analyzing a motion for a temporary restraining order is the same as a motion for a preliminary injunction," but the duration of the order is generally limited to 14 days. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (citing Fed. R. Civ. P. 65).

[7] The Administrative Procedure Act authorizes courts "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.  There is "substantial overlap" between the factors for a § 705 stay and a preliminary injunction.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).

# ARGUMENT

Through the Deferral, Defendants do what they could not in the compliance action: immediately withhold millions of dollars of Medicaid funding to Minnesota. But Defendants' attempt to end-run the procedural safeguards provided in the compliance action run afoul of the Constitution, the Administrative Procedure Act, and the deferral regulation itself. The Court should enjoin Defendants from enforcing this notice and order that they immediately distribute the $243 million CMS improperly deferred.

## I. THE STATE HAS A FAIR CHANCE OF PREVAILING IN THIS LAWSUIT.

The State's due process, APA, and Spending Clause claims all stem from the same problem: the law does not permit CMS to immediately withhold millions of federal Medicaid dollars, under the guise of a "deferral." The State has a fair chance of prevailing on any of these claims.

### A. Procedural Due Process Claim (Count I): CMS's Deferral Action End-Runs The Procedural Protections Provided To MDHS In The Compliance Action.

In January, CMS took the extraordinary action of finding the State of Minnesota in noncompliance with certain statutory and regulatory Medicaid requirements due, in large part, to the federal government's belief that Minnesota had not done enough to protect Medicaid funds from fraud, waste, and abuse. Brennaman Decl., Ex. 3. As part of this compliance action, CMS withheld $515 million, which CMS claimed to be "the federal share for one quarter's amount of the previous calendar year's annual total paid expenditures for the fourteen high-risk services." *Id.* at 5. CMS stated "[t]he withholding will end" when DHS "fully and satisfactorily" implements a corrective action plan that

addresses fraud, waste, and abuse in the fourteen high-risk service areas. *Id.* Because DHS initiated the administrative appeal process, none of the threatened funds can be withheld until the conclusion of the appeal process. 42 C.F.R. §§ 430.35(a), 430.104(a).

Evidently unsatisfied that Defendants had to wait to withhold hundreds of millions of dollars until after DHS had received due process, Defendants initiated the present deferral action to immediately target much of the same Medicaid funding that is at issue in the compliance matter. Indeed, of the $259 million that CMS withheld, over $243 million—that is, 94%—was due to CMS's focus on the same "fourteen high-risk Medicaid service areas identified as particularly vulnerable to fraud or abuse" that are at issue in the compliance case. Brennaman Decl., Ex. 6, at 2. And like the compliance matter, Dr. Oz conditioned lifting the deferral on Minnesota "propos[ing] and act[ing] on a comprehensive corrective action plan to solve the [fraud] problem," *see* Deferral Press Conference, at 11:37, despite such information being outside the scope of the type of information on which CMS is permitted to base a deferral. Defendants' decision to immediately defer $243 million dollars end-runs the procedures and process provided to Minnesota in the compliance action in violation of Minnesota's procedural due process rights.

To succeed on a procedural due process claim, a plaintiff must show that the government (1) deprived a party of a protected life, liberty, or property interest, and (2) failed to provide adequate procedural rights before impinging upon the protected interest. *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 817 (8th Cir. 2011). A liberty interest can arise from two sources: the Constitution or a federal statute. *See United States v. Johnson*, 703 F.3d 464, 469 (8th Cir. 2013).

Here, Minnesota has a protected liberty interest in the process it is provided in the compliance matter—process Minnesota receives *before* CMS withholds hundreds of millions of dollars.  *See* 42 C.F.R. § 430.35.   But by initiating the present Deferral that targets the same funding at issue in the compliance matter, Defendants have effectively deprived Minnesota of that process.

It is true that, under different circumstances, the federal government can defer Medicaid payments to the State for "a narrow item or class of items" that "do not, in some general sense, affect the working of the program or federal–state cooperation." *Massachusetts v. Departmental Grant Appeals Bd.*, 698 F.2d 22, 25 (1st Cir. 1983); *see also* 42 C.F.R. §§ 430.40, 430.42.   But when "refusal of FFP touches on matters of far-reaching importance, affecting the overall Medicaid program," courts have "treat[ed] the dispute as involving compliance" and not as a disallowance.[8] *Departmental Grant Appeals Bd.*, 698 F.2d at 27.   To determine whether a claim is a disallowance or functionally a compliance matter, courts look at: (1) whether the matter might have "fit comfortably" within the noncompliance statute, (2) whether the matter "is of such a character, by reason of its generality and importance, as to point towards inclusion under the compliance rather than the disallowance rubric," and (3) the government's chosen procedures and label, though that is not dispositive.  *Id.*

---

[8] If a State cannot substantiate a deferred claim, it results in a disallowance.  42 C.F.R. § 430.40(c)(5) ("The current Designee has 90 days, after all documentation is available in readily reviewable form, to determine the allowability of the claim."), (e)(1) ("The Administrator or current Designee gives the State written notice of his or her decision to pay or disallow a deferred claim.").

All three factors are met.  *First*, not only *could* this matter "fit comfortably" as part of the noncompliance statutory scheme, the issue of whether the State can correct the purported deficiencies identified by the federal government as part of a corrective action plan is precisely what is already at issue in the compliance matter.  *Second*, the amount of money at issue is so massive that its character screeches inclusion under the compliance matter.  As discussed above, this deferral amounts to a number that represents a complete quarterly federal defunding of four Medicaid services that serve over 160,000 Minnesotans. Connolly Decl., ¶ 18.  Dr. Oz even admitted this is a "massive action to defer funds to [Minnesota]."  Deferral Press Conference, at 9:50.  *Third*, while the government has chosen to label this matter as a deferral, Dr. Oz indicated that even if the State could show that every dollar of the deferred money was properly paid by the State, Minnesota would still not receive it until Minnesota "propose[s] and act[s] on a comprehensive corrective action plan to solve the [fraud] problem."  *Id.* at 11:37.  But coming into purported compliance with Medicaid regulations is the purpose of a compliance action, not a deferral.  *Compare* 42 C.F.R. §§ 430.35, 430.60, *with id.* §§ 430.40, 430.42; *see also* 42 C.F.R. § 430.35(a) ("Hearings [in a compliance action] are generally not called until a reasonable effort has been made to resolve the issues through conferences and discussions. These may be continued even if a date and place have been set for the hearing.").

By pursuing this enormous withholding of federal funds through a deferral, CMS is end-running the procedures the State is entitled to (and in fact, going through right now) and immediately taking away hundreds of millions of dollars meant to help the most

vulnerable of Minnesotans. The State is likely to succeed on the merits of its procedural due process claim and accordingly, the Court should enjoin CMS from deferring payment.[9]

**B.    APA Claims (Counts II and III):  The deferral notice does not comply with federal regulations because it is arbitrary, capricious, and contrary to law, and it is procedurally deficient.**

The Court need not even consider whether the State has a fair chance of prevailing on its APA claims because, as discussed, Defendants are depriving Minnesota of due process. The State nevertheless has a fair chance of prevailing on these claims because the Deferral is arbitrary, capricious, and contrary to law, and it is procedurally deficient.

### 1.    The Deferral notice is a final agency action.

Two conditions must be established for an agency action to be final. First, "the action must mark the consummation of the agency's decision-making process and not be merely tentative or interlocutory in nature." *Union Pac. R.R. Co. v. U.S. R.R. Ret. Bd.*, 162 F.4th 908, 917 (8th Cir. 2025). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). To meet this second condition, "the agency action must inflict some legal injury upon the party seeking judicial review, either compelling affirmative action or prohibiting otherwise lawful action." *Id.*

---

[9] Minnesota also has a protected property interest in the $243 million, and it was deprived of that interest without due process when Defendants immediately withheld that funding without a substantiated deferral pursuant to 42 C.F.R. § 430.40. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").

Both conditions are met here.  First, the Deferral is not "merely tentative or interlocutory in nature."  Rather, it is a final decision by the agency that it will use the deferral process to immediately withhold $243 million in Medicaid money.  It "mark[s] the consummation of [CMS's] decision-making process" to deprive Minnesota of the procedures it is entitled to as part of a compliance action before money is withheld.  *E.g.*, *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 239–41 (D.D.C. 2014) (finding CMS's decision to bypass notice and comment rulemaking when modifying its methodology to calculate certain Medicaid payment limits was a final agency action).

Second, concrete legal consequences flow from CMS's decision.  Not only does it immediately withhold $243 million, it initiates a process where the burden is on the State to establish the allowability of a deferred claim, *compare* 42 C.F.R. § 430.40(b)(2) (stating the State must establish the allowability of a deferred claim), *with* 42 C.F.R. § 430.35(a)(2) (stating the Administrator must show the state is in "substantial noncompliance" with federal law).  It also deprives Minnesota of a discovery period and a contested hearing where the State can present evidence and examine witnesses.  *Compare* 42 C.F.R. § 430.40 (providing no right to discovery or a hearing following deferral), *with* 42 C.F.R. § 430.86 (permitting discovery in compliance actions).  In short, CMS's decision to end-run the compliance matter by initiating this deferral action results in significant legal consequences to Minnesota.  The notice is thus a final agency action and subject to the APA.[10]

---

[10] *See California v. U.S. Dep't of Agric.*, 800 F. Supp. 3d 1015, 1024 (N.D. Cal. 2025), *modified on other grounds by* No. 25-CV-06310-MMC, 2025 WL 2772872 (N.D. Cal. Sept. 29, 2025) (finding an agency's letter that demanded actions and stated that failure to (Footnote Continued on Next Page.)

## 2.    The Deferral is arbitrary, capricious, and contrary to law.

An agency action is arbitrary and capricious if it "has relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Missouri ex rel. Bailey v. U.S. Dep't of Interior, Bureau of Reclamation*, 73 F.4th 570, 576–77 (8th Cir. 2023). Although the scope of review is narrow, the agency must still provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

A deferral notice must, among other things, ask the State "to make available all documents and materials the regional office then believes are necessary to determine the

---

comply "may trigger noncompliance procedures" was a final agency decision because the statute that authorizes such a procedure provides the consequences that flow from failing to comply, despite the permissive language); *Texas v. Brooks-LaSure*, 680 F. Supp. 3d 791, 805 (E.D. Tex. 2023) (finding agency bulletin a final agency action because it had practical binding effect in that the affected parties were reasonably led to believe that failure to conform would bring adverse consequences); *Minnesota v. U.S. Dep't of Agriculture*, No. 25-cv-4767, 2026 WL 125180, at *9 n.6 (D. Minn. Jan. 16, 2026) (finding an agency's Recertification Letter to be a final agency action because it determined the State of Minnesota's obligations and the consequences flowing from its failure to comply with those obligations); *see also Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593–94 (9th Cir. 2008) (explaining that the second *Bennett* prong is not established where "rights and obligations remain unchanged."); *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C.Cir.2005) ("[I]f the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review.").

allowability of the claim." 42 C.F.R. § 430.40(b)(1)(ii). It is ultimately "the responsibility of the State to establish the allowability of a deferred claim." *Id.* § 430.40(b)(2). Thus, a state that receives a deferral notice can recoup the withheld federal dollars if it simply provides documentation that the claim at issue was properly paid.

The deferral notice instructs DHS to provide "all documents and materials that it believes support the allowability of the [claims at issue]." Brennaman Decl., Ex. 7, at 2. But DHS has already provided this documentation to CMS, and CMS concedes it has not reviewed it. *Supra* p. 16. A deferral in this context makes no sense, either logically or legally. CMS must have a need for additional information to defer funds. *See* 42 C.F.R. § 430.40(a)(1). CMS received data from DHS related to this issue on February 5, and CMS's own deferral letter admits its review is "ongoing" (i.e., it has the data but has not reviewed it yet). Brennaman Decl., Ex. 6. Logically, CMS cannot simultaneously claim that it needs more information (i.e., the deferral's stated basis) and that it has not reviewed what it already received. And legally, CMS cannot issue a deferral when it does not actually "need[] additional information." *See* 42 C.F.R. § 430.40(a)(1).

Why, then, would CMS issue a notice of deferral to obtain documents it already has in its possession but has admitted it has not had time to review? Because, as Dr. Oz and Vice President Vance boasted, this deferral has nothing to do with obtaining documentation to verify claims, as required by the regulations. Both officials made clear that the only way for Minnesota to recoup the withheld money is for Minnesota to act on a corrective action plan that meets their approval. *See* Deferral Press Conference, at 11:37 (Dr. Oz stating that the federal government will "only release [the money] after they propose and act on a

comprehensive corrective action plan"); *id.* at 0:53 (Vance stating, "We have decided to temporarily halt certain amounts of Medicaid funding that are going to the State of Minnesota in order to ensure that the State of Minnesota takes its obligations seriously."). Notably, Dr. Oz stated that if Minnesota does not do so, "the state will rack up a billion dollars of deferred payments this year." *Id.* at 11:46.

Nothing about this purported corrective action plan is mentioned in the deferral notice. *See generally* Brennaman Decl., Ex. 7. Nor should it be, as a deferral action is retrospective—CMS is looking at past claims and considering past documentation to determine whether the State should be reimbursed. 42 C.F.R. § 430.40(a), (b). But the statements by Dr. Oz and Vice President Vance show this Deferral is forward-looking; that is, that DHS's *future* actions will determine whether this money is ever released.[11] Remarkably, Dr. Oz stated that Minnesota could see additional quarter-billion-dollar deferrals if it does not submit the corrective action plan sought by the federal government. Deferral Press Conference, at 11:46. Such a statement makes no sense as part of a deferral because Defendants have no way of knowing whether any future claims submitted by Minnesota will have deficiencies that require CMS to defer payments. Instead, Dr. Oz's statements demonstrate he has pre-judged future quarterly reports without any factual basis, and that he has no intention of releasing funds based on documentation alone. Moreover, the State submitted its corrective action plan weeks ago and has received no indication from CMS that it is deficient, or any way in which it is deficient.

---

[11] Likewise, the compliance action is prospective. *See* 42 C.F.R. § 430.35.

Because Dr. Oz and the Vice President have laid bare that this deferral has nothing to do with substantiating particular claims with documentation, which is the required use of a deferral under federal regulations, CMS's action is arbitrary, capricious, and contrary to the regulatory scheme. *See Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (an agency is action is arbitrary and capricious when it is not "reasonable and reasonably explained"). CMS's action should be enjoined.[12]

### 2.    The Deferral is without observance of procedure required by law.

Not only is the Deferral arbitrary, capricious, and contrary to law, but it also fails to follow the required procedure outlined in the deferral regulation. *See* 5 U.S.C. § 706(2)(D) (stating that a reviewing court shall set aside an agency action that is "without observance of procedure required by law").

CMS's own regulations state that a notice of deferral must "identif[y] the type and amount of the deferred claim and specif[y] the reason for deferral."   42 C.F.R.

---

[12] For these same reasons, the State has a fair chance of prevailing on its ultra vires claim (Count V).  Courts recognize "a right to equitable relief where an agency's action was ultra vires—that is, unauthorized by any law and in violation of the rights of the individual." *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665, 665 (2025) (quotation omitted).  While an ultra vires claim is narrow, it nevertheless applies "when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute.  *Id.* at 681 (quotation omitted); *see Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958) (sustaining an ultra vires claim when an agency plainly attempted to exercise power that had been withheld under an Act).  Here, CMS's regulations state that CMS can defer federal financial participation dollars for particular claims, and a State can lift the deferral by providing sufficient documentation to the agency.  The regulation, however, prohibits CMS from conditioning the lifting of a deferral on anything other than the state providing documentation for the claim. *See* 42 C.F.R. § 430.40(a) (detailing the mandatory criteria for a deferral).  In other words, the regulation prohibits CMS from deferring federal dollars until DHS provides what CMS considers an adequate corrective action plan.

§ 430.40(b)(1)(i).  Here, the notice falls woefully short of providing the State with any information about the particular claims at issue or the specific reasons for the deferral.  As to the $243 million deferred, the only information the notice provided was that it was "attributable to CMS's ongoing review of state expenditures."  Brennaman Decl., Ex. 7, at 2.  It does not identify what those "state expenditures" are, nor does it provide any information about particular claims that could be at issue.  It only states that the "focus" was on "fourteen high-risk Medicaid service areas identified as particularly vulnerable to fraud or abuse," but it does not state that the deferred dollars *only* come from those programs.  While CMS breaks this $243 million down into two buckets, this breakdown provides equally vague information:

- CMS has identified $164,198,916 FFP for other practitioner, personal care, and home and community-based services lines that have questionable variances and raise concerns about allowability of the claimed expenditures.

- Additionally, CMS has identified $79,591,344 FFP claimed by the state associated with reimbursement claims submitted to the state by specific providers that we have identified as high-risk for fraud or aberrant billing practices based on historical billing and CMS data analytics.

*Id.*

The purpose of a deferral notice is to give the State sufficient information so it can "make available all the documents and materials" necessary for CMS to determine whether the claim is allowable, as it "is the responsibility of the State to establish the allowability of a deferred claim."  42 C.F.R. § 430.40(b)(1)(ii), (b)(2).  But nothing in this notice provides the State with specific information about the particular claims at issue:

- It does not indicate what the "questionable variances" are that cause CMS concern.

- It does not identify the "specific providers" CMS identified as "high-risk for fraud."

- It does not identify the "aberrant billing practices" that led to the deferral.

The State, thus, is left to guess at what documentation CMS would deem acceptable to resolve the unspecified issues that led to this deferral.[13]  The vagueness of the notice effectively blocks Minnesota from establishing whether the "claims" at issue are allowable, which not only undermines the entire purpose of CMS's own administrative process for deferrals, but also makes it legally impossible for the State to discharge its burden to establish allowability of the deferred claims.  *See* 42 C.F.R. § 430.40(b)(2).

The notice fails to provide the procedure required by section 430.40 because it does not identify the type and amount of the deferred claim or specify the reason for denial.  This serious deficiency is just one more reason why Defendants' unprecedented action should be enjoined.

### C.   Constitutional Claim (Count IV): CMS's deferral is coercive in violation of the Spending Clause.

It follows that Minnesota has a fair chance to succeed on its Spending Clause claim because the deferral of nearly a quarter billion dollars is meant to coerce Minnesota into Defendants' desired corrective action plan.

---

[13] While the State has been able to make an educated guess as to what CMS is seeking based on previous conversations with the agency, nothing in this notice provides sufficient specificity such that the State can determine whether CMS leadership will deem its documentation acceptable.

Congress may impose conditions on states' acceptance of federal funds, but "the conditions must be set out unambiguously."[14] *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (citations omitted). This is so States can "exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. "Respecting [the] limitation" that a "State voluntarily and knowingly accepts" conditions on federal funds is "critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) ("NFIB") (quoting *Pennhurst*, 451 U.S. at 17); *see also NFIB*, 567 U.S. at 581 (finding that the Medicaid provisions of the ACA were coercive and beyond "mild encouragement" allowed under the Spending Clause, and more akin to a "gun to the head").

---

[14] These Spending Clause limitations apply equally to the Executive Branch. *See, e.g.*, *City of Santa Clara v. Noem*, No. 25-CV-08330-WHO, 2025 WL 3251660, at *34 (N.D. Cal. Nov. 21, 2025); *California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316, 322–23 (D.R.I. 2025); *see also City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 (9th Cir. 2019) (holding that the Spending Clause "appl[ies] to agency-drawn conditions on grants to states and localities just as they do to conditions Congress directly places on grants[,]" and there is "no reason why the addition of an agency middleman either expands or contracts Congress's power to 'provide for the general Welfare'" (quoting U.S. Const. art. I, § 8, cl. 1)).

Here, Defendants have imposed post-acceptance or retroactive conditions on the State's Medicaid funding that were not contemplated when the State elected to participate in the Medicaid program.  Minnesota knew that if the federal government believed the State was out of compliance with the Medicaid Act, the federal government could withhold federal dollars following the administrative procedures in 42 U.S.C. ch. 1396c.  It also knew that if the federal government believed that particular claims lacked sufficient documentation or were not allowed, it could defer paying the State until it provided sufficient documentation to substantiate those claims.  42 C.F.R. § 430.40.  What it did not know, however, was that the federal government could immediately defer hundreds of millions of dollars every quarter, with no due process, based purely on Defendants' desire for Minnesota to create, and comply with, a corrective action plan that meets Defendants' ever-changing standards and regardless of DHS's relentless efforts to collaborate with CMS as encouraged by the regulations. *See* 42 C.F.R. §§ 430.35(a), 430.60(b). This is, plain and simple, a retroactive, post-acceptance condition. *See NFIB*, 567 U.S. at 580 ("When, for example, such conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes.").

Defendants have not been shy that the basis for this deferral is not to substantiate disputed claims but to coerce the State into enacting the policies that Dr. Oz and Vice President Vance deem acceptable. *See supra* pp. 13–14.  This retroactive, post-acceptance condition on continued federal funding for Minnesota violates the Spending Clause.

## II.    MINNESOTA WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION.

Irreparable harm exists "when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  Absent interim relief, Minnesota will suffer irreparable harm for a number of reasons.

As discussed above, this withholding is the latest in a pattern of "reckoning and retribution" against the state of Minnesota—political punishment meant to hurt a blue state. And the immediate loss of $243 million will hurt Minnesota and its citizens.  The immediate withholding of federal funding, especially if funding is delayed or denied for a protracted period or assuming Dr. Oz follows through with his promise to defer every quarter, would require the State to make cuts to Medicaid services, which would directly harm Minnesotans unable to receive necessary medical care. *See supra* p. 18.  The sheer amount of this deferral is so massive, it is equivalent to cutting off all federal funding for multiple Medicaid programs. *Id.*  Minnesota's Medicaid budget assumed federal matching funds, and absent a legislative appropriation to make up the shortfall, DHS will have to cut Medicaid programs. *Id.*  And contrary to Dr. Oz's claim, Minnesota does not have a "rainy day" fund it can use to make up the budget shortfall caused by the Deferral. *Id.*

## III.    THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT ENJOINING DEFENDANTS.

The third and fourth factors—harm to the opposing party and the public interest— merge when the government opposes preliminary relief. *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023).

As discussed above, the public faces imminent harm to their detriment from the loss of $243 million.  *See supra* pp. 18, 35.  Defendants face absolutely no hardship from an injunction.  As an initial matter, "there is substantial public interest in a federal agency following its own regulations . . . and in Americans trusting their own government to follow the rule of law."  *Shaik v. Noem*, No. 25-cv-1584, 2025 WL 1170447, at *3 (D. Minn. Apr. 22, 2025).  Further, Defendants are already pursuing a noncompliance action against Minnesota related to fraud; if they are successful, they could recover significantly more than they are deferring in the present matter.  Moreover, nothing prevents CMS from disallowing a claim in the future if, after it reviews the documentation DHS provided, it concludes that a claim was improperly paid.  *See* 42 C.F.R. § 430.42.  Further, CMS can withhold—as it has threatened to do—if it can prove noncompliance by Minnesota after discovery and a hearing, in its noncompliance action.  And finally, to the extent Defendants have legitimate concerns about fraud, they could simply respond to DHS's continued inquiries and requests for input on the State's corrective action plan.  But CMS has refused to provide any feedback to the State, despite the State's relentless efforts to collaborate with CMS.

## CONCLUSION

Minnesota asks this Court to enjoin Defendants from immediately deferring over $243 million in Medicaid from the State and prevent Defendants from end-running the procedures granted to Minnesota in the compliance action.

*(Signature on next page)*

Dated:  March 2, 2026

KEITH ELLISON
Attorney General
State of Minnesota

**s/ Scott Ikeda**
NATE BRENNAMAN
Assistant Attorney General
Atty. Reg. No. 0331776

SCOTT H. IKEDA
Assistant Attorney General
Atty. Reg. No. 0386771

BRANDON BOESE
Assistant Attorney General
Atty. Reg. No. 0396385

EMILY DOYLE
Assistant Attorney General
Atty. Reg. No. 0403550

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1112 (Voice)
(651) 282-5832 (Fax)
Nate.Brennaman@ag.state.mn.us
scott.ikeda@ag.state.mn.us
brandon.boese@ag.state.mn.us
Emily.Doyle@ag.state.mn.us

*Attorneys For Plaintiffs*