*State of Minnesota, et al.*
*v.*
*Dr. Mehmet Oz, et al.*
U.S. District Court No. 26-cv-1701

# DECLARATION OF
# NATE BRENNAMAN

# Exhibit 1



# STATE *of* MINNESOTA

---

Executive Department                                    Governor Tim Walz

## Executive Order 25-10

### Empowering State Agencies to Continue Combatting Fraud

I, Tim Walz, Governor of the State of Minnesota, by the authority vested in me by the Constitution and applicable statutes, issue the following executive order:

Fraud perpetrated against the State is unacceptable and my administration will not tolerate the abuse or misuse of public funds. The State oversees a number of public programs intended to help our most vulnerable populations, including people with disabilities, those with housing insecurity, and children who need medical assistance services. We have seen ever-evolving criminal schemes focused on taking advantage of Minnesota's programs and our culture of generosity. These criminal activities erode public trust and take from those who need the most support.

Fraud committed against the State has several root causes. The legislature created programs that prioritized access, but did not always include the safeguards necessary to protect programs against predatory or fraudulent providers. Similarly, the federal government approved programs that were novel but did not have the internal controls needed to prevent fraud. All the while, leaders in communities where fraud is prevalent stayed silent.

My administration has made numerous advances in response to these evolving scams and fraudulent schemes. We have created new inspector general positions, like at the Minnesota Department of Education. We have increased agency authority to stop fraudulent payments and allow for better data sharing. We have added new criminal statutes, like those barring kickbacks. And we created a new Financial Crimes and Fraud Section at the Bureau of Criminal Apprehension ("BCA"), creating a centralized fraud investigative unit operated by law enforcement.

More recently, I have installed new leadership at the Department of Human Services ("DHS") with an emphasis on fraud prevention, including Temporary Commissioner Shireen Gandhi and Inspector General James Clark. My administration continues to assist the Minnesota Attorney General's Office, the United States Attorney's Office, and other law enforcement and prosecution agencies to ensure that fraudsters are brought to justice. But there is more to do, and State agencies need the resources and clear direction to continue the fight against fraud.

Fraud is never acceptable and my administration will continue to bring everyone to the table to help solve this problem. As financial stewards of public funds, I am ordering agencies to show the public all the efforts they have taken and continue to take to stop and prevent fraud. I am ordering agencies to use their new data sharing abilities to create a Statewide Office of Inspector General ("OIG") Coordinating Council to collaborate and stop fraud across the enterprise. And, I'm ordering agencies to take an even harder look at programs and end the ones that pose too much risk.

We have always taken a zero-tolerance approach on this issue and will continue to root out those individuals who use the most vulnerable as a shield to enrich themselves. We must ensure that agencies have the ability to make necessary administrative changes to stop fraud, organize across the enterprise effectively to root out fraud, and have all possible tools to refer criminal behavior for future prosecution.

For these reasons, I order as follows:

1. DHS will, to the maximum extent allowed by law:

   a. Publish information about program integrity actions taken by the agency so that the public can know of the efforts to prevent fraud, waste, and abuse.

   b. Direct the DHS Inspector General to:

      i. Establish a proactive, data-driven post-payment review program for Medicaid providers and claims and deploy advanced analytics and risk-scoring models to identify high-risk providers, claims, and service patterns for targeted review.

      ii. Identify DHS programs that present a high risk of fraud, waste, and abuse and:

         1. Recommend programmatic changes, up to and including terminating high-risk programs. The recommendation to terminate a program shall include consideration of whether there are alternative services available to meet the needs of vulnerable Minnesotans;

         2. Implement a temporary licensing moratorium, both directly under Minnesota Statutes, section 245A.03, subdivision 7a, and by requesting that the Centers for Medicare & Medicaid Services ("CMS") allow DHS to implement moratoria; and

         3. Ensure that all providers in these programs have a unique identifier that will allow the agency to better track funds across agency programs.

   c. Subject providers who present identified risk factors to prepayment review.

   d. Immediately disenroll all Minnesota Health Care Program enrolled providers who have not billed Medicaid in the last 12 months.

   e. Submit a request for funds from any available state accounts to modernize systems to better prevent and detect fraud, waste, and abuse.

   f. Request any and all assistance from CMS and other federal partners to ensure that DHS' program integrity measures are in line with national program integrity standards.

   g. Hire an external consultant to assess DHS and make recommendations on reorganization to more effectively serve as the State's Medicaid agency. The consultant's review should focus on program integrity and anti-fraud efforts, including suggested policies, procedures, system changes, organizational structure

changes, staffing levels, and program integrity considerations that should be part of any state legislation that proposes to expand or create new covered Medicaid services. The consultant should also provide guidance how to best utilize partnerships with counties, Tribal Nations, and managed care organizations to minimize fraud and optimize efficient service delivery.

2. The Department of Public Safety ("DPS") will:

    a. Convene and lead a Statewide OIG Coordinating Council made up of the Superintendent of the BCA (or designee), representatives from offices of each agency's inspector general's office, representatives of the Financial Crimes and Fraud Section of the BCA, the Internal Controls and Accountability Unit at Minnesota Management and Budget ("MMB"), the Grants Management team at the Minnesota Department of Administration, and other agency representatives who bring expertise in program integrity, audit, or internal controls. The Statewide OIG Coordinating Council will:

        i. Meet monthly to use the new data sharing provisions set out in the recently adopted Minn. Laws 2025, Ch. 39, Art. 2, Sec. 16 to share investigative data and trends that could improve outcomes at other agencies;

        ii. Develop data sharing, investigative best practices, and program integrity review processes for all new publicly funded programs; and

        iii. Assist agencies in securing specialized audit, inspector, or other skillsets as needed.

    b. Enter into interagency agreements with state agencies that do not have an existing OIG to provide additional criminal investigative support as needed.

    c. Collaborate with the Minnesota Attorney General's Office to provide additional criminal investigative support for Medicaid programs upon request if resources are available.

3. MMB will:

    a. Coordinate an interagency workgroup to combat fraud through prevention, early identification, mitigation, culture and learning.

    b. Conduct a comprehensive review of existing state job classifications and create a job class family to establish a clear career pathway for state roles dedicated to program integrity, accountability, and fraud detection.

    c. Lead an enterprise agency work group to create job specific training and education standards for state employees whose jobs are dedicated to preventing fraud waste and abuse.

    d. Create required training for all state employees on the topic of ethical conduct, and preventing fraud, waste, and abuse.

4. Minnesota IT Services will assist DHS and other requesting agencies with technological support, including available financial support, to improve data analysis and fraud detection technological capabilities.

5.  All state agencies, meaning the departments and agencies listed in Minnesota Statutes, section 15.06, subdivision 1, in addition to the Office of Higher Education, Office of Cannabis Management, Direct Care and Treatment, and the Department of Military Affairs, will:

    a.  Gather, combine, and analyze data to identify, prevent, or eliminate the fraudulent use of State funds, resources, or programs.

    b.  Refer suspected fraud cases to the Department of Revenue for tax fraud investigation, in addition to referring all allegations of suspected fraud to the BCA and the Office of the Legislative Auditor.

This Executive Order is effective fifteen days after publication in the State Register and filing with the Secretary of State. It will remain in effect until rescinded by proper authority or until it expires in accordance with Minnesota Statutes 2024, section 4.035, subdivision 3.

A determination that any provision of this Executive Order is invalid will not affect the enforceability of any other provision of this Executive Order. Rather, the invalid provision will be modified to the extent necessary so that it is enforceable.

Signed on September 17, 2025.

**Tim Walz,** GOVERNOR

Filed According to Law:

**Steve Simon,** SECRETARY OF STATE

Filed September 17, 2025
Office of the Minnesota
Secretary of State
Steve Simon

4

*State of Minnesota, et al.*
*v.*
*Dr. Mehmet Oz, et al.*
U.S. District Court No. 26-cv-1701

# DECLARATION OF
# NATE BRENNAMAN

# Exhibit 2

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



December 5, 2025

John Connolly
Deputy Commissioner and State Medicaid Director
Minnesota Department of Human Services
540 Cedar Street
St. Paul, MN 55164-0983

Dear Mr. Connolly:

As has been widely reported—and as acknowledged by the State of Minnesota—there is significant and ongoing fraud within Minnesota's Medicaid program. Fraud investigations from the Centers for Medicare & Medicaid Services, Department of Health and Human Services Office of the Inspector General (OIG), Department of Justice (DOJ), Federal Bureau of Investigation (FBI), and other federal agencies have identified widespread fraud in Minnesota Medicaid, and repeated failures on the part of Minnesota to adequately address it. (See Appendix A for a sampling of cases and audit reports that demonstrate this repeated failure.)

Fraud cases have involved individuals or entities billing Minnesota for services never provided, or not provided at the level billed, and using complex international crime rings that exploit vulnerable populations for extreme financial gain. A recent FBI investigation, for example, identified a Somali national who allegedly recruited and employed numerous unqualified individuals to furnish autism services on behalf of a Medicaid provider she controlled and offered kickbacks to parents of Medicaid-enrolled children for allowing their children's identities to be used to commit fraud. This provider is alleged to have fraudulently billed $14 million in Medicaid claims for services purportedly, but not actually, furnished to clients by these individuals.[1]

The widespread fraud in Minnesota has not gone unnoticed, even within the state itself. During the 2025 legislative session, a bill was enacted that introduced new provisions to combat fraud, specifically focusing on autism services. The legislature also passed bills for new licensing requirements for autism service providers and to create a House Oversight Committee to hold hearings on fraud. Whistleblowers and state employees have long complained that Minnesota's

---

[1] District of Minnesota | First Defendant Charged in Autism Fraud Scheme | United States Department of Justice

executive branch is not taking fraud allegations seriously and not providing proper oversight of the Medicaid program.[2]

Minnesota's own Medicaid data showed incredible service utilization trends reflective of suspicious usage that would have been obvious to even casual observers. CMS' analysis of Minnesota Medicaid data shows, for example, that between 2023 and 2025 the number of adult companion service providers increased by 131% with a corresponding increase in Medicaid payments by 234%, all while the number of purported recipients only increased by 24%. In that same time period, total Medicaid payments for 13 of the 14 high-risk service types[3] increased from $2.8 billion to $3.6 billion.

In response to mounting public pressure involving fraud in other government services, Governor Walz recently suspended Medicaid payments and implemented a 90-day pre-payment review for all claims involving 14 Medicaid services that, by the state's own admission,[4] are recognized as targets of systemic fraud. On December 1, 2025, Minnesota also announced that it would be issuing a temporary licensing moratorium for licensed Home and Community-Based Services (HCBS), openly acknowledging that Minnesota licensors outpaced the needs of enrolled participants and were unable to "contribute to effective program integrity oversight."[5]

**Minnesota Must Take Additional Steps Now**

While Minnesota has taken steps in the right direction, they are insufficient to adequately address a problem that has been years in the making. Even the Minnesota State Auditor recognizes that you cannot audit your way out of fraud."[6] CMS agrees—widespread fraud requires widespread remediation. Accordingly, CMS strongly urges Minnesota to take the following actions, most of which have been addressed in a separate letter to Governor Walz:

1. **Meet with CMS to provide weekly updates on its progress in executing its action plan to address widespread fraud in the state.** Representatives from the CMS Center for Program Integrity and/or Center for Medicaid and CHIP Services will participate and are ready to provide appropriate technical assistance. Please contact Evan Godfrey (Evan.Godfrey@cms.hhs.gov) as soon as possible to schedule these meetings. CMS also plans to schedule a site visit with Minnesota program integrity leadership and staff in January 2026, by which time we expect to see that significant progress has been made.

---

[2] For example, *see* Chairman Comer Launches Investigation into Massive Fraud in Minnesota's Social Services System on Governor Walz's Watch
[3] These services include Housing Stabilization Services (Benefit discontinued on 11/1/25); Early Intensive Developmental Behavioral Intervention (Moratorium in place, effective 11/1/25); Integrated Community Supports Nonemergency Medical Transportation; Peer Recovery Services; Adult Rehabilitative Mental Health Services; Adult Day Services; Personal Care Assistance/Community First Services & Supports; Recuperative Care; Individualized Home Support; Adult Companion Services; Night Supervision; Assertive Community Treatment; Intensive Residential Treatment Services. 2024 payment data for recuperative care is unavailable.
[4] Governor Walz Orders Third-Party Audit of Medicaid Billing at DHS
[5] Minnesota Department of Human Services Memo (December 1, 2025)
[6] Minnesota fraud allegations: Department of Human Services halt payments to another program

During this visit, CMS may request access to state systems to conduct additional data analytics, and we expect Minnesota to take whatever steps are necessary to grant that access.

2. **Impose a six-month Medicaid enrollment moratorium for all high-risk providers.** Minnesota enacted a licensing moratorium on HCBS providers, which includes many of the 14 known high-risk service types. This action signals the state's recognition of serious concerns within this provider category but stops short of the necessary action and demands the next step: a moratorium on Medicaid enrollment for these same provider types to stop further harm to the program. CMS' provider enrollment team is ready to assist Minnesota with implementing this moratorium as soon as possible, including expediting the required approval process. The federal Medicaid moratorium regulation can be found at 42 CFR § 455.470.

3. **Develop a corrective action plan that assures CMS and the American people that Minnesota is going to address this rampant fraud.** Efforts by legislators, complaints filed by whistleblowers, and monumental spikes in payments were largely ignored by the state. A thorough corrective action plan, submitted for CMS' review and approval, that the state then faithfully implements is critical for the legitimacy of Minnesota's Medicaid program. CMS will meet with the state on at least a weekly basis to monitor progress and provide technical assistance.

4. **Enact an off-cycle revalidation effort for all provider enrollments currently in place.** Although not addressed in the letter sent to Governor Walz, based on Minnesota's identification of fraud in high-risk service areas and the number of providers arrested and convicted, CMS strongly recommends that enrollments of providers in all 14 high-risk services be revalidated as soon as practicable to ensure bad actors do not remain in the Medicaid program. This may include redesignations of these provider types at the "high" risk level if they are not already so designated. The federal Medicaid revalidation regulation at 42 CFR § 455.414 mandates revalidation *at least* every five years, but states are permitted to conduct revalidations on a more frequent cycle or off-cycle as needed. *See also* 42 CFR 455.452.

If Minnesota refuses to take these meaningful steps and/or make adequate progress to address fraud in its Medicaid program, **CMS may use its authority to withhold future Federal Financial Participation (FFP), in whole or in part**, under section 1904 of the Social Security Act.

Please provide a response to this letter by December 22, 2025, including Minnesota's timeline for the start and end of the above actions, to Evan Godfrey (Evan.Godfrey@cms.hhs.gov).

Sincerely,

Kim Brandt
Chief Operating Officer and Deputy Administrator, CMS
Acting Director, Center for Program Integrity

Daniel Brillman
Deputy Administrator, CMS
Director, Center for Medicaid and CHIP Services

**Appendix A: Examples Demonstrating Inadequacy of Minnesota Program Integrity Oversight**

- Centers for Medicare & Medicaid Services, *Minnesota Personal Care Services Focused Program Integrity Review* (January 2019).

- Department of Health and Human Services Office of Inspector General, *Minnesota Did Not Always Comply With Federal and State Requirements for Claims Submitted for the Nonemergency Medical Transportation Program* (September 15, 2017).

- Department of Health and Human Services Office of Inspector General, *Minnesota Did Not Comply With Federal Waiver and State Requirements for 18 of 20 Family Adult Foster Care Homes Reviewed* (October 31, 2017).

- Department of Health and Human Services Office of Inspector General, *Minnesota Did Not Comply With Federal Waiver and State Requirements for All 20 Adult Day Care Centers Reviewed* (May 30, 2018).

- Department of Health and Human Services Office of Inspector General, *Minnesota Medicaid Fraud Control Unit: 2022 Inspection* (September 4, 2023).

- KSTP, *Feds Auditing Minnesota DHS Over Medicaid Fraud* (September 3, 2025).

- Minnesota Attorney General, *Abdifatah Yusuf found guilty of bilking Medicaid program out of over $7.2 million* (August 12, 2025).

- Minnesota Attorney General, *Two plead guilty to Medicaid fraud in case Attorney General Ellison investigated jointly with U.S. Attorney's Office* (October 22, 2025).

- Office of Governor Tim Walz & Lt. Governor Peggy Flanagan, *Governor Walz Orders Third-Party Audit of Medicaid Billing at DHS* (October 29, 2025).

- Office of the Legislative Auditor, *DHS Oversight of Personal Care Assistance* (March 16, 2020).

- Office of the Legislative Auditor, *Home- and Community-Based Services: Financial Oversight* (February 21, 2017).

- United States Department of Justice, *Defendants Charged in First Wave of Housing Stabilization Fraud Cases* (September 18, 2025).

- United States Department of Justice, *First Defendant Charged in Autism Fraud Scheme* (September 24, 2025).

- United States Department of Justice, *Three Indicted In Medicaid Fraud Conspiracy Scheme* (December 19, 2024).

*State of Minnesota, et al.*
*v.*
*Dr. Mehmet Oz, et al.*
U.S. District Court No.
26-cv-1701

# DECLARATION OF
# NATE BRENNAMAN

# Exhibit 3

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

**Administrator**
Washington, DC  20201

January 6, 2026

The Honorable Tim Walz
Governor of Minnesota
130 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MD  55155G

Dear Governor Walz:

This letter provides notice and an opportunity for a hearing on a finding by the Centers for Medicare & Medicaid Services (CMS) of significant noncompliance with applicable statutory and regulatory requirements in the operation of the Minnesota Medicaid program, because the Minnesota Medicaid agency fails to adequately identify, prevent, and address fraud in its Medicaid program.

As described further in this letter, federal law and regulation require states to maintain effective administrative controls, conduct audits, cooperate with federal integrity efforts, enforce accountability, and protect Medicaid funds from fraud, waste, and abuse (FWA).  As has been widely reported—and acknowledged by the State of Minnesota—there is significant and ongoing fraud within Minnesota's Medicaid program. Investigations by the CMS, the Department of Health and Human Services Office of Inspector General (HHS OIG), the Department of Justice (DOJ), the Federal Bureau of Investigation (FBI), and other federal partners have identified widespread FWA in Minnesota's Medicaid program and repeated failures by the State to adequately address it.

These investigations have revealed schemes involving billing for services not rendered, services billed at levels not supported by documentation, and exploitation of vulnerable Medicaid beneficiaries for financial gain. Federal law enforcement has identified complex fraud schemes involving networks of providers operating across multiple high-risk service categories, including services delivered through Minnesota's home and community-based services system.

CMS has been engaged in numerous on-site and virtual discussions with state agency staff to discuss the known fraud schemes and severe lack of state oversight mechanisms in place to meet minimum oversight requirements. Specifically, in December 2025, CMS met onsite with state agency staff and law enforcement to see firsthand the historical deficiencies in the state's ability to proactively identify potential Medicaid FWA.  The lack of processes to receive reports and compile data on allegations of FWA demonstrates that the state is not in compliance with section 1902(a)(64) of the Social Security Act (the Act). States are required to ensure their state plan provides a mechanism to receive reports from beneficiaries and others and compile data concerning alleged instances of waste, fraud, and abuse relating to the operation of the Medicaid Act. In addition, pursuant to 42 CFR 455, Subpart A, States are required to implement methods for identifying, investigating, and referring suspected Medicaid fraud. These methods must include a pathway to receive complaints of Medicaid fraud or abuse from any source and methods for identifying any questionable practices. This information and related data sources must be used to pursue robust preliminary and full investigations, as appropriate, as well as refer cases to law enforcement, if applicable. These regulatory authorities

reflect one of the core pillars of state Medicaid oversight that CMS expects every state to have in place effectively. We have raised these issues to the state and as we discuss below, the state has been unable to resolve it's inability to maintain compliance, resulting in its inability to identify or prevent widespread fraud, waste and abuse of the program.

Pursuant to section 1904 of the Social Security Act and 42 CFR 430.35, CMS is providing the Minnesota Medicaid agency with an opportunity for a hearing on these findings of noncompliance with statutory and regulatory requirements. If these findings are upheld or unchallenged following this opportunity for a hearing, a portion of federal financial participation (FFP), as specified in more detail below, will be withheld until CMS makes a finding that the State has come into compliance with the statute and regulations.

The factual details of the findings, the withholding, how the Minnesota Medicaid agency can request a hearing on the findings, and the steps Minnesota can take to avoid sanctions by coming into compliance are described below.

**Factual Findings**

CMS's concerns are not limited to isolated incidents. Minnesota has historically had significant deficiencies in proactively identifying suspected Medicaid FWA, primarily through limitations in data analytics and monitoring.  These limitations have become prolific in many areas of the state's Medicaid program and are well documented in CMS and other oversight agency audit reports. For example, CMS conducted an audit of the State's Personal Care Services program in 2019, which resulted in numerous findings and recommendations that reflect the State's deficiencies in basic oversight efforts.[1] The State's own Office of the Legislative Auditor released a report in 2021 about the deficiencies in the PCS program.[2] In addition, the HHS OIG documented the state's failure to effectively oversee its Nonemergent Medical Transportation (NEMT) program in a 2017 report.[3]

Recent investigations have focused on fourteen high-risk Medicaid services that the State itself has identified as particularly vulnerable to fraud (linked here: https://mn.gov/dhs/program-integrity/). According to CMS analysis of Minnesota Medicaid data, these fourteen programs consume $3.75 billion in federal and state taxpayer resources.  CMS analysis of Minnesota Medicaid data shows extraordinary growth in provider enrollment and payments for several of these services that is inconsistent with beneficiary growth and service utilization trends. Despite warning signs that have been evident for years, the State has not implemented sufficient safeguards to prevent ongoing improper payments.

**Applicable Statutory and Regulatory Provisions**

Pursuant to § 1902(a)(64) of the Act, States are required to ensure their state plan provides a mechanism to receive reports from beneficiaries and others and compile data concerning alleged instances of waste, fraud, and abuse relating to the operation of the Medicaid Act.   In addition, pursuant to 42 CFR 455, Subpart A, State are required to implement methods for identifying,

---

[1] https://www.cms.gov/medicare-medicaid-coordination/fraud-prevention/fraudabuseforprofs/downloads/mnfy18.pdf
[2] https://www.auditor.leg.state.mn.us/ped/updates/2021/dhspca.pdf
[3] https://oig.hhs.gov/reports/all/2017/minnesota-did-not-always-comply-with-federal-and-state-requirements-for-claims-submitted-for-the-nonemergency-medical-transportation-program/

investigating, and referring suspected Medicaid fraud. These methods must include a pathway to receive complaints of Medicaid fraud or abuse from any source and methods for identifying any questionable practices. This information and related data sources must be used to pursue robust preliminary and full investigations, as appropriate, as well as refer cases to law enforcement, if applicable.

Prior CMS oversight work has identified consistent non-compliance with the State's ability to proactively identify suspected Medicaid FWA, primarily through limitations in data analytics and monitoring. It should also be mentioned that Minnesota's submission of its quarterly expenditure reports through the Form CMS-64, includes a certification that the state is operating under the authority of its approved Medicaid state plan.

**Discussions with the State Medicaid Agency**

Beginning in July 2024, CMS began working with the State to address concerns of potential fraud in the housing stabilization program (HSS) through Unified Program Integrity Contractor (UPIC) audits. In April 2025, CMS and its UPIC presented the State with preliminary findings from the 3 HSS providers for input about payment policies and state exceptions to rules. Shortly after, in June 2025, the State requested the audits be transferred to the State for investigation. In August, October, and November 2025, CMS continued discussions with the state to address issues with closing the HSS program, reviewing provider enrollment actions, and redesigning the State's program integrity operations, among other issues. On December 5, 2025, CMS formally notified the Minnesota Medicaid Director of these concerns and directed the State to submit a comprehensive corrective action plan (CAP) by December 31, 2025. Finally, as noted previously, in December 2025, CMS met onsite with state agency staff and law enforcement to see firsthand the historical deficiencies in the state's ability to proactively identify potential Medicaid FWA.

While the State submitted a document labeled as a CAP to CMS on December 31, 2025, CMS has determined that it is deficient. The plan relies heavily on temporary or future-contingent measures, lacks enforceable timelines and performance metrics, acknowledges current noncompliance with key federal requirements, and provides limited assurance of accountability for past misconduct.

Given the widespread concerns that these fraudulent activities were undertaken by individuals with ties outside of the U.S. and that some of the funds were then transferred outside of the U.S., CMS sees nothing in the CAP that would result in the State being able to understand ownership or corporate structure of providers and how the State will work with law enforcement to assure that no Medicaid funds are used to support criminal international entities.

The CAP largely emphasizes prospective controls while providing limited assurance of meaningful accountability for past misconduct. Although the State references a forthcoming historical claims review, it does not commit to specific enforcement actions, recovery targets, referral thresholds, or timelines for resolving identified overpayments or fraud. Absent clear commitments to corrective financial remedies and sanctions, the CAP does not adequately protect the fiscal integrity of the Medicaid program. The CAP also fails to adequately address how claim editing will be applied, such as whether those edits will deny payments or whether the data will identify claims with attributes appropriate for additional scrutiny, such as outlier billers, utilization trends in high-risk services, and other appropriate flags. The CAP should also include how artificial intelligence and other modern

automated methods will be used to address the rampant fraud in the program, and how performance of these methods will be assessed.

Additionally, Minnesota's draft Program Integrity Playbook identifies additional vulnerabilities and gaps in its oversight operations that are not addressed in the CAP. CMS expects Minnesota to also address the outstanding issues in its updated CAP. For example:

- **Prior Authorization Program:** Please provide additional details on Minnesota's assessment of its prior authorization program and enhancements that are needed.
- **Provider Training and Education:** Please specify what enhancements or changes Minnesota proposes to make its provider training and education efforts more effective, such as pre-enrollment training; post-enrollment training; billing and documentation training; fraud, waste, and abuse training; and compliance and legal obligations training, among any others identified by the state.
- **DHS Employee Training and Education:** Please specify what enhancements or changes Minnesota proposes to make to its DHS employee training and education efforts to identify, evaluate, and mitigate fraud, waste, and abuse in the state's Medicaid program.
- **Surveillance and Utilization Review (SURS):** Minnesota stated in its draft Program Integrity Playbook that is implementing a formal SURS system. Please provide additional information the status of the SURS system, its capabilities, and how it will feed into the state's broader program integrity efforts and lead generating activities.
  **Managed Care Oversight:** Please include information as to how the state plans to enhance oversight of its managed care plans (MCPs). This includes relevant state-MCP contract language (including any barriers within existing contract language that need to be addressed), the state's ability to conduct data analytics on managed care claims and spending, processes for and evaluations of referring potential fraud from the MCP to the state/law enforcement (including implementation of payment suspensions), and recovery of identified overpayments, among any other issues identified by the state.

**Focused Financial Reviews of Expenditures on the CMS-64**

Given the severity and persistence of these deficiencies, CMS must take additional steps to protect the integrity of the Medicaid program and federal taxpayer dollars. Pursuant to section 1903 of the Social Security Act and implementing regulations in 42 CFR 430 Subpart C, CMS has the authority to conduct reviews of state expenditures reported on the quarter Form CMS-64  Accordingly, CMS intends to immediately initiate a focused CMS-64 review of all fourteen high-risk services self-identified by the state starting with the most recently certified CMS-64 (Quarter Four of Federal Fiscal Year 2025). As necessary, CMS intends to issue deferral or disallowance of any FFP claimed by the state that does not meet applicable federal requirements.

**Determination of Non-Compliance and FFP Withholding**

The CMS has concluded that the Minnesota Medicaid agency is operating its program in substantial noncompliance with federal requirements described in sections 1902(a)(64) of the Act, generally requiring the State to ensure sufficient controls to prevent, detect, and address fraud, waste, and abuse.

Subject to the state's opportunity for a hearing, CMS will withhold a portion of FFP from the Minnesota Medicaid quarterly claim of expenditures on the Form CMS-64 until such time as the Minnesota Medicaid agency is, and continues to be, in compliance with the federal requirements. The quarterly withholding will be calculated based on the federal share for one quarter's amount of the previous calendar year's annual total paid expenditures for the fourteen high-risk services, estimated as $515,154,947.56, or an alternative substantiated amount per quarter based on evidence provided by the state to the Administrator or his designee of an accurate amount of fraudulent expenditures. This amount may increase based on additional findings of fraud or insufficient progress towards mitigating fraud—until Minnesota demonstrates full and sustained compliance with federal Medicaid requirements. The withholding will end when the Minnesota Medicaid agency fully and satisfactorily implements a comprehensive CAP that addresses FWA in the 14 high-risk service areas to bring the program into compliance with the federal requirements.

**Opportunity to Request a Hearing**

The State has 10 days from the date of this letter to request a hearing. If a request for hearing is submitted timely, the hearing will be convened by the designated hearing officer below, 30 days after the date of the Federal Register notice, at the CMS Regional Office in Chicago, Illinois, in accordance with the procedures set forth in federal regulations at 42 CFR part 430, subpart D. The Hearing Officer also should be notified if the Minnesota Medicaid agency requests a hearing but cannot meet the timeframe expressed in this notice. The Hearing Officer designated for this matter is:

Ben Cohen
Centers for Medicare & Medicaid Services
7111 Security Blvd, Suite B1-15-15
Baltimore, MD, 21244

At issue in any such hearing will be:

a. Whether the evidence establishes that Minnesota has failed to substantially comply with the federal requirements described in section 1902(a)(64) of the Social Security Act and the federal regulations implementing those provisions.

b. Whether Minnesota's failure to substantially comply with those federal requirements supports the partial withholding of FFP imposed by CMS.

If the Minnesota Medicaid agency plans to come into compliance with the federal requirements, the Minnesota Medicaid agency should submit, by January 30, 2026 a revised comprehensive CAP including the timeframe for implementation and any performance or quality metrics the state will use to evaluate effectiveness of the actions.

CMS will continue to exercise strong oversight of State actions to address these issues. CMS will review and negotiate the terms of an acceptable corrective action plan and will monitor progress closely. Our goal is to have the Minnesota Medicaid agency come into compliance, and CMS continues to be available to provide technical assistance to help achieve this outcome.

Should you not request a hearing within 5 days of this letter, the withholding of funds will be imposed, contingent on the State's progress toward compliance as discussed above.

Please provide any response or questions regarding this matter to Kimberly.Brandt@cms.hhs.gov.

Sincerely,

Mehmet Oz, M.D.
Administrator
Centers for Medicare & Medicaid Services

Cc:     John Connolly
        Minnesota Medicaid Director

        Dan Brillman
        Director, Center for Medicaid & CHIP Services, Centers for Medicare & Medicaid Services

        Kimberly Brandt
        Acting Director, Center for Program Integrity, Centers for Medicare & Medicaid Services

*State of Minnesota, et al.*
*v.*
*Dr. Mehmet Oz, et al.*
U.S. District Court No.
26-cv-1701

# DECLARATION OF
# NATE BRENNAMAN

# Exhibit 4



**DEPARTMENT OF HUMAN SERVICES**

**Minnesota Department of Human Services**
**Elmer L. Andersen Building**
**John Connolly, Ph.D., M.S.Ed.**
**Deputy Commissioner and Minnesota Medicaid Director**
**Temporary Commissioner Shireen Gandhi**
**Post Office Box 64998**
**St. Paul, Minnesota 55164-0998**


January 9, 2026

Dr. Mehmet Oz, M.D.
Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

**Re:**    **Appeal from January 6, 2026, Notice of Noncompliance**

Dear Administrator Oz:

I write in response to your January 6, 2026, letter and notice of noncompliance ("Notice"), attached as Exhibit 1. The Minnesota Department of Human Services ("DHS" or "State") disagrees with, and hereby appeals, your decision to withhold needed Medicaid dollars from Minnesota. DHS, on behalf of the State, requests that a hearing be scheduled for the issues raised in your Notice, pursuant to 42 CFR, Part 430, Subpart D. Your stated bases for withholding Medicaid funds from Minnesota, and the threatened amount of withholding, are legally baseless.

As an initial matter, the Notice is legally deficient. You do not provide a hearing date and time, as required by the federal regulations. 42 C.F.R. § 430.70. You also have arbitrarily demanded a response within 5 days, which is not a requirement of the State under Subpart D. *See* 42 CFR, Part 430, Subpart D.

CMS has also not identified facts or law that either warrant the threatened withholding or provide notice sufficient for the State to prepare for hearing. Indeed, CMS admits it has conducted no recent audit to support its Notice but instead relies on off-topic and out-of-date 2017-2021 reports that are of little relevance to the issues currently facing the state. To the extent that CMS appears to be taking aim at the Minnesota state plan itself, it should be noted that CMS *approved* that plan. Minnesota contests that the plan is deficient, but to the extent it does not contain certain legally required provisions pursuant to 42 U.S.C. § 1396a(64) and 42 C.F.R.455, Subpart A, it was incumbent upon CMS to bring such issues to the State's attention before approving the plan.

Moreover, there are no facts to support the withholding of *all* federal dollars for fourteen separate benefits. Even if plan noncompliance is proven at hearing, CMS's withholding should be limited to the

Dr. Mehmet Oz
January 9, 2026
Page 2

scope of noncompliance; there is no basis to eliminate funding to the benefits entirely. Also, even if CMS's intent is to eliminate all funding for these benefits, CMS has miscalculated, and overstated, the federal quarterly share.

In any event, DHS looks forward to the opportunity to prove, at hearing, that its state plan meets the requirements of 42 U.S.C. § 1396a(64) and 42 C.F.R.455, Subpart A, and that no federal withholding of Medicaid dollars to Minnesota is warranted.

In fact, since October 2024, DHS has been focused on rooting out fraud, strengthening program integrity, and protecting our public programs from bad actors. These efforts have included:

- beginning in October 2024, the implementation of a comprehensive on-site audit process for autism service providers, prompting an aggressive Early Intensive Developmental and Behavioral Intervention ("EIDBI") program integrity legislative package and additional anti-fraud requests to shift oversight from a tip-based investigative model to a proactive model based on data analytics;
- in early 2025, designating EIDBI and Housing Stabilization Services ("HSS") as high-risk to provide additional program integrity tools;
- on August 1, 2025, requesting CMS's assistance in taking the unprecedented step of terminating the HSS benefit to protect the fiscal integrity of the State's Medicaid program, leading to CMS's approval to shutter the HSS benefit at the end of October 2025;
- in September 2025, accelerating and expanding our efforts to combat fraud by executing a wide range of anti-fraud directives contained in Governor Walz's Executive Order EO 25-10;
- as discussed in DHS's October 27, 2025, correspondence to CMS, identifying providers of 14 total service types as high-risk based on programmatic vulnerabilities, investigations, and analysis by DHS, and initiating enhanced prepayment review for all fee-for-service claims involving these services, a 24-month licensing moratorium for Home and Community Based Services providers, an additional licensing moratorium for Adult Day Services, and a stop in enrollment of new autism service providers; and
- acting to further safeguard against fraudulent billing by disenrolling inactive health care providers, with over 800 such providers disenrolled in October 2025 alone and disenrolling another roughly 4,300 managed care organization providers in January 2026 that were out-of-network and out-of-state.

DHS would have preferred to work as a partner with CMS to address the recent challenges that have been identified in Minnesota's Medicaid program. See 42 C.F.R. § 430.35(a) ("Hearings under Subpart D are generally not called until a reasonable effort has been made to resolve the issues through conferences and discussions."). Indeed, the State believed that CMS's recent visit to Minnesota was done in good faith to "participate and…provide appropriate [] assistance," as stated in CMS's December 5, 2025, letter, and in accord with our communications and partnership to date.

Consistent with our historical partnership, DHS engaged in good faith and in close communication with CMS staff throughout these efforts. You have made it clear now, however, that the purpose of CMS's recent visit was instead for CMS to "see firsthand [the State's alleged] deficiencies…" to attempt to

Dr. Mehmet Oz
January 9, 2026
Page 2

bolster your case for withholding.[1] *See* Notice, p. 3. These adversarial actions run contrary to the structure of the Medicaid program. As the United States Supreme Court has said, "Medicaid is a joint state-federal funding program for medical assistance in which the Federal Government approves a state plan for the funding of medical services for the needy and then subsidizes a significant portion of the financial obligations the State has agreed to assume." *Alexander v. Choate*, 469 U.S. 287, 289 n. 1 (1985). Instead of being a reliable partner to Minnesota in the joint Medicaid enterprise, it is regrettable that the federal administration has chosen to weaponize the Medicaid program against the State of Minnesota for political purposes.

Sincerely,

John M. Connolly, Ph.D., M.S.Ed.
Deputy Commissioner and Minnesota Medicaid Director

Cc: Ben Cohen, Designated Hearing Officer

---

[1] CMS is also engaging in political gamesmanship with respect to the Corrective Action Plan ("CAP") that it requested of DHS. As you are surely aware, DHS worked in close consultation with CMS on the CAP during December to ensure it would address all of CMS's concerns, only for you to proclaim the CAP "deficient" for not containing information never requested of, or discussed with, DHS.

# EXHIBIT 1

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC  20201

January 6, 2026

The Honorable Tim Walz
Governor of Minnesota
130 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MD  55155G

Dear Governor Walz:

This letter provides notice and an opportunity for a hearing on a finding by the Centers for Medicare & Medicaid Services (CMS) of significant noncompliance with applicable statutory and regulatory requirements in the operation of the Minnesota Medicaid program, because the Minnesota Medicaid agency fails to adequately identify, prevent, and address fraud in its Medicaid program.

As described further in this letter, federal law and regulation require states to maintain effective administrative controls, conduct audits, cooperate with federal integrity efforts, enforce accountability, and protect Medicaid funds from fraud, waste, and abuse (FWA).  As has been widely reported—and acknowledged by the State of Minnesota—there is significant and ongoing fraud within Minnesota's Medicaid program. Investigations by the CMS, the Department of Health and Human Services Office of Inspector General (HHS OIG), the Department of Justice (DOJ), the Federal Bureau of Investigation (FBI), and other federal partners have identified widespread FWA in Minnesota's Medicaid program and repeated failures by the State to adequately address it.

These investigations have revealed schemes involving billing for services not rendered, services billed at levels not supported by documentation, and exploitation of vulnerable Medicaid beneficiaries for financial gain. Federal law enforcement has identified complex fraud schemes involving networks of providers operating across multiple high-risk service categories, including services delivered through Minnesota's home and community-based services system.

CMS has been engaged in numerous on-site and virtual discussions with state agency staff to discuss the known fraud schemes and severe lack of state oversight mechanisms in place to meet minimum oversight requirements. Specifically, in December 2025, CMS met onsite with state agency staff and law enforcement to see firsthand the historical deficiencies in the state's ability to proactively identify potential Medicaid FWA.  The lack of processes to receive reports and compile data on allegations of FWA demonstrates that the state is not in compliance with section 1902(a)(64) of the Social Security Act (the Act). States are required to ensure their state plan provides a mechanism to receive reports from beneficiaries and others and compile data concerning alleged instances of waste, fraud, and abuse relating to the operation of the Medicaid Act. In addition, pursuant to 42 CFR 455, Subpart A, States are required to implement methods for identifying, investigating, and referring suspected Medicaid fraud. These methods must include a pathway to receive complaints of Medicaid fraud or abuse from any source and methods for identifying any questionable practices. This information and related data sources must be used to pursue robust preliminary and full investigations, as appropriate, as well as refer cases to law enforcement, if applicable. These regulatory authorities

reflect one of the core pillars of state Medicaid oversight that CMS expects every state to have in place effectively. We have raised these issues to the state and as we discuss below, the state has been unable to resolve it's inability to maintain compliance, resulting in its inability to identify or prevent widespread fraud, waste and abuse of the program.

Pursuant to section 1904 of the Social Security Act and 42 CFR 430.35, CMS is providing the Minnesota Medicaid agency with an opportunity for a hearing on these findings of noncompliance with statutory and regulatory requirements. If these findings are upheld or unchallenged following this opportunity for a hearing, a portion of federal financial participation (FFP), as specified in more detail below, will be withheld until CMS makes a finding that the State has come into compliance with the statute and regulations.

The factual details of the findings, the withholding, how the Minnesota Medicaid agency can request a hearing on the findings, and the steps Minnesota can take to avoid sanctions by coming into compliance are described below.

**Factual Findings**

CMS's concerns are not limited to isolated incidents. Minnesota has historically had significant deficiencies in proactively identifying suspected Medicaid FWA, primarily through limitations in data analytics and monitoring.  These limitations have become prolific in many areas of the state's Medicaid program and are well documented in CMS and other oversight agency audit reports. For example, CMS conducted an audit of the State's Personal Care Services program in 2019, which resulted in numerous findings and recommendations that reflect the State's deficiencies in basic oversight efforts.[1] The State's own Office of the Legislative Auditor released a report in 2021 about the deficiencies in the PCS program.[2] In addition, the HHS OIG documented the state's failure to effectively oversee its Nonemergent Medical Transportation (NEMT) program in a 2017 report.[3]

Recent investigations have focused on fourteen high-risk Medicaid services that the State itself has identified as particularly vulnerable to fraud (linked here: https://mn.gov/dhs/program-integrity/). According to CMS analysis of Minnesota Medicaid data, these fourteen programs consume $3.75 billion in federal and state taxpayer resources.  CMS analysis of Minnesota Medicaid data shows extraordinary growth in provider enrollment and payments for several of these services that is inconsistent with beneficiary growth and service utilization trends. Despite warning signs that have been evident for years, the State has not implemented sufficient safeguards to prevent ongoing improper payments.

**Applicable Statutory and Regulatory Provisions**

Pursuant to § 1902(a)(64) of the Act, States are required to ensure their state plan provides a mechanism to receive reports from beneficiaries and others and compile data concerning alleged instances of waste, fraud, and abuse relating to the operation of the Medicaid Act.  In addition, pursuant to 42 CFR 455, Subpart A, State are required to implement methods for identifying,

---

[1] https://www.cms.gov/medicare-medicaid-coordination/fraud-prevention/fraudabuseforprofs/downloads/mnfy18.pdf

[2] https://www.auditor.leg.state.mn.us/ped/updates/2021/dhspca.pdf

[3] https://oig.hhs.gov/reports/all/2017/minnesota-did-not-always-comply-with-federal-and-state-requirements-for-claims-submitted-for-the-nonemergency-medical-transportation-program/

investigating, and referring suspected Medicaid fraud. These methods must include a pathway to receive complaints of Medicaid fraud or abuse from any source and methods for identifying any questionable practices. This information and related data sources must be used to pursue robust preliminary and full investigations, as appropriate, as well as refer cases to law enforcement, if applicable.

Prior CMS oversight work has identified consistent non-compliance with the State's ability to proactively identify suspected Medicaid FWA, primarily through limitations in data analytics and monitoring. It should also be mentioned that Minnesota's submission of its quarterly expenditure reports through the Form CMS-64, includes a certification that the state is operating under the authority of its approved Medicaid state plan.

**Discussions with the State Medicaid Agency**

Beginning in July 2024, CMS began working with the State to address concerns of potential fraud in the housing stabilization program (HSS) through Unified Program Integrity Contractor (UPIC) audits. In April 2025, CMS and its UPIC presented the State with preliminary findings from the 3 HSS providers for input about payment policies and state exceptions to rules. Shortly after, in June 2025, the State requested the audits be transferred to the State for investigation. In August, October, and November 2025, CMS continued discussions with the state to address issues with closing the HSS program, reviewing provider enrollment actions, and redesigning the State's program integrity operations, among other issues. On December 5, 2025, CMS formally notified the Minnesota Medicaid Director of these concerns and directed the State to submit a comprehensive corrective action plan (CAP) by December 31, 2025. Finally, as noted previously, in December 2025, CMS met onsite with state agency staff and law enforcement to see firsthand the historical deficiencies in the state's ability to proactively identify potential Medicaid FWA.

While the State submitted a document labeled as a CAP to CMS on December 31, 2025, CMS has determined that it is deficient. The plan relies heavily on temporary or future-contingent measures, lacks enforceable timelines and performance metrics, acknowledges current noncompliance with key federal requirements, and provides limited assurance of accountability for past misconduct.

Given the widespread concerns that these fraudulent activities were undertaken by individuals with ties outside of the U.S. and that some of the funds were then transferred outside of the U.S., CMS sees nothing in the CAP that would result in the State being able to understand ownership or corporate structure of providers and how the State will work with law enforcement to assure that no Medicaid funds are used to support criminal international entities.

The CAP largely emphasizes prospective controls while providing limited assurance of meaningful accountability for past misconduct. Although the State references a forthcoming historical claims review, it does not commit to specific enforcement actions, recovery targets, referral thresholds, or timelines for resolving identified overpayments or fraud. Absent clear commitments to corrective financial remedies and sanctions, the CAP does not adequately protect the fiscal integrity of the Medicaid program. The CAP also fails to adequately address how claim editing will be applied, such as whether those edits will deny payments or whether the data will identify claims with attributes appropriate for additional scrutiny, such as outlier billers, utilization trends in high-risk services, and other appropriate flags. The CAP should also include how artificial intelligence and other modern

automated methods will be used to address the rampant fraud in the program, and how performance of these methods will be assessed.

Additionally, Minnesota's draft Program Integrity Playbook identifies additional vulnerabilities and gaps in its oversight operations that are not addressed in the CAP. CMS expects Minnesota to also address the outstanding issues in its updated CAP. For example:

- **Prior Authorization Program:** Please provide additional details on Minnesota's assessment of its prior authorization program and enhancements that are needed.
- **Provider Training and Education:** Please specify what enhancements or changes Minnesota proposes to make its provider training and education efforts more effective, such as pre-enrollment training; post-enrollment training; billing and documentation training; fraud, waste, and abuse training; and compliance and legal obligations training, among any others identified by the state.
- **DHS Employee Training and Education:** Please specify what enhancements or changes Minnesota proposes to make to its DHS employee training and education efforts to identify, evaluate, and mitigate fraud, waste, and abuse in the state's Medicaid program.
- **Surveillance and Utilization Review (SURS):** Minnesota stated in its draft Program Integrity Playbook that is implementing a formal SURS system. Please provide additional information the status of the SURS system, its capabilities, and how it will feed into the state's broader program integrity efforts and lead generating activities.
  **Managed Care Oversight:** Please include information as to how the state plans to enhance oversight of its managed care plans (MCPs). This includes relevant state-MCP contract language (including any barriers within existing contract language that need to be addressed), the state's ability to conduct data analytics on managed care claims and spending, processes for and evaluations of referring potential fraud from the MCP to the state/law enforcement (including implementation of payment suspensions), and recovery of identified overpayments, among any other issues identified by the state.

**Focused Financial Reviews of Expenditures on the CMS-64**

Given the severity and persistence of these deficiencies, CMS must take additional steps to protect the integrity of the Medicaid program and federal taxpayer dollars. Pursuant to section 1903 of the Social Security Act and implementing regulations in 42 CFR 430 Subpart C, CMS has the authority to conduct reviews of state expenditures reported on the quarter Form CMS-64 Accordingly, CMS intends to immediately initiate a focused CMS-64 review of all fourteen high-risk services self-identified by the state starting with the most recently certified CMS-64 (Quarter Four of Federal Fiscal Year 2025). As necessary, CMS intends to issue deferral or disallowance of any FFP claimed by the state that does not meet applicable federal requirements.

**Determination of Non-Compliance and FFP Withholding**

The CMS has concluded that the Minnesota Medicaid agency is operating its program in substantial noncompliance with federal requirements described in sections 1902(a)(64) of the Act, generally requiring the State to ensure sufficient controls to prevent, detect, and address fraud, waste, and abuse.

Subject to the state's opportunity for a hearing, CMS will withhold a portion of FFP from the Minnesota Medicaid quarterly claim of expenditures on the Form CMS-64 until such time as the Minnesota Medicaid agency is, and continues to be, in compliance with the federal requirements. The quarterly withholding will be calculated based on the federal share for one quarter's amount of the previous calendar year's annual total paid expenditures for the fourteen high-risk services, estimated as $515,154,947.56, or an alternative substantiated amount per quarter based on evidence provided by the state to the Administrator or his designee of an accurate amount of fraudulent expenditures. This amount may increase based on additional findings of fraud or insufficient progress towards mitigating fraud—until Minnesota demonstrates full and sustained compliance with federal Medicaid requirements. The withholding will end when the Minnesota Medicaid agency fully and satisfactorily implements a comprehensive CAP that addresses FWA in the 14 high-risk service areas to bring the program into compliance with the federal requirements.

**Opportunity to Request a Hearing**

The State has 10 days from the date of this letter to request a hearing. If a request for hearing is submitted timely, the hearing will be convened by the designated hearing officer below, 30 days after the date of the Federal Register notice, at the CMS Regional Office in Chicago, Illinois, in accordance with the procedures set forth in federal regulations at 42 CFR part 430, subpart D. The Hearing Officer also should be notified if the Minnesota Medicaid agency requests a hearing but cannot meet the timeframe expressed in this notice. The Hearing Officer designated for this matter is:

Ben Cohen
Centers for Medicare & Medicaid Services
7111 Security Blvd, Suite B1-15-15
Baltimore, MD, 21244

At issue in any such hearing will be:

a. Whether the evidence establishes that Minnesota has failed to substantially comply with the federal requirements described in section 1902(a)(64) of the Social Security Act and the federal regulations implementing those provisions.

b. Whether Minnesota's failure to substantially comply with those federal requirements supports the partial withholding of FFP imposed by CMS.

If the Minnesota Medicaid agency plans to come into compliance with the federal requirements, the Minnesota Medicaid agency should submit, by January 30, 2026 a revised comprehensive CAP including the timeframe for implementation and any performance or quality metrics the state will use to evaluate effectiveness of the actions.

CMS will continue to exercise strong oversight of State actions to address these issues. CMS will review and negotiate the terms of an acceptable corrective action plan and will monitor progress closely. Our goal is to have the Minnesota Medicaid agency come into compliance, and CMS continues to be available to provide technical assistance to help achieve this outcome.

Should you not request a hearing within 5 days of this letter, the withholding of funds will be imposed, contingent on the State's progress toward compliance as discussed above.

Please provide any response or questions regarding this matter to Kimberly.Brandt@cms.hhs.gov.

Sincerely,

Mehmet Oz, M.D.
Administrator
Centers for Medicare & Medicaid Services

Cc:    John Connolly
       Minnesota Medicaid Director

       Dan Brillman
       Director, Center for Medicaid & CHIP Services, Centers for Medicare & Medicaid Services

       Kimberly Brandt
       Acting Director, Center for Program Integrity, Centers for Medicare & Medicaid Services

*State of Minnesota, et al.*
*v.*
*Dr. Mehmet Oz, et al.*
U.S. District Court No.
26-cv-1701

# DECLARATION OF
# NATE BRENNAMAN

# Exhibit 5

 **DEPARTMENT OF HUMAN SERVICES**

**Minnesota Department of Human Services**
**Elmer L. Andersen Building**
**John Connolly, Ph.D., M.S.Ed.**
**Deputy Commissioner and Minnesota Medicaid Director**
**Post Office Box 64998**
**St. Paul, Minnesota 55164-0998**

January 30, 2026

Kim Brandt, Chief Operating Officer and Deputy Administrator
Daniel Brillman, Deputy Administrator
Centers for Medicare & Medicaid Services (CMS)
7500 Security Blvd
Baltimore, MD 21244-1850

**Subject: Corrective Action Plan for Program Integrity Update**

Deputy Administrators Brandt and Brillman:

The Minnesota Department of Human Services (DHS) is submitting this revised, comprehensive corrective action plan on behalf of Governor Tim Walz in response to the letter from Administrator Oz dated January 6, 2026. This revised corrective action plan proposes additional program integrity actions and identifies timeframes for implementation and performance metrics to evaluate each action where appropriate.  As part of our ongoing commitment to fighting and preventing fraud, the Department hosted in-person meetings with CMS staff on January 21 and 22 and seeks good faith collaboration to finalize and begin implementing the corrective action plan.

The Department has taken additional actions beyond the items listed in Governor Walz's Executive Order 25-10, including the following actions described in our first reply to your letter:

- In October 2024, DHS began a top-to-bottom, on-site audit process of all autism service providers enrolled in the State of Minnesota. This work prompted an aggressive Early Intensive Developmental and Behavioral Intervention (EIDBI) program integrity legislative package, and additional anti-fraud requests to shift oversight from relying on a tip-based investigative model, to a proactive model to stop fraud on the front-end.

Deputy Administrators Brandt and Brillman
January 30, 2026

- Early in 2025, DHS changed the designation of EIDBI and Housing Stabilization Services (HSS) to high-risk to provide additional program integrity tools, including unannounced on-site visits.
- DHS requested assistance from CMS on August 1, 2025, to take the unprecedented action to terminate the agency's Housing Stabilization Services (HSS) benefit to protect the fiscal integrity of Minnesota's Medicaid program. We appreciate the support we received from your team during that process, which resulted in CMS approval to shutter the HSS program at the end of October.
- During HSS termination discussions, CMS suggested that DHS disenroll inactive health care providers to further safeguard against fraudulent billing. DHS immediately acted on that suggestion, and to-date has disenrolled almost 6,000 inactive providers since October 2025. That work continues with a review of an additional 13,000 providers, many of which will receive termination notices by January 30.
- DHS has acted more aggressively to withhold payments over the last year. In 2025, DHS issued over 500 payment withholds to providers where DHS determined there was a credible allegation of fraud.
  - Since the Executive Order was signed, DHS has implemented 134 payment withholds, issued ten monetary recoveries, and two suspensions relative to the fourteen high risk services.

In his January 6 letter, Administrator Oz indicated that the CAP did not demonstrate the state's ability to understand ownership or corporate structure of providers or detail how the state will work with law enforcement to ensure that Medicaid funds are not used to support criminal entities. DHS agrees that understanding current ownership structures of providers is a key component to preventing and detecting fraud and necessarily works with its law enforcement partners to investigate and expose criminal networks to ensure Medicaid is not supporting these entities.

To accomplish this, DHS maintains ownership information on all enrolled and licensed providers, which is required by state and federal law. DHS further requires that providers update ownership information should it change. DHS verifies this ownership information at initial validation and routinely through revalidation and licensing reviews (for those services that require licensure). When DHS determines a provider has failed to disclose or lied about their ownership, it sanctions the provider, up to termination. DHS is revalidating all providers in the 13 high-risk services to verify ownership information.

Minn. Stat. 13.37 (Security/Trade Secret Information)

, DHS has expanded authority to take actions against Medicaid providers whose affiliated entities and individuals are found to be committing fraud against other publicly funded programs as well – Minnesota Statutes, section 245.095 was proposed by DHS, passing initially in 2019, and has continued to be enhanced as an effective tool to mitigate the opportunities of bad actors to commit fraud across state and federal public programs, including Medicaid.

DHS has strong partnerships with state and federal law enforcement agencies and refers all cases of suspected Medicaid provider fraud to the Minnesota Attorney General's Office as described in the approved state plan. This is particularly important when there is evidence of shared ownership and broad networks of connected individuals working together to commit fraud. Law enforcement has broader authority and tools to investigate the nuances of these networks. MFCU and the United States Attorney's Office have the power to charge crimes, including those with wide criminal enterprise connections. The DHS Inspector General meets weekly with the heads of the Minnesota Bureau of Criminal Apprehension (BCA) and the Attorney General's Office's (AGO) Medicaid Fraud Control Unit (MFCU) to collaborate on issues related to preventing and prosecuting Medicaid fraud. Office of Inspector General staff meets on a bi-monthly basis with MFCU staff to discuss trends, patterns, and specific cases of suspected fraud. Office of Inspector General staff are also in frequent communication with the FBI and HHS-OIG agents regarding program trends, specific providers, requests for information, and subpoenas, and has met with the U.S. Attorney's Office several times during the past year. To quickly detect, identify, investigate, and take action against fraudulent networks, DHS and law enforcement each play an important role: DHS has the authority to swiftly stop payments when a credible allegation of fraud is determined, while law enforcement has the authority to pursue criminal charges and convictions.

DHS also collaborates with and refers information about suspected fraud to partners across state and law enforcement agencies and the Office of Legislative Auditor (OLA). DHS recently launched a new data sharing application intended to provide up to date information on sanctions and to facilitate the sharing of data across agencies and the OLA who need the information to conduct their own investigations and make connections between programs.

Deputy Administrators Brandt and Brillman
January 30, 2026

Evidence of the state's program integrity actions, including law enforcement referrals and provider sanctions, is available on the Department's website: https://mn.gov/dhs/program-integrity.

Also in the January 6 letter, Administrator Oz indicates that the state did not commit to specific enforcement actions, recovery targets, referral thresholds, or timelines for resolving identified overpayments or fraud. It is unclear in this statement what specific component of DHS' program integrity work Administrator Oz is referencing, but there are protocols in place to address suspected fraud, waste, or abuse at multiple points of the billing, enrollment, and investigative process. For example, the prepayment review process includes guidelines on when a claim requires further review before payment or denial as well as guidelines on when a case should be referred for a deeper investigation by the Office of Inspector General. The Office of Inspector General in turn has policies in for implementing sanctions and pursuing administrative action against provides including monetary recoveries, payment withholds, suspensions, and terminations. Through its policies and actions, especially over the past year and a half, DHS has demonstrated its commitment to taking swift and strong enforcement actions. For example, under Minnesota law, DHS is required to cut off funding to people and businesses when an investigation uncovers "credible allegations of fraud." DHS has a strong commitment to imposing sanctions against providers, including cutting off funding and making law enforcement referrals, when we uncover evidence of fraud. While the prepayment review process has just begun, DHS is already demonstrating its commitment to enforcement action through the detailed review and denial of claims.

Through this Corrective Action Plan, DHS seeks to address items CMS found deficient in the previous CAP, dated December 31, 2025, and to take further steps to assure that Minnesota's Medicaid program is a leader in program integrity. We believe we are building on a strong foundation and will adapt our program to respond to the novel fraud schemes employed by criminals across the country.

## Program Integrity Playbook

The Administrator's letter of January 6th requested the state include additional items from the state's Program Integrity Playbook. The section that follows includes the detail and specificity requested in Dr. Oz's letter. The Administrator's correspondence also requested that the state's CAP include timelines and performance metrics for the measures included in the state's submission of December 31, 2025. The discussion that follows the items from the Program Integrity Playbook includes this detail for actions in the state's earlier submission as well as some new program integrity measures.

Page 4

Deputy Administrators Brandt and Brillman
January 30, 2026

## Program Assessments

- **February 1, 2026**
    - DHS will commence Program Assessments for the 13 high-risk services and all other Medicaid covered services.
    - These assessments will be ongoing and revised at least annually (summary attached).
    - Program Assessments include:
        - a compliance gap analysis,
        - risk assessment and mitigation plan,
        - utilization review and monitoring,
        - randomized provider evaluations,
        - documented oversight, monitoring and reporting procedures, and
        - clear accountability within roles and escalation (RACI matrices)
    - DHS will use guidance from the GAO Fraud Risk Management Report.
- **March 1, 2026**
    - DHS to send CMS a revised MN PI Playbook, using similar metrics as those applied to the CAP.
- **April 1, 2026**
    - DHS will complete Program Assessments for the 13 high risk services. At this time, DHS plans to use internal resources for this activity, including redeployed staff, but will explore the assistance of a vendor for the assessments, as appropriate.
    - DHS will develop a governance structure for program oversight and compliance to review risks, mitigation strategies and results of provider evaluations for adequacy and oversight.
- **August 1, 2026**
    - DHS will complete Program Assessments for all covered services.

    - DHS program integrity governance body will prepare and submit a report to CMS with governance and oversight activities.

These Program Assessments are aimed at clarifying responsibility, governance and oversight of risks and vulnerabilities in our programs. These are meant to be actively maintained, reviewed and updated. The purpose of these documents is to assist our

Deputy Administrators Brandt and Brillman
January 30, 2026

agency in achieving a more proactive approach to program integrity and enhance our culture of compliance within DHS.

## Prior Authorization

Minnesota uses prior authorization as a condition of payment throughout the Medicaid program to ensure services are medically necessary and that the service is the least costly alternative. To date, Minnesota has prior authorization requirements on more than 3,400 codes. The use of prior authorizations or service level authorizations is identified in the PI playbook where policy areas identify a need for increased oversight and authorization.

- **March 31, 2026**
  - To enhance consistency and transparency, DHS will review prior authorization requirements for existing services and repeat this analysis every two years. DHS will also implement a quarterly audit of the prior authorizations approved and denied by the contractor to assess whether updates need to be made to prior authorization policies.
  MN state law has numerous limitations in the use of prior authorization. During the 2026 legislative session, DHS will work with the legislature to remove restrictions against using prior authorization in its Medicaid program.

## Provider Training and Education

Minnesota currently requires Steps for Success training for personal care providers prior to enrollment. All owners and managing employees must complete this training before enrolling as a Medicaid provider. This training delivers updated resources and guidance designed to reinforce compliance expectations and strengthen program integrity standards for personal care service providers.

During the 2025 legislative session, the Legislature mandated an expansion of these training requirements to additional service areas—including Recovery Community Organizations (RCOs) and recuperative care providers—to promote greater consistency, accountability, and oversight across Minnesota's Medicaid program.

- **January 1, 2027**
  - All owners and managing employees for RCOs, and Recuperative Care providers will have to complete the training prior to enrollment and every 3 years thereafter.
- **January 1, 2028**

Deputy Administrators Brandt and Brillman
January 30, 2026

- o   All RCO and Recuperative Care providers who were enrolled prior to this date must complete the training no later than January 1, 2028 and every 3 years thereafter.

Workshop and training materials cover key program integrity and compliance topics, including:

- Program Integrity and Oversight (PIO)

- Medicaid Fraud Control Unit (MFCU) – 1-hour dedicated session
- Fraud prevention practices, including site visits and oversight activities
- Provider responsibilities and compliance obligations
- Use of the Provider Manual and adherence to guidelines prior to claims submission

Waiver providers are also required to complete the Home and Community-Based Services (HCBS) Waiver and Alternative Care Provider Training 101 during enrollment.  Personal care service providers have 30 days after active enrollment to complete a required billing session. Waiver providers have 6 months after active enrollment to complete a required billing session.

- **March 1, 2026**
   - o   Provider enrollment staff monitor compliance with these trainings in our system and will develop reports to track compliance.
- **August 1, 2026**
   - o   Additional training modules are currently available to providers but are not mandatory.  Our provider trainers will make these trainings available on demand.

Training includes a detailed review of provider requirements, with emphasis on:

- Federal and state exclusion lists
- Provider participation requirements and violations of the provider agreement
- Provider abuse
- Program Integrity Oversight Division (PIOD) functions
- Health service documentation standards
- Record-keeping requirements and investigative processes
- Monetary recovery and sanctioning procedures
- Crimes related to MHCP participation
- Access to care requirements

Page 7

Deputy Administrators Brandt and Brillman
January 30, 2026

- PERM expectations and error-reduction strategies
- Billing requirements
- How to report fraud

## DHS Employee Training and Education

The Department will provide and require additional training for staff regarding their obligations to identify and report Medicaid fraud and to ensure proper documentation for all state and federal expenditures.  All employees will complete this new required training by the end of 2026.

- **March 1, 2026**

    - DHS's OIG and Minnesota's Medicaid Fraud Control Unit will provide an annual staff training session on identifying and reporting Medicaid fraud, waste and abuse. This training is expected to improve communication, provide guidance, and support enhanced program integrity activities. An outline of this training is available and attached to this letter. It will also cover an overview of how to identify and report provider abuse (attached). These trainings will be required for staff annually, administered through their online training profiles. The Department will develop additional content by May 1, 2026, regarding required documentation to support all federal expenditures. This includes all state plan and waiver authorities, eligibility records, provider files, and accounting data.

- **Ongoing**

    - DHS will identify appropriate staff to attend relevant Medicaid Integrity Institute (MII) trainings.

## Surveillance and Utilization Review

The Department is taking measures to improve fraud detection through enhanced expenditure and utilization tracking. In October 2025, DHS began a formal surveillance and utilization review of services using an internal predictive analytics dashboard. This enhanced review process enables DHS policy teams to monitor and evaluate fiscal performance and program integrity, including:

- Minn. Stat. 13.37 (Security/Trade Secret Information)
- 
- 
-

Deputy Administrators Brandt and Brillman
January 30, 2026

■ Minn. Stat. 13.37 (Security/Trade Secret Information)

The dashboard identifies statistical outliers and identifies potential risk to guide further analysis and determine whether billing patterns are explainable.

- **Monthly**
  - Data are updated monthly, and policy teams document their review of billing patterns, noting whether identified anomalies are reasonable and explainable based on available data and contextual factors. When billing patterns are not explainable, referrals will be made to the Program Integrity Oversight (PIO) team for further investigation.
- **Semi-Annual**

  - Oversight of the monthly data reviews are conducted semi-annually and are incorporated into the program assessments, referenced in the Program Integrity Playbook. Review of data informs the provider review selection and risk identification and mitigation activities. These data are monitored monthly. Outliers are reported to the program integrity governance and oversight structure quarterly to assure that escalation was effective, and related risks are documented and mitigated.

## Managed Care Oversight

Last year, DHS conducted post payment claims review of managed care organization (MCO) payments for Housing Stabilization Services (HSS) and Personal Care Assistant (PCA) claims. The review resulted in multiple MCO breach of contract notices, new corrective action plans, and the identification of over $4 million in payments for services in excess of the contractual allowed amounts.

The Department is continuing its review of MCO claims with CMS' Unified Program Integrity (UPIC) contractor. Post-payment review of MCO claims as part of these investigations are overseen by CMS and resulted in completed recoveries in the amount of over $135,000 in calendar year 2025 and about $36,000 in calendar year 2024. Only completed recoveries and closed cases are included, and 2026 recoveries are expected to be in the millions of dollars once the recoveries are collected and the cases are completed.

In January 2026, DHS engaged an outside vendor through a limited, temporary contract to increase review of post-payment MCO claims. DHS will work with the legislature to secure

Deputy Administrators Brandt and Brillman
January 30, 2026

permanent funding and dedicated staff to oversee the contract and to continue expansion of MCO post-payment claims reviews and recoveries.

DHS will pursue the following changes to managed care oversight via contract amendment or legislative action where necessary:



- Minn. Stat. 13.591/13.599 (contract negotiations)

- **January 1, 2026**
  DHS updated 2026 MCO contract language to allow DHS to sanction an MCO with repeated contract breaches that occurred for the same incident type.

- **July 1, 2026**
  DHS to negotiate mid-year MCO contract amendments, to be effective July 1, 2026, that would:
  - Shorten the current 6-month timeframe MCOs are afforded to recover overpayments from providers when the State initiates investigations and identifies Medicaid overpayments.
  - Increase the percentage of State identified overpayments DHS is allowed to recover to 100% from the MCO, including incidents in which the MCO is unable to collect from the provider.
  - Require MCOs to implement payment suspensions and make associated criminal referrals when a provider refuses to grant access to their records.
  - Change current MCO reporting structure for required monthly adverse action reports and case referrals to the State for better tracking and monitoring by the State.
  - Increase the required number of SIU investigative staff based on MCO enrollment
  - Require MCOs to conduct investigative provider site visits

Deputy Administrators Brandt and Brillman
January 30, 2026

## Enrollment Moratoria for Providers in 13 High-Risk Service Areas

Late last year DHS took several actions to temporarily pause enrollment of new providers across many of the identified high-risk services. First, the Department implemented an enrollment moratorium for Early Intensive Developmental and Behavioral Intervention (EIDBI) services in November 2025 and an HCBS licensure moratorium that began January 1, 2026. A licensure moratorium on one additional service will take effect on February 1, 2026. These actions effectively stop enrollment of new providers across 7 of the remaining 13 high-risk services identified by DHS's risk assessment.

The December 5th correspondence from CMS included a recommendation that the state also enact enrollment moratoriums for all high-risk services. The Department concurred with this recommendation submitting requests for temporary enrollment moratoria for all services (except EIDBI) on January 23, 2026. CMS approved the state's requests, and a 6-month enrollment moratoria across the remaining 12 services took effect on January 27, 2026.

DHS will take the following actions on or before the specified date during the temporary moratorium period:

- **March 1, 2026**
    - MN to share a report with CMS that details their moratoria exit strategy and how they will address any access to care issues that arise as a result of the moratoria
- **April 27, 2026**
    - Submit an access to care analysis demonstrating continued access to services subject to an enrollment moratorium
- **June 27, 2026**
    - Provide a written request to extend enrollment moratoria where appropriate

In recognition of the statutory requirement to ensure enrollees have access to covered services, the Department will make exceptions to moratoria based on verifiable access to care needs. Moratoria may be extended or lifted at the end of the initial 6-month period based on the state's assessment of risk and progress implementing corrective actions.

## Off-Cycle Revalidation for Providers in 13 High-Risk Service Areas

In its December 5th letter, CMS strongly recommended DHS complete this action as soon as practicable. We agree with CMS's direction and have initiated an incident command structure that is focused on completing the process as quickly as possible while ensuring compliance with

Deputy Administrators Brandt and Brillman
January 30, 2026

state and federal law. This effort will require an in-person site visit, fingerprint background study for individuals with a controlling interest in the provider organization, and verification of provider credentials for approximately 5,800 providers. From October 2024 through June 2025, DHS conducted visits to EIDBI providers to review a detailed checklist of required elements of an EIDBI provider. There were 324 visits conducted. Although these visits were announced, they were far more detailed than a pre-enrollment or revalidation site visit and we consider these sufficient for the EIDBI revalidation. DHS Licensing conducts licensing reviews for Adult Day Services and Intensive Residential Treatment Services. DHS is reviewing licensing visits conducted in 2025 and will consider a site visit complete if the review was unannounced.

To execute these actions in alignment with CMS direction, DHS will require tremendous additional, professional human capacity beyond what it currently has available for provider revalidation work. DHS has requested and already received reassigned staff from across Minnesota state government to implement Governor Walz' Executive Order, EO 25-10, and we similarly plan to request additional resources from across state government to satisfy CMS's requirements. The department intends to take the following additional actions:

- **January 23, 2026 - January 28, 2026**
  - Notice of revalidation requirements were sent to all 5,640 providers in the high-risk services.
    - DHS revalidated 1,127 of these 5,640 providers in 2025; of these 452 were screened at the high-risk level and are considered complete. The remaining 675 were screened at a lower risk level and will need to have an unannounced site visit and confirmation the background study requirements have been met.  DHS will prioritize this group and get the site visits scheduled ahead of any new ones that need to be done.
    - DHS has also initiated revalidation in the last 6 months for 1,813 of the providers in these 13 service categories, all of the providers who respond will be screened at the high risk level which includes the fingerprint background study and unannounced site visit, those that do not will be terminated accordingly.
    - DHS is sending a list of all the owners of the provider organizations in this high-risk group, as well as all currently enrolled 300,000+ individual PCAs to CMS' Provider Enrollment Team for a Data Compare to ensure there haven't been any federal convictions that we were unable to locate/identify.
- **January 30, 2026**

Deputy Administrators Brandt and Brillman
January 30, 2026

- o DHS to send CMS the following:
    - State laws and provisions associated with provider revalidation efforts
        - Minnesota Statutes, § 256B.04, subdivision 21.
        - DHS is working on a proposal that would consolidate the timeline for provider revalidations for the upcoming session.
    - Memorandum summarizing state law challenges and a proposal to overcome these barriers and expedite (see attached).
- **February 1, 2026**
    - o Provide CMS with a staff training plan that includes staff resource constraints and figures on the following:
        - Number of state staff currently trained to do provider revalidation, broken out by whether staff supports site visit or application processing efforts: 20 staff are trained to conduct all aspects of the provider enrollment process.
        - Number of state staff who usually train new staff on provider revalidations: 5
        - Number of cross-state and/or contractor staff who will be working on provider revalidations and when they have been/will be trained on the provider revalidation process: DHS will engage approximately 170 additional staff, through both inter-agency agreements and contracting, to assist with site visits.
        - See the attached reports for the list of all high-risk providers, categorized by provider type, that the state needs to revalidate, along with the following:
            - when the provider was initially enrolled,
            - date of each provider's last revalidation
            - date of the most recent site visit
            - whether fingerprinting was captured during enrollment or previous revalidation
- **April 1, 2026**
    - o Provider revalidation application deadline – All revalidation submissions must be submitted by this date to ensure timely processing and appropriate action is taken on providers who do not comply.
- **May 31, 2026**

Deputy Administrators Brandt and Brillman
January 30, 2026

      o  MN to complete their revalidation process and to deactivate those providers found to be non-compliant

## Enhanced Prepayment Review Project

Through newly implemented and enhanced prepayment review process, DHS will use Optum to identify and report potentially concerning claims within each provider payment cycle. DHS will release unflagged claims for payment if Optum characterizes them as not concerning or "clean." Flagged claims are routed to the policy and program teams responsible for administration of the benefit associated with the suspended claims and follow up as needed with providers. DHS OIG may initiate site visits, if appropriate, and gather clinical documentation and other records to substantiate service delivery. Department staff may interview provider organization leadership, clinicians, and staff and/or interview program members who should have received services associated with the claims submitted to DHS for payment. If this process does not resolve concerns about the claims or a provider's billing behavior, the provider and all relevant associated information will be referred to the Department's Office of Inspector General (OIG) for formal investigation.

- **December 23, 2025**
  - DHS paused payments for 14 high-risk services to allow Optum to perform enhanced prepayment review.
- **January 13, 2026**
  - DHS released payment for "clean" claims paused in the first warrant cycle through December 23.
    - Approx. 1700 claims were flagged. After DHS review and consultation with policy areas, 14 claims were denied because an edit on the service agreement was forced by the case manager.  All other claims were released and were paid on either 01/13/26 or 01/27/26 depending on submission date.
- **January 14, 2026**
  - For the warrant Cycle ending 1/9/26; Optum flagged 12286 claim lines (4,842 claims) for review and categorized below:
    - High= 78 lines (26 claims)
    - Medium= 9129 (3378 claims)
    - Low= 623 (114 claims)
    - Watch= 2459 (1322 claims)

Deputy Administrators Brandt and Brillman
January 30, 2026

- Optum will ramp up the number of analytics applied each warrant cycle until it reaches the total number of approximately 190 analytics that have been refined and optimized for DHS based off 3 years of paid claims history.
  - The warrant cycle ending 01/23/26 consisted of 56 analytics, 112 will be applied on the warrant cycle ending 02/06/26 and the full approximately 190 by the 2/20/26 warrant cycle.

- **January 30, 2026**
  - Optum will provide DHS with a vulnerability assessment of the 14 high-risk programs. DHS will incorporate this information in our program assessment work and utilization oversight activities.

- **February 1, 2026**
  - DHS to provide CMS with an interim report on its enhanced prepayment review.

- **March 1, 2026**
  - DHS will send CMS a report of the findings from Optum's review of historical claims data.

## Disenrollment of Inactive Providers

Minnesota began disenrolling inactive health care providers late this fall at the suggestion of CMS staff with the Centers for Program Integrity. On October 15, DHS disenrolled about 800 providers that were enrolled in the 13 high-risk services. On January 5, 2026, the Department disenrolled roughly 4,300 out of network and out of state managed care providers and will be disenrolling another 800 inactive providers on January 30, 2026. The Department is working with providers who contact us with valid reasons to delay or defer disenrollment. The Department will take the following additional disenrollment actions:

- **January 30, 2026**
  - DHS completed a review of an additional 13,000 inactive providers with our MCO partners on January 15, 2026. We identified about 2,000 providers who will need to receive notice of termination. About 1,000 providers will be sent Notice of Proposed Action letters on January 30 advising their enrollment will be terminated effective **March 2, 2026**.
  - Due to resource constraints, DHS will split this group into two parts and send the final 1,000 letters on February 15. We will terminate an additional 11,000 providers via batch job in early February.

- **March 1, 2026**

Deputy Administrators Brandt and Brillman
January 30, 2026

- o DHS will share a report with CMS detailing the process for deactivating inactive providers. This process identifies inactive providers every 6 months and commences the disenrollment process following an internal review.

## Claims Editing System (CES) Assessment

- **January 30, 2026**
  - o Optum delivered DHS a Claims Editing System (CES) assessment. As a claim is received from the clearinghouse/provider, it runs through the pre-adjudication process of checking for eligibility, coordination of benefits, and provider verification. Within the mid-adjudication, prepayment cycle, claims are routed for clinical editing, applying clinical and policy edits. The State provided six months of data to support the CES team assessment on November 24, 2025. This data was validated and accepted by Optum for use in an assessment on December 5, 2025. Based on the assessment, the following work will occur:
    - DHS will review the assessment Optum provides and determine if any MMIS claims edits aren't operating correctly.  Edits that are not working as intended will be forwarded to MMS programmers to be fixed.
    - DHS will work with system programmers to implement and test for effectiveness and accuracy of system edits.
- **February 1, 2026**
  - o DHS to provide CMS with a report on its CES Assessment.

## External Management Consultants Procurement

- **February 1, 2026**
  - o MN to provide CMS with a report outlining how they plan to optimize their external management consultant procurement process (see attached)

## Use of Advanced Analytics and Predictive Indicators

The Minnesota Department of Human Services (DHS) is strengthening Medicaid program integrity through the expanded use of advanced analytics, automated indicators, and data-driven dashboards to support risk-based oversight across provider enrollment, claims payment, and post-payment review. DHS's analytic approach is designed as a closed-loop oversight framework in which risk indicators inform operational action, outcomes are measured and validated, and analytic thresholds and processes are continuously refined.

Deputy Administrators Brandt and Brillman
January 30, 2026

This structure ensures analytics functions as integrated program integrity controls rather than standalone tools.

Current capabilities are limited to rules-based and descriptive analytics and do not include automated decision-making or machine learning models. All current and planned analytic enhancements are subject to legislative authority and approval by the Centers for Medicare & Medicaid Services (CMS) through the Advanced Planning Document (APD) process.

## Risk Identification Using Analytic Dashboards and Automated Indicators

- **Implemented in Q4 2025**
  - DHS developed and deployed analytic dashboards for 14 high-risk service types that apply standardized risk metrics and descriptive indicators to identify potentially concerning provider and billing behavior. These dashboards are advisory in nature and support risk identification, prioritization, and human review. These dashboards support:
    -  Minn. Stat. 13.37 (Security/Trade Secret Information)

## Use of Analytics to Prioritize Prepayment and Post-Payment Review

- **Implemented in Q4 2025**
  - Launched a business process redesign effort to align post-payment review activities with data-driven risk indicators generated through analytic dashboards.
  - Contracted with vendors to support development of a tip prioritization framework and vulnerability assessments.
  - Contracted with a vendor and began implementation of prepayment review analytics for the 14 high risk service types.
- **March 31, 2026**
  - DHS will expand the use of historical, multi-year claims data within analytic dashboards to support post-payment audits and referral processes for 14 high-risk service types, with assistance from contracted vendors.
- **September 30, 2026**

Deputy Administrators Brandt and Brillman
January 30, 2026

- o DHS will incorporate dashboard-based risk indicators into prepayment review workflows, including reviews conducted with assistance of contracted vendor.
  - o DHS will flag atypical service combinations and billing patterns that warrant additional documentation or review.
- **March 31, 2027**
  - o DHS will expand the use of historical, multi-year claims data within analytic dashboards to support post-payment audits and referral processes for all service types, with assistance from the Data Analytics and Systems Group in CMS' Center for Program Integrity and the state's contracted vendors.
  - o Risk indicators will be applied proportionally across the provider and payment lifecycle, with lower-risk signals informing monitoring and higher-risk, validated patterns informing prepayment review, post-payment audit selection, or referral pathways.

**Operational Use -** Dashboard-generated indicators are used to:
- Identify providers that may warrant additional documentation or pre or post payment review
- Prioritize post-payment audits, site visits, and targeted reviews
- Inform referrals to DHS program areas or the Office of Inspector General (OIG), with documented human review prior to any adverse action

Analytics do not independently trigger payment denial, suspension, or recoupment and are used solely to support risk-based prioritization and oversight decisions.

**Benchmarks -** Demonstrated correlation over time between dashboard-flagged indicators and confirmed audit or review findings:
- Documented analytic rationale included in audit selection, prepayment review, and referral decisions.
- Increased consistency and transparency in how reviews are prioritized across DHS program areas.
- Reduction in time required to identify and prioritize high-risk providers compared to pre-dashboard processes.

## Validation, Monitoring, and Governance
- **September 30, 2026**
  - o DHS will establish a documented analytic governance process to track outcomes associated with dashboard-flagged indicators, including audit

Deputy Administrators Brandt and Brillman
January 30, 2026

findings, investigations, referrals, and recoveries. Indicator thresholds and rules will be periodically reviewed and refined based on validated outcomes and operational experience. Governance artifacts will include documented indicator methodologies, change logs, outcome analyses, and periodic review summaries retained for audit and CMS review. Benchmarks include:

- Documented review of dashboard indicators conducted at least semi-annually.
- Monitoring of false positives and indicator performance to improve precision over time.
- Continued human review and due-process safeguards prior to any payment suspension, denial, or recoupment.

## Planned Enhancements (Subject to Legislative Authority and CMS APD Approval)

Consistent with a phased modernization approach, DHS and the Governor's Office will work with the legislature in 2026 to strengthen statutory authority and secure funding to support expanded, risk-based program integrity capabilities across the provider enrollment and payment lifecycle. These changes would authorize DHS to modernize analytics infrastructure, prepayment and post-payment oversight processes, and feedback integration, establishing a foundation for more advanced analytic methods over time.

The Governor's proposals will enable DHS to design, train, and deploy advanced statistical and machine learning–based models to augment existing dashboard-based indicators. These models would be used to identify complex, non-obvious risk patterns across large volumes of enrollment, claims, and encounter data that are not readily detectable through rules-based methods alone. Model development would be phased, beginning with supervised approaches informed by validated audit findings and investigative outcomes, and expanding incrementally as accuracy, performance, and governance controls are demonstrated. Any advanced analytic or machine learning models would be introduced through limited pilot use cases with defined performance thresholds and CMS-approved APDs prior to operational use.

Additional proposed statutory changes would strengthen provider licensing and enrollment by establishing structured, data-driven risk and readiness assessments prior to enrollment, enhancing verification of business legitimacy, deterring false or misleading applications, and clarifying the Commissioner's authority to apply enhanced screening in higher-risk program areas. Risk indicators generated through post-payment reviews would

Deputy Administrators Brandt and Brillman
January 30, 2026

be incorporated into front-end screening processes to create a continuous feedback loop across the provider and payment lifecycle. The Governor's Office and the Department will also work with the legislature on enhanced billing and payment oversight and documentation requirements, additional service and billing limits, expanded use of prior authorization, additional fines for licensing violations, and additional statutory authority to employ payment withholds.

The Minnesota Department of Human Services requests CMS' collaboration in this federal and state enterprise as we undertake these important reforms to assure effective oversight of our programs and early prevention and detection of fraud. The Governor's Office and the Department are open to working with the legislature on any additional program integrity enhancements suggested by CMS, the HHS OIG, and federal law enforcement partners.

The actions detailed above demonstrate Minnesota's continued commitment to enhance and strengthen program integrity and swiftly identify and address fraud, waste, and abuse in its Medicaid program. We welcome partnership, guidance, and direction from CMS to ensure that Minnesota Medicaid is a leader in program integrity and continues to serve and benefit our most vulnerable citizens.


Sincerely,


John M. Connolly, Ph.D., M.S. Ed.
Deputy Commissioner and Minnesota Medicaid Director

*State of Minnesota, et al.*
*v.*
*Dr. Mehmet Oz, et al.*
U.S. District Court No.
26-cv-1701

# DECLARATION OF
# NATE BRENNAMAN

# Exhibit 6

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop: S2-26-12
Baltimore, Maryland   21244-1850



---

**Financial Management Group**
*Division of Financial Operations West*

February 25, 2026

John Connolly
State Medicaid Director
Department of Human Services
444 Lafayette Road
St. Paul, MN 55155

Deferral Numbers: MN/2025/4/E/04/ADM - MN/2025/4/E/05/MAP - MN/2025/4/E/06/MAP - MN/2025/4/E/07/MAP

Dear Director Connolly,

This letter constitutes a notice of four deferrals totaling $259,505,491 federal financial participation (FFP). This amount represents expenditures claimed on Form CMS-64 for the quarter ending September 30, 2025, certified on December 30, 2025. The state should provide the requested documentation for each deferral within the required timeframe of 42 C.F.R. § 430.40 for CMS to make a proper determination on the allowability of the claim or remove the claims by including a Line 10B decreasing adjustment on the next quarterly CMS-64 submission. During the handling of these deferred amounts, please reduce your draws in the Payment Management System (PMS) MAP25 - $255,139,149 and ADM25 - $4,366,342. A negative grant award was issued in the amount of $259,505,491 in federal share dated February 25, 2026.

CMS identified $4,366,342 FFP (MN/2025/4/E/04/ADM) due to the continuing review of documentation that demonstrates administrative costs are properly allocated that include state-only health programs, including those relating to individuals lacking a satisfactory immigration status. CMS's deferral is based on the percentage of claims volume related to state-only health programs from an Advanced Planning Document for the Medicaid Management Information System at five point two-nine (5.29%) percent and applied to specific Administrative Lines on Form CMS 64.10. We are requesting Minnesota provide additional supporting documentation that no allocation to the local-only programs was appropriate, provide a better allocation basis that is validated through Minnesota's current Public Assistance Cost Allocation Plan, or make a decreasing Line 10B adjustment on the next quarterly CMS-64 submission to reflect the deferred amounts.

CMS identified $11,025,548 FFP (MN/2025/4/E/05/MAP) related to an ongoing review of claims documentation for services furnished to individuals lacking satisfactory immigration status. The supporting documentation does not appear to satisfy Minnesota's policy for

emergency Medicaid services and does not appear to comply with section 1903(v) of the Social Security Act. We are requesting Minnesota either provide additional documentation to support the claims or make a decreasing Line 10B adjustment on the next quarterly CMS-64 submission.

CMS identified $243,790,260 FFP (MN/2025/4/E/06/MAP) attributable to CMS's ongoing review of state expenditures, with a focus on fourteen high-risk Medicaid service areas identified as particularly vulnerable to fraud or abuse.  CMS has identified $164,198,916 FFP for other practitioner, personal care, and home and community-based services lines that have questionable variances and raise concerns about allowability of the claimed expenditures.  Additionally, CMS has identified $79,591,344 FFP claimed by the state associated with reimbursement claims submitted to the state by specific providers that we have identified as high-risk for fraud or aberrant billing practices based on historical billing and CMS data analytics.  We are requesting Minnesota either provide additional state and provider documentation to support the allowability of these claims, including through CMS sample-based reviews, or make decreasing Line 10B adjustments on the next quarterly CMS-64 submission.

Finally, CMS identified $323,341 FFP (MN/2025/4/E/07/MAP) due to returns of FFP for periods of 2020 through 2024 that were not returned at the same matching percentage of the original claim and that require additional documentation to demonstrate the allowability of the claims. We are requesting Minnesota provide additional supporting documentation that demonstrates the FFP was reported at the correct FMAP or make a Line 10B adjustment on the next quarterly CMS-64 submission to reflect the deferred amounts.

Per 42 C.F.R. §430.40, your office is requested to provide, within 60 days from receipt of this letter, all documents and materials that it believes support the allowability of the above claims that have not already been received by CMS. The requested information must be in readily reviewable form. If your office is unable to provide the required information within the 60 days, you may request an extension up to an additional 60 days as specified in 42 C.F.R. §430.40(c)(1). Your request for an extension should be submitted to our Financial Analyst, Audrey Mattison at audrey.mattison@cms.hhs.gov.

Should you require further details regarding this matter, please contact Jeoffrey Branch, Branch Chief, Branch A, Division of Financial Operations West, Financial Management Group, CMS at jeoffrey.branch@cms.hhs.gov or (214) 326-9038.

Sincerely,

Dorothy Ferguson

Digitally signed by Dorothy Ferguson
Date: 2026.02.25 15:05:48 -06'00'

Dorothy Ferguson, Director
Division of Financial Operations West

*State of Minnesota, et al.*
*v.*
*Dr. Mehmet Oz, et al.*
U.S. District Court No.
26-cv-1701

# DECLARATION OF
# NATE BRENNAMAN

# Exhibit 7


# DEPARTMENT OF HUMAN SERVICES

**Minnesota Department of Human Services**
**Elmer L. Andersen Building**
**Temporary Commissioner Shireen Gandhi**
**Post Office Box 64998**
**St. Paul, Minnesota 55164-0998**

December 31, 2025

Kim Brandt, Chief Operating Officer and Deputy Administrator
Daniel Brillman, Deputy Administrator
Centers for Medicare & Medicaid Services (CMS)
7500 Security Blvd.,
Baltimore, MD 21244-1850

Subject: **Corrective Action Plan for Program Integrity**

Deputy Administrators Brandt and Brillman:

This Corrective Action Plan (CAP) is in response to your letter of December 5, 2025, in which you requested a plan from Minnesota to strengthen program integrity and anti-fraud actions within its Medicaid program. As we stated in our December 17 reply to your letter, we strongly agree that assertive, ongoing action is necessary. Governor Walz issued Executive Order (EO) 25-10 on September 17, 2025, to bolster and expand this work. The Department of Human Services (DHS) has been proactive beyond the items in the EO, including taking the following actions described in our first reply to your letter:

- In October 2024, DHS began a top-to-bottom, on-site audit process of all autism service providers enrolled in the State of Minnesota. This work prompted an aggressive Early Intensive Developmental and Behavioral Intervention (EIDBI) program integrity legislative package, and additional anti-fraud requests to shift oversight from relying on a tip-based investigative model, to a proactive model to stop fraud on the front-end.

- Early in 2025, DHS changed the designation of EIDBI and Housing Stabilization Services (HSS) to high-risk to provide additional program integrity tools, including unannounced on-site visits.

- DHS requested assistance from CMS on August 1, 2025, to take the unprecedented action to terminate the agency's Housing Stabilization Services (HSS) benefit to protect the fiscal integrity of Minnesota's Medicaid program. We appreciate the support we received from your team during that process, which resulted in CMS approval to shutter the HSS program at the end of October.

Kim Brandt, Chief Operating Officer and Deputy Administrator
Daniel Brillman, Deputy Administrator
December 30, 2025
Page 2 of 5

- During HSS termination discussions, CMS suggested that DHS disenroll inactive health care providers to further safeguard against fraudulent billing. DHS immediately acted on that suggestion disenrolling over 800 inactive providers in October 2025 alone.

DHS values the opportunity to partner with CMS through this Corrective Action Plan (CAP) to add to the program integrity actions Minnesota has already taken. As detailed below, DHS fully supports CMS's direction to prevent, detect, and investigate fraud in our Medicaid program even more aggressively.

Minnesota's CAP includes the following actions:

- **Implement a provider enrollment moratorium for all 14 high-risk services that DHS identified and that are referenced in CMS's December 5th letter.** DHS has determined that these 14 services are high-risk based on a number of factors, including: tips, referrals, investigative findings, data analysis, and an assessment of program vulnerabilities. The high-risk designation provides DHS with the ability to install additional program integrity oversight to prevent fraud on the front-end before program weaknesses could be exploited. DHS is continuing to investigate programmatic vulnerabilities and remains on the lookout for emerging concerns. DHS is also implementing a temporary licensing moratorium for Home and Community Based Services providers and an enrollment moratorium on new autism service providers. DHS is also implementing a temporary licensing moratorium for Adult Day Services. As mentioned above, Minnesota has worked with CMS to terminate the Housing Stabilization Services benefit, effective October 31, 2025. These actions effectively pause provider enrollment for 8 of the 14 high-risk services. Minnesota agrees with CMS' recommendation for a broader moratorium and will implement a six month pause on provider enrollment for all high-risk services effective January 8, 2026. In recognition of the statutory obligation to ensure enrollee access to critical Medicaid-covered services, 42 C.F.R. § 455.470(a)(3)(ii), Minnesota will provide CMS with written notification of any proposed exceptions to the enrollment moratorium detailing the basis of its concerns.

- **Implement an immediate, off-cycle revalidation of all providers of the 14 high-risk benefits.** In its December 5th letter, CMS strongly recommended DHS complete this action as soon as practicable. We agree with CMS's direction and have established a plan that is focused on completing the process as quickly as possible while ensuring compliance with state and federal law.

  This effort will require an in-person site visit, fingerprint background study for individuals with a controlling interest in the provider organization, and verification of provider credentials for approximately 5,800 providers. To execute these actions in alignment with your direction, DHS will require tremendous additional, professional human capacity beyond what it currently has available for provider revalidation work. DHS has requested and already received reassigned

Kim Brandt, Chief Operating Officer and Deputy Administrator
Daniel Brillman, Deputy Administrator
December 30, 2025
Page 3 of 5

staff from across Minnesota state government to implement Governor Walz' Executive Order, EO 25-10, and we similarly plan to request additional resources from across state government in an attempt to meet CMS's requirements.

At the same time, Minnesota law is proscriptive regarding how DHS can implement provider revalidations, including significant timing and notice restrictions. *See* Minnesota Statutes, § 256B.04, subdivision 21. DHS welcomes guidance from and dialog with CMS on how to best meet CMS's direction and timing requirements in a legally compliant manner.

Compliance with high-risk provider revalidation also includes DHS verification that a fingerprint background study has been completed and cleared by those individuals with five percent or more ownership in the provider entity. Currently, DHS has the legal authority and capability of conducting fingerprint studies for 10 of the 14 service types within this high-risk group. *See generally* Minnesota Statutes, Chapter 245C. Currently, DHS does not see how it can comply with CMS direction and Minnesota law; however, DHS is actively developing a solution to conduct required studies for the remaining 4 service types and will undergo revalidation of those providers upon securing this capability. DHS again welcomes guidance and direction from CMS on how to meet CMS's requirements while complying with applicable law. DHS will also continue to independently work on potential solutions and will report a target date to CMS as soon as possible.

DHS intends to begin revalidation on 9 of the 13 service types (as Housing Stabilization Services has been terminated) on January 5, 2026. Due to the large number of providers requiring revalidation, Minnesota respectfully requests significant resources from CMS to accomplish the aggressive revalidation timelines demanded by CMS. We also request the assistance of CMS' Unified Program Integrity Contractor to complete document review and high-priority site visits. As mentioned, DHS also intends to request additional state employee redeployments needed to revalidate approximately 5,000 providers. With these additional resources and in light of the statutory timelines required under state and federal law, DHS anticipates completion of revalidation of these providers by May 31, 2026. The revalidation timeline under this accelerated schedule for the remaining approximately 1,000 providers in the 4 additional service types will be developed in consultation with the provider enrollment team from the Centers for Program Integrity as we seek authority to complete that workload.

- **Disenroll inactive providers who have not billed for Medicaid services within the previous year.** In October 2025, to reduce the administrative burden of provider oversight and revalidation, DHS disenrolled over 800 providers that had not billed in the prior year. The Department will now immediately disenroll an additional approximately 4,300 out-of-network and out-of-state providers within managed care organizations' networks for the same reason.

Kim Brandt, Chief Operating Officer and Deputy Administrator
Daniel Brillman, Deputy Administrator
December 30, 2025
Page 4 of 5

DHS will send notifications to approximately 800 additional providers to notify them of their inactive status and our intent to terminate their enrollment as a Medicaid billing provider. The Department will disenroll providers who are not adequately responsive by January 30, 2026. A review of an additional 13,000 providers should be completed by end of February 2026. All providers are being reviewed for network adequacy and access needs.

- **Implement enhanced prepayment review of the 14 high-risk services through a contract with Optum.** Through a newly implemented and enhanced prepayment review process, DHS will use Optum to identify and report potentially concerning claims within each provider payment cycle. The Department's Medicaid Payment and Provider Services (MPPS) Division will release unflagged claims for payment if Optum characterizes them as not concerning or "clean," while the MPPS team will send claims to the appropriate policy and program teams for further review if they are identified as potentially concerning.

  The policy and program teams responsible for administration of the benefit associated with the suspended claims will review the claims and follow up as needed with providers, including site visits if appropriate. This action will gather necessary clinical documentation and other records to substantiate service and support billing. Department staff may interview provider organization leadership, clinicians, and staff, and/or interview program members who should have received services associated with the claims submitted to DHS for payment. If this process does not resolve concerns about the claims or a provider's billing behavior, the provider and all relevant associated information will be referred to the Department's Office of Inspector General (OIG) for formal investigation.

  This is a very new enhanced prepayment review process. Payment for claims in the 14 high-risk services were paused on December 25, 2025 to allow Optum to perform enhanced prepayment review. DHS anticipates receiving the first report of prepayment findings from Optum soon. DHS anticipates the report will contain information about specific providers and billing entities and potentially concerning billing patterns. DHS will release payment to providers once we are able to identify claims as "clean" or after the relevant policy teams can resolve concerns about claims that Optum flagged as possibly problematic.

  Generally, we will release "clean" claims for payment within the customary 30-day timeframe, and we will release complex claims within a 90-day timeframe if further review is needed from policy teams to resolve concerns. Claims with possible evidence of fraudulent or other concerning activity will be referred to the OIG with a continuing payment suspension and possibly resulting in a provider payment withhold action depending on the evolution of an investigation.

Kim Brandt, Chief Operating Officer and Deputy Administrator
Daniel Brillman, Deputy Administrator
December 30, 2025
Page 5 of 5

DHS also expects to receive a report from Optum by the end of January that is focused on a historical review of claims paid in the 14 high-risk services over the last three years. DHS will provide this report when it is complete, available, and reliable.

In 2026, DHS will also release a request for proposals (RFP) to secure a longer-term vendor to conduct an even more expansive and continuing prepayment review for all Medicaid services, based on capacity, after the initial one-year Optum contract term expires.

- **Conduct a claims editing system (CES) assessment to pinpoint vulnerabilities in claims and identify opportunities for improvement.** Optum will deliver a CES Assessment by January 22, 2026. As a claim is received from the clearinghouse/provider, it runs through the pre-adjudication process of checking for eligibility, coordination of benefits, and provider verification. Within the mid-adjudication, pre-payment cycle, claims are routed for clinical editing, applying clinical and policy edits. The State provided six months of data to support the CES team assessment on November 24, 2025. This data was validated and accepted by Optum for use in an assessment on December 5, 2025. Optum has initiated the analysis and is on schedule to deliver the assessment by January 22, 2026.

- **Release an RFP to secure an external management consultant vendor to provide long term recommendations for restructuring the Department's organization and processes as the single state Medicaid agency to optimally support program integrity as an integral, core function and identity**. The Department plans to release the RFP in January 2026 and begin implementation of the vendor's recommendations as soon as practicable.

The actions detailed above demonstrate Minnesota's commitment to aggressively strengthening program integrity in its Medicaid program. We welcome further guidance and direction from CMS to ensure we are combatting fraud while also taking care of Minnesota's most vulnerable citizens. We look forward to ongoing engagement with CMS, including in scheduled weekly meetings, about this plan and your collaboration in this work.

Sincerely,

John M. Connolly, Ph.D., M.S.Ed.
Deputy Commissioner and State Medicaid Director