UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 0:26-cv-1701

STATE OF MINNESOTA, *by and through its
Attorney General, Keith Ellison*,

                Plaintiff,

   v.

DR. MEHMET OZ, *in his official capacity as
Administrator for the Centers for Medicare and
Medicaid Services*; the CENTERS FOR MEDICARE
AND MEDICAID SERVICES; ROBERT F.
KENNEDY, JR., *in his official capacity as Secretary
of the U.S. Department of Health and Human
Services*; U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES.

                Defendants.

MEMORANDUM OF LAW IN OPPOSITION TO MINNESOTA'S MOTION FOR A
TEMPORARY RESTRAINING ORDER

i

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

REGULATORY BACKGROUND .................................................................................... 3

    A.    The Medicaid Program and Federal Financial Participation ................................. 3

    B.    CMS's Three Main Tools to Address Concerns about State Medicaid Expenditures ................................................................................................... 4

        a.    Deferral: A Claim-Level Auditing Tool (42 C.F.R. § 430.40). .................. 5

        b.    Disallowance: A Definitive Determination (42 C.F.R. § 430.42).............. 6

        c.    Compliance Actions: Addressing Systemic Noncompliance (42 C.F.R. § 430.35)........................................................................... 6

FACTUAL BACKGROUND ............................................................................................ 6

    C.    CMS's December 2025 Engagement ..................................................................... 8

    D.    The January 6, 2026 Compliance Action................................................................ 8

    E.    The February 25, 2026 Deferral............................................................................. 9

    F.    The Status of Administrative Proceedings............................................................ 10

LEGAL STANDARD ...................................................................................................... 10

ARGUMENT ....................................................................................................................11

I.      MINNESOTA HAS NOT SHOWN IRREPARABLE HARM...........................................11

    A.    The deferral is temporary, and Minnesota has a clear path to payment............... 14

    B.    Minnesota has not shown that Medicaid cuts are imminent................................. 14

    C.    The financial harm is reparable............................................................................ 15

    D.    Hypothetical future deferrals do not establish present irreparable harm. ............. 15

II.     MINNESOTA'S CLAIMS ARE NOT PROPERLY BEFORE THIS COURT................ 16

    A.    The deferral is not final agency action.................................................................. 16

    B.    Minnesota has an adequate alternative remedy.................................................... 17

    C.    The case is not ripe. ............................................................................................. 17

D.      The administrative scheme requires exhaustion. ................................... 18

E.      These threshold deficiencies apply to all claims.................................... 19

III.    MINNESOTA HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE
        MERITS........................................................................................................ 19

A.      Minnesota's APA claims fail. .............................................................. 20

        a.      The press conference is not the operative agency rationale.................... 20

        b.      CMS has a legitimate basis to defer claims notwithstanding its
                ongoing review of prior submissions......................................... 22

        c.      The regulation imposes no scale limitation. .............................. 24

        d.      The deferral notice satisfies § 430.40's requirements.............................. 25

B.      Minnesota's non-APA claims fail independently. .................................. 27

        a.      Due process ....................................................................... 27

        b.      Spending Clause.................................................................. 28

        c.      Ultra vires......................................................................... 29

IV.     THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR CMS. ................. 30

V.      MINNESOTA'S REQUESTED PRELIMINARY RELIEF IS
        INAPPROPRIATELY BROAD ............................................................... 31

CONCLUSION................................................................................... 32

# TABLE OF AUTHORITIES

**CASES**

*Alliance v. Gandhi*,
No. CV 25-492 (JRT/ECW), 2025 WL 607326 (D. Minn. Feb. 25, 2025)................. 13, 28, 30

*Arc of Iowa v. Reynolds*,
94 F.4th 707 (8th Cir. 2024)................................................................................... 15

*Asante v. Azar*,
2020 WL 1930263 (D.D.C. 2020) ..................................................................... 12, 15

*Bennett v. Spear*,
520 U.S. 154 (1997)............................................................................................. 16

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)............................................................................................. 17

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)....................................................................................... 17, 20

*Clarinda Home Health v. Shalala*,
100 F.3d 526 (8th Cir. 1996)........................................................................... 27, 28

*Commonwealth of Massachusetts v. Departmental Grant Appeals Board of HHS*,
698 F.2d 22 (1st Cir. 1983) ................................................................................. 24

*Darby v. Cisneros*,
509 U.S. 137 (1993)............................................................................................. 18

*Department of Commerce v. New York*,
139 S. Ct. 2551 (2019)......................................................................................... 21

*Department of Homeland Security v. Regents of the University of California*,
140 S. Ct. 1891 (2020)......................................................................................... 31

*FTC v. Standard Oil Co.*,
449 U.S. 232 (1980)............................................................................................. 16

*Ga. Dep't of Cmty. Health v. HHS*,
79 F. Supp. 3d 269 (D.D.C. 2015) ...................................................................... 24

*Gen. Motors Corp. v. Harry Brown's LLC*,
563 F.3d 312 (8th Cir. 2009) ............................................................................... 15

*Home Instead, Inc. v. Florance*,
721 F.3d 494 (8th Cir. 2013) ...............................................................................11

*Leach v. Minn. DHS*,
  No. CV 25-3220 (PAM/SGE), 2025 WL 2962486 (D. Minn. Oct. 17, 2025) ........................ 13

*Lindell v. United States*,
  82 F.4th 614 (8th Cir. 2023) .............................................................................................. 11, 31

*McCarthy v. Madigan*,
  503 U.S. 140 (1992) ................................................................................................................ 18

*Mitchael v. Colvin*,
  809 F.3d 1050 (8th Cir. 2016) ............................................................................................... 31

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  78 F.4th 1011 (8th Cir. 2023) ................................................................................................ 30

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ................................................................................................................ 29

*NRC v. Texas*,
  605 U.S. 665 (2025) ................................................................................................................ 29

*Packard Elevator v. I.C.C.*,
  782 F.2d 112 (8th Cir. 1986) ................................................................................................. 12

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) .................................................................................................................... 29

*Pub. Water Supply Dist. No. 10 of Cass Cnty., Mo. v. City of Peculiar, Mo.*,
  345 F.3d 570 (8th Cir. 2003) ................................................................................................. 18

*S. Dakota v. U.S. Dep't of Interior*,
  665 F.3d 986 (8th Cir. 2012) ................................................................................................. 27

*Sampson v. Murray*,
  415 U.S. 61 (1974) .................................................................................................................. 11

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) .......................................................................................................... 17, 20

*Sessler v. City of Davenport*,
  990 F.3d 1150 (8th Cir. 2021) ............................................................................................... 11

*Shalala v. Ill. Council on Long Term Care*,
  529 U.S. 1 (2000) ............................................................................................................... 19, 31

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ................................................................................................................ 27

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ................................................................................... 29

*Trudeau v. FTC,*
    384 F. Supp. 2d 281 (D.D.C. 2005) ......................................................... 20

*U.S. Army Corps of Engineers v. Hawkes Co.,*
    578 U.S. 590 (2016) ................................................................................... 16

*University of Texas v. Camenisch,*
    451 U.S. 390 (1981) ................................................................................... 10

*Weinberger v. Salfi,*
    422 U.S. 749 (1975) ................................................................................... 19

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................................... 11

**STATUTES**

5 U.S.C. § 704 ............................................................................... 16, 17, 19

5 U.S.C. § 706(2) .................................................................................... 31

5 U.S.C. § 706(2)(D) ............................................................................... 19

42 U.S.C. § 1316(d) ................................................................................ 18

42 U.S.C. § 1316(e) ................................................................................ 18

42 U.S.C. § 1396a .................................................................................... 4

42 U.S.C. §§ 1396–1396w ......................................................................... 3

Minn. Stat. Ann. § 256B.064 ................................................................... 13

**RULES**

Fed. R. Civ. Proc. 65(c) .......................................................................... 32

**REGULATIONS**

42 C.F.R. Part 430 .................................................................................... 6

42 C.F.R. Part 455 .................................................................................... 8

42 C.F.R. § 430.10 .................................................................................... 4

42 C.F.R. § 430.30 .................................................................................... 4

42 C.F.R. § 430.35 ........................................................................................ 6

42 C.F.R. § 430.35(a) .................................................................................... 9

42 C.F.R. § 430.40 ............................................................................... *passim*

42 C.F.R. § 430.40(a)(1) ............................................................................. 22

42 C.F.R. § 430.40(b)(1) ..................................................................... 26, 28

42 C.F.R. § 430.40(c)(1) ............................................................................. 13

42 C.F.R. § 430.40(c)(5) ..................................................................... 14, 18

42 C.F.R. § 430.40(c)(6) ..................................................................... 12, 16

42 C.F.R. § 430.40(e) .................................................................................. 16

42 C.F.R. § 430.42 ................................................................................. 6, 14

42 C.F.R. § 430.102 ...................................................................................... 6

42 C.F.R. § 430.104(a) ................................................................................. 9

## OTHER AUTHORITIES

Centers for Medicare & Medicaid Services; Statement of Organization, Functions and
   Delegations of Authority; Reorganization Order,
   66 Fed. Reg.35,437 (2001) ........................................................................ 3

Notice of Opportunity for Hearing,
   91 Fed. Reg. 1539 ....................................................................................... 8

## INTRODUCTION

Minnesota is the site of one of the largest Medicaid fraud schemes in American history. The Feeding Our Future case and related prosecutions exposed billions of dollars in fraudulent claims flowing through Minnesota programs, revealing systemic failures in provider enrollment, claims processing, and program oversight that allowed fraudulent providers to operate at scale. Minnesota itself has acknowledged the depth of the crisis. It identified fourteen Medicaid service areas as high-risk for fraud, imposed enrollment moratoria, conducted emergency revalidations, and disenrolled thousands of providers. The Centers for Medicare & Medicaid Services' (CMS) data analytics confirmed what Minnesota has already recognized: these service areas present acute program-integrity vulnerabilities.

The deferral at issue is proportionate to the magnitude of the documented fraud. CMS deferred $243 million in fourth-quarter 2025 claims primarily from the fourteen high-risk service areas. This figure is substantial, and reflects the scale of the documented problem—not an arbitrary exercise of authority. The governing regulation, 42 C.F.R. § 430.40, authorizes CMS to defer "a claim or any portion of a claim" whenever it "questions its allowability and needs additional information." Nothing in the regulation caps the number of claims CMS may question or the aggregate dollar amount of a deferral. And while Minnesota has taken some steps to address these vulnerabilities, those steps do not moot CMS's authority to question whether past claims in these service areas are documentarily supported. When an entire category of services has been identified as vulnerable to fraud, CMS has authority to question claims across that category. Indeed, it would be a dereliction of CMS's duties to do otherwise.

But the deferral does not foreclose Minnesota's path to payment. It opens one. CMS could resolve the deferral in Minnesota's favor after reviewing documentation; CMS could disallow only

the portion that proves unallowable upon review; or CMS could take no further action, in which case payment flows automatically. Rather than allowing this well-established process to play out as it normally would, Minnesota has come straight to court based on statements made at a press conference. That is hardly a basis for the extraordinary relief it seeks. Minnesota's motion should be denied.

First, Minnesota has not shown irreparable harm. At bottom, this is a payment dispute. The regulatory framework provides an adequate post-deprivation remedy: if Minnesota substantiates the allowability of its claims, CMS must pay. That process presents an adequate alternative remedy and forecloses a finding of irreparable injury.

Second, Minnesota's claims are not properly before this Court. The deferral is not final agency action under § 704, but rather the first step in a structured administrative process that Minnesota has not started. Similarly, this dispute is not ripe for judicial review. The disallowance process also provides Minnesota with an adequate remedy, which also forecloses Administrative Procedure Act (APA) review. And Minnesota's failure to exhaust is yet another independent bar. These deficiencies apply with equal force to Minnesota's constitutional and ultra vires counts, which are, in substance, APA challenges repackaged in different doctrinal clothing—they rise or fall with the same requirement that Minnesota must first complete the administrative process Congress prescribed.

Third, Minnesota cannot demonstrate a likelihood of success on the merits. Its APA theory rests on press conference statements reflecting political framing, not the operative agency rationale reflected in the deferral notice and administrative record; its due process claim fails because a State is not a "person" under the Fifth Amendment; and its Spending Clause claim misapprehends both the nature of CMS's deferral and the holding of *NFIB v. Sebelius*.

2

Finally, even if Minnesota could show a defect in the deferral notice, the most Minnesota would be entitled to at final judgment is vacatur and remand, *not* the mandatory injunction to release all deferred funds it now seeks. Under the APA, the most relief Minnesota could receive is vacatur and remand—not vacatur and payment. Minnesota does not dispute that CMS possesses regulatory authority to issue deferrals. Nor does it dispute that the fourteen service areas present genuine fraud concerns: Minnesota itself designated them as high-risk. If the deferral notice lacks sufficient specificity, then the remedy is to order CMS to issue a compliant notice, not to compel the release of $243 million in unreviewed claims. No deficiency in the form of a deferral notice entitles a State to payment of claims whose allowability remains unresolved, and Minnesota can point to no authority for that proposition.

Lastly, if the Court does not deny Plaintiffs' motion in its entirety, Plaintiffs should be required to post security commensurate with any injunctive relief.  And the Court should stay any such relief pending the disposition of any appeal that is authorized by the Solicitor General or at least for a period of seven days to allow Defendants to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## REGULATORY BACKGROUND

### A.    The Medicaid Program and Federal Financial Participation

Medicaid is a cooperative federal-state program that helps finance the cost of providing medical assistance to eligible individuals. 42 U.S.C. §§ 1396–1396w. The HHS Secretary is responsible for the program and has delegated its administration to CMS, an agency within HHS. *See* Centers for Medicare & Medicaid Services; Statement of Organization, Functions and Delegations of Authority; Reorganization Order, 66 Fed. Reg. 35,437 (2001).

States that elect to participate must submit a state plan to CMS for approval and must comply with the requirements of Title XIX of the Social Security Act and implementing regulations. 42 U.S.C. § 1396a; 42 C.F.R. § 430.10. In return, the federal government reimburses each state for a percentage of its Medicaid expenditures—known as federal financial participation (FFP)—through quarterly grant awards. 42 C.F.R. § 430.30. CMS reviews state plans to determine whether plans meet the requirements for approval. *E.g.*, *id.* § 430.12(c)(2).

The Medicaid payment process operates in two stages. First, states submit estimated expenditure projections to CMS on Form CMS-37, and CMS issues quarterly advance payments based on those estimates. *Id.* § 430.30(a). Second, after the quarter ends, states submit actual expenditure reports on Form CMS-64, which reconcile the advance payments against what the state actually spent. *Id.* § 430.30(b)–(c). CMS reviews the CMS-64 data, calculates the federal share, and adjusts the state's grant award accordingly. CMS issues additional funds if the state spent more than the advance or reduces future advances if the state spent less. This reconciliation process is the point at which CMS evaluates whether the expenditures a state has reported are allowable, and it is also the point at which CMS may defer a claim under § 430.40 if it questions the allowability of reported expenditures and needs additional information.

The deferral at issue here arose from CMS's review of Minnesota's CMS-64 submission for the quarter ending September 30, 2025, certified on December 30, 2025.

**B.    CMS's Three Main Tools to Address Concerns about State Medicaid Expenditures**

When CMS has concerns about a state's Medicaid expenditures or operations, the regulatory scheme provides three distinct mechanisms, each with its own scope, purpose, and procedural protections. Deferrals are preliminary, retrospective, and time-limited; disallowances are definitive and appealable; and compliance actions are systemic, prospective, and subject to the most robust procedural protections. These distinctions reflect a Congressional judgment about

4

what process is due when federal dollars are at stake, calibrated to the nature and gravity of the government's concerns.

### a. Deferral: A Claim-Level Auditing Tool (42 C.F.R. § 430.40).

Deferral under 42 C.F.R. § 430.40 is a retrospective auditing mechanism that allows CMS to temporarily pause payment on "a claim or any portion of a claim" when the Administrator "questions its allowability and needs additional information to resolve the question." *Id.* § 430.40(a)(1). As used in the regulation, "claim" refers to the State's claim for federal financial participation as reported on its quarterly CMS-64 expenditure submission—not to individual provider claims submitted to the State. A single CMS-64 line item may aggregate thousands of underlying provider claims across a service category. CMS may defer all or any portion of that line item. CMS must issue a deferral within 60 days of receiving the quarterly expenditure report that includes the questioned claim. *Id.* § 430.40(a)(2).

The process is designed to be specific, bounded, and time-limited. Within 15 days of deferring a claim, CMS must send the state a written notice that "identifies the type and amount of the deferred claim and specifies the reason for deferral," and that "requests the State to make available all the documents and materials the regional office then believes are necessary to determine the allowability of the claim." *Id.* § 430.40(b)(1)(i)–(ii). Then, "[i]t is the responsibility of the State to establish the allowability of a deferred claim." *Id.* § 430.40(b)(2).

The state has 60 days (or 120 days with an extension) to make the requested documentation available. *Id.* § 430.40(c)(1). CMS has 90 days after all documentation is available in readily reviewable form to determine allowability. *Id.* § 430.40(c)(5). If CMS cannot complete its review within 90 days, it must pay the claim. *Id.* § 430.40(c)(6). This safety valve ensures that the deferral process cannot be used to withhold funds indefinitely.

*b.  Disallowance: A Definitive Determination (42 C.F.R. § 430.42)*

Disallowance under 42 C.F.R. § 430.42 is the mechanism by which CMS formally determines that a claim for FFP is not allowable and recovers the federal share. Unlike a deferral, a disallowance is a final determination. A state may appeal a disallowance to the Departmental Appeals Board (DAB), and the state may request to retain the disputed funds during the pendency of the appeal. *Id.* § 430.42(b)–(f). The DAB's decision is a final decision subject to judicial review. *Id.*

*c.  Compliance Actions: Addressing Systemic Noncompliance (42 C.F.R. § 430.35)*

When CMS concludes that a state has failed to comply substantially with certain Medicaid requirements, it may prospectively withhold federal payments under 42 C.F.R. § 430.35. This is distinct from a deferral and then disallowance which is retrospective. CMS may not withhold funds until after providing the state "reasonable notice and an opportunity for a hearing." *Id.* § 430.35(a). The compliance hearing process under 42 C.F.R. Part 430, Subpart D, provides significant procedural protections: CMS may submit an administrative record, the parties may agree to conduct discovery prior to the hearing, and the state is entitled to an evidentiary hearing before a hearing officer at which both parties may present evidence and cross-examine witnesses. *Id.* §§ 430.76, 430.80, 430.86, 430.88. The hearing officer issues a recommended decision which the Administrator reviews before issuing his final decision within sixty days. *Id.* § 430.102(b). The Administrator's final decision is subject to judicial review. *Id.* § 430.102(c). During the pendency of the hearing and appeal, CMS may not withhold funds. *Id.* § 430.104(a).

## FACTUAL BACKGROUND

Minnesota administers its Medicaid program, known as Medical Assistance, under a state plan approved by CMS. Approximately 1.16 million Minnesotans are enrolled. The federal

government provides roughly 54% of the program's funding—approximately $10.2 billion of the State's $18.9 billion in total annual expenditures for fiscal year 2024. Ferguson Decl. ¶ 8.

Minnesota has been at the center of one of the largest Medicaid fraud schemes in American history. The Feeding Our Future case and related prosecutions exposed systematic fraud running to billions of dollars in federal funds claimed through Minnesota's programs.[1] These investigations revealed significant vulnerabilities in the State's provider enrollment, claims processing, and oversight systems—vulnerabilities that allowed fraudulent providers to enroll, bill, and receive payment with insufficient scrutiny. Ferguson Decl. ¶ 9.

In response, Governor Walz issued Executive Order 25-10 on September 17, 2025, directing DHS and other state agencies to implement antifraud measures. Dkt. 5-1 (Brennaman Decl.), Ex. 1. Minnesota itself identified fourteen Medicaid service categories as high-risk based on programmatic vulnerabilities, investigations, and analysis. The State's own identification of these areas as high-risk reflects its acknowledgment that claims in these service categories present elevated serious questions of allowability.

Minnesota's own State Medicaid Director John Connolly confirms these vulnerabilities. He declares that Minnesota "identified providers of 14 total service types as high-risk based on programmatic vulnerabilities, investigations, and analysis," and that the State "initiated enhanced prepayment review for all fee-for-service claims involving these fourteen services, a twenty-four-month licensing moratorium for Home and Community Based Service providers, an additional moratorium for Adult Day services, and ended enrollment of new autism service providers." Connolly Decl. ¶ 6. In October 2025 alone, DHS disenrolled over 800 inactive healthcare

---

[1] Feeding Our Future was primarily a child nutrition fraud scheme that helped expose systemic vulnerabilities in Minnesota's provider oversight systems that extend to Medicaid.

providers. *Id*. These actions preceded any CMS deferral or compliance action and reflect the State's own assessment that claims in these service areas presented serious allowability concerns.

## A.    CMS's December 2025 Engagement

On December 5, 2025, Administrator Mehmet Oz sent a letter to Minnesota expressing CMS's concern that the State's antifraud efforts remained insufficient and requesting that Minnesota submit a corrective action plan by December 31, 2025. Brennaman Decl., Ex. 2. Minnesota took some of the steps requested: it provided weekly updates, imposed enrollment moratoria, conducted off-cycle revalidations, and on January 5, 2026, disenrolled approximately 4,300 out-of-network and out-of-state managed care providers but problems remained. Ferguson Decl. ¶ 12.  Minnesota submitted a corrective action plan to CMS on December 31, 2025.

## B.    The January 6, 2026 Compliance Action

On January 6, 2026, CMS notified Minnesota that it considered the State to be out of substantial compliance with Section 1902(a)(64) of the Social Security Act and 42 C.F.R. Part 455, Subpart A—the Medicaid provisions governing fraud detection and investigation. Notice of Opportunity for Hearing, 91 Fed. Reg. 1539, 1540-42 (Jan. 14, 2026) (letter from CMS to Minnesota); Brennaman Decl., Ex. 3. CMS also notified the state that it found its December 31 corrective action plan deficient. 91 Fed. Reg. at 1541; Brennaman Decl., Ex. 3 at 3. Therefore, CMS stated it planned to withhold more than $515 million[2] from Minnesota's next quarterly claim of expenditures on the Form CMS-64, unless Minnesota addresses the concerns through "a revised comprehensive CAP that includes the timeframe for implementation and any performance or quality metrics the state will use to evaluate [the] effectiveness of the actions." 91 Fed. Reg. at 1542; Brennaman Decl., Ex. 3 at 5.

---

[2] The $515 million reflects the federal share for one quarter's amount of the previous calendar year's annual total paid expenditures for the fourteen high-risk services.

Minnesota appealed the noncompliance determination on January 9, 2026. Brennaman Decl., Ex. 4. Under 42 C.F.R. §§ 430.35(a) and 430.104(a), the appeal stays any withholding pending the conclusion of the administrative hearing process. That process is ongoing. No merits hearing has been scheduled yet.

### C.     The February 25, 2026 Deferral

On February 25, 2026, CMS's Division of Financial Operations West issued a deferral notice to Minnesota's State Medicaid Director. Brennaman Decl., Ex. 6 ("Notice"). The notice, signed by Dorothy Ferguson, Director of the Division, was issued through the same financial management channels CMS uses to process all quarterly expenditure reports. Ferguson Decl. ¶ 38.

The Notice identifies four separate deferrals totaling $259,505,491 in FFP claimed on Form CMS-64 for the quarter ending September 30, 2025. Three of the four deferrals are unrelated to the fourteen high-risk service areas: $4,366,342 for administrative cost allocation issues involving state-only health programs; $11,025,548 for documentation deficiencies related to emergency Medicaid services furnished to individuals lacking satisfactory immigration status; and $323,341 for Federal Medical Assistance Percentage (FMAP) return discrepancies spanning 2020 through 2024. And Minnesota does not challenge those here. The fourth deferral (the $243,790,260 at issue) relates to the fourteen high-risk service areas. Within that amount, CMS identified $164,198,916 for "other practitioner, personal care, and home and community-based services lines that have questionable variances and raise concerns about allowability," and $79,591,344 "associated with reimbursement claims submitted to the state by specific providers that [CMS has] identified as high-risk for fraud or aberrant billing practices based on historical billing and CMS data analytics." For each deferral, the notice requested specific documentation, offered the option of resolving the matter through decreasing Line 10B adjustments, and for the $243 million, offered resolution "including through CMS sample-based reviews." The Notice cited 42 C.F.R. § 430.40,

9

provided 60 days to respond with an option for a 60-day extension and identified CMS career staff as the contacts for further communication.

CMS's review of Minnesota's Q4 2025 expenditure data identified specific, quantifiable concerns underlying each component of the deferral. Variance analysis on the CMS-64 data revealed significant unexplained increases on three service lines between Q3 and Q4 FY 2025 (the $164 million). Ferguson Decl. ¶¶ 28-29. Separately, given the scale of Minnesota's documented fraud problem, CMS cross-referenced detailed claims data provided by Minnesota against Fraud Prevention System alerts and identified 113 specific billing providers with anomalous patterns (the $79.5 million). Ferguson Decl. ¶ 31-32. These steps were commensurate with the severity of the fraud Minnesota itself has acknowledged. And the deferral notice says nothing about a corrective action plan.

Minnesota has not yet meaningfully responded to the deferral notice.

### D.    The Status of Administrative Proceedings

Two administrative processes are currently pending. The compliance action related to the proposed withholding initiated on January 6 is in its early stages; no hearing has yet been scheduled. The deferral process for the quarter ending September 30, 2025 initiated on February 25 has barely begun. Minnesota has 60 days to submit documentation. That deadline has not passed. No allowability determination has been made. No claim has been disallowed.

## LEGAL STANDARD

The purpose of preliminary equitable relief is to preserve the status quo, not to provide the movant with the ultimate relief sought. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A TRO requires the plaintiff to make "a clear showing" that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). Success on the merits is most significant. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

Minnesota applies the prohibitory standard but it seeks mandatory relief. The funds have been excluded from the grant; ordering release requires recalculation and disbursement—that is, affirmative action. Mandatory injunctions require a movant show that its position is "clearly right." *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021).

The posture of this motion underscores the problem with this case. If the Court grants the TRO Minnesota requests, CMS's reasonable concerns of fraud and abuse will be ignored, and Minnesota gets the full $243 million released. A TRO that gives the movant the entirety of the relief it seeks on the merits is not a temporary restraining order—it is a final judgment entered without full briefing, without an administrative record, and without the administrative process Congress created for exactly this dispute. When preliminary relief is indistinguishable from final relief, it is no longer preliminary and must thus be denied for this reason alone. *See Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023).

## ARGUMENT

## I.    MINNESOTA HAS NOT SHOWN IRREPARABLE HARM

This case is about money. *See* Compl. ¶¶ 4, 38. Minnesota wants $243 million. It wants it now. And it wants it without first showing that the claims are allowable.

Where a plaintiff demands the right to payment and has an adequate post-deprivation remedy, preliminary injunctive relief commanding payment prior to a decision on the merits is extraordinary. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[I]njuries, however substantial, in terms of money, time and energy" are not irreparable where "compensatory or other corrective

relief" is available in the ordinary course.). *Sampson* held that a terminated government employee's right to back pay if the employee ultimately prevailed was an adequate legal remedy precluding preliminary injunctive relief. That is true even though the employee faced genuine financial hardship in the interim. The Court emphasized that "an insufficiency of savings or difficulties in immediately obtaining other employment will not support a finding of irreparable injury, however severely they may affect a particular individual." *Id.* at 92 n.68. *See also Asante v. Azar*, 2020 WL 1930263, at *3–4 (D.D.C. 2020) (denying preliminary injunction against CMS in Medicaid funding dispute citing 42 C.F.R. § 430.40; "economic loss is not irreparable harm in and of itself"; loss of $15 million in Medicaid supplemental payments was not irreparable where funds were ultimately recoverable if court set aside the challenged plan).

So too here. If Minnesota establishes the allowability of the deferred claims, CMS must pay. If CMS cannot complete its review within 90 days, it must pay. 42 C.F.R. § 430.40(c)(6). If CMS ultimately disallows claims and Minnesota appeals successfully to the DAB, Minnesota recovers. At every stage, Minnesota has a path to payment. It is well-established that Minnesota's alleged fiscal inconvenience in the interim does not transform a reparable monetary dispute into irreparable harm. *See also Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986) ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the [petitioner]'s business.").

Moreover, as Minnesota admits, the deferral at issue affects just **7.2%** of Minnesota's projected quarterly federal share. Minge Decl. ¶ 3. The vast majority of Minnesota's Medicaid FFP—over 92%—continues to flow normally. While $243 million is significant in isolation, it represents a fraction of the State's $18.9 billion annual program. Minnesota is not being cut off

from Medicaid; rather CMS asks it to document claims in service areas with documented fraud vulnerabilities while the remainder of its program operates uninterrupted.

Minnesota's own description of its harm confirms the point. Its brief conditions the threatened cuts on funding being "delayed or denied for a protracted period" or on CMS following through on future quarterly deferrals. Br. 35. Neither condition has been met. A protracted delay cannot occur under the regulatory framework: Minnesota has 60 days to submit adequate documentation, CMS has 90 days to review it; and if CMS cannot finish in time, it must pay automatically. 42 C.F.R. § 430.40(c)(1), (5), (6). And no future deferral has been issued. Minnesota's irreparable harm argument depends on assumptions about what might happen if regulatory timelines are not honored or if CMS takes actions it has not yet taken. That is speculation, not irreparable harm.

It is unsurprising, then, that when the shoe is on the other foot and Minnesota defends its own temporary suspensions or withholdings of Medicaid funding to providers, it argues that economic loss while the administrative process plays out is not irreparable harm. *E.g.*, Defs.' Resp. to Pls.' Mot. for TRO & Prelim. Inj. 32–34, *Alliance v. Gandhi*, No. CV 25-492 (JRT/ECW) (D. Minn. Feb. 15, 2025) ("Minn. Alliance Br.") (arguing mere "economic loss" is insufficient in challenge to State's temporary suspension of Medicaid reimbursements to providers under Minn. Stat. Ann. § 256B.064, subdiv. 2). Notably, courts in this District have agreed. *E.g., Leach v. Minn. DHS*, No. CV 25-3220 (PAM/SGE), 2025 WL 2962486, at *4 (D. Minn. Oct. 17, 2025) ("If the investigation concludes without any finding of wrongdoing, all of the withheld payments will be later issued to Plaintiff."); *Alliance*, 2025 WL 607326, at *1 (D. Minn. Feb. 25, 2025) ("merely withholding Medicaid payments" constitutes "economic loss," which "alone does not constitute irreparable harm").

**A.    The deferral is temporary, and Minnesota has a clear path to payment.**

A deferral is not a denial of funds: it is a pause. Under § 430.40(c), Minnesota has 60 days to submit documentation to support the allowability of the deferred claims. Once CMS receives the documentation in readily reviewable form, CMS has 90 days to make a determination, 42 C.F.R. § 430.40(c)(5), and either pays or disallows the claims. If CMS cannot finish in 90 days, it must pay the claim. *Id.* § 430.40(c)(6). And if CMS ultimately disallows claims after review, the State may seek reconsideration by the Administrator or appeal to the Departmental Appeals Board. *Id.* §§ 430.42(b), (f); 433.38. At every stage of this process, Minnesota has a path to payment.

Minnesota's own Deputy Medicaid Director confirms that deferrals are an established feature of the CMS-Minnesota relationship. The Hultman Declaration acknowledges that "Minnesota has received many deferral notices over the years," Hultman Decl. ¶ 2, describes a regulatory process with defined timelines to determine allowability, *id.* ¶ 8, and notes a 60-day window for the State to respond, *id.* ¶ 7. His concern is not that the process lacks protections, but that CMS *may* not honor them.

**B.    Minnesota has not shown that Medicaid cuts are imminent.**

Minnesota claims the deferral "would require the State to make cuts to Medicaid services." Br. 35. Its own evidence says otherwise.

The Minge Declaration conditions harm on the Legislature not acting: cuts would be needed only "absent a legislative appropriation that covers this shortfall." Minge Decl. ¶ 3; *see* Compl. ¶ 4. The Legislature is in session. Minnesota has not alleged that it has requested and been denied an emergency appropriation. And the Minge Declaration says nothing about mechanisms available to the State such as borrowing authority, interfund transfers, general fund balances, emergency appropriations, or reallocation of existing resources. That one reserve fund does not apply does not mean the State is without options.

14

Connolly's declaration is no different. He conditions the harm on funding being "delayed or denied for a protracted period" or on deferrals recurring "quarterly, as has been threatened." Connolly Decl. ¶ 18. That is also conditional: if protracted, if quarterly, then cuts. None of those conditions has been met. The deferral is only days old. Indeed, Connolly identifies four specific programs whose combined quarterly federal funding equals the deferral amount. But he does not say those programs will be cut. Minnesota therefore cannot show that any cuts are imminent.

## C.    The financial harm is reparable.

Should Minnesota establish the allowability of the deferred claims, it then gets the money. Any deferred claims resolved in the State's favor will result in full payment of those claims.

Correspondingly, the harm is a temporary delay in the receipt of federal funds—compensable and reversible. *See Gen. Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 319 (8th Cir. 2009) (affirming finding that decrease in sales caused by lost customer relationships was quantifiable, could therefore be compensated, and was therefore compensable); *see Azar*, 2020 WL 1930263, at *3–4. Unlike cases involving loss of constitutional rights or environmental degradation, the harm here is quintessentially monetary.

## D.    Hypothetical future deferrals do not establish present irreparable harm.

No future deferral notice has been issued. Future deferrals are contingent on future quarterly reports and future agency decisions and would present different questions. Courts do not enjoin speculative future actions. *See Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024).

## II.    MINNESOTA'S CLAIMS ARE NOT PROPERLY BEFORE THIS COURT

### A.    The deferral is not final agency action.

Minnesota's claims require final agency action. 5 U.S.C. § 704. Under *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), a final agency action must mark "the consummation of the agency's decision-making process" and determine "rights or obligations." The deferral does neither.

A deferral initiates structured review: CMS questions allowability, the state produces documentation, CMS determines whether to pay or disallow. 42 C.F.R. § 430.40(e). That determination is the consummation. Everything before it is interlocutory.

First, Minnesota's own evidence confirms that the deferral initiates a process rather than concludes one. The Hultman Declaration describes a sequence in which CMS requests information, the State responds within 60 days, CMS evaluates submissions, and CMS resolves claims within 90 days. Hultman Decl. ¶¶ 6-8. That is a multi-step administrative process, not a final determination. Not surprisingly, Minnesota's own brief describes a deferral as "initiat[ing] a process." Br. 26; *see FTC v. Standard Oil Co.*, 449 U.S. 232, 241 (1980) (holding that issuance of FTC complaint was not final agency action because it was "a determination that adjudicatory proceedings will commence" not "a definitive agency position on the question" of a violation).

Second, a temporary exclusion of funds pending review is a hold, not a determination. Section 430.40 has always placed the burden on the state to establish allowability. And the 90-day safety valve—CMS must pay if it cannot decide in time, 42 C.F.R. § 430.40(c)(6)—is incompatible with finality. Unlike the jurisdictional determination in *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016), which "gave rise to direct and appreciable legal consequences by altering the legal regime applicable to the parties," the deferral alters nothing. Minnesota's obligations remain what they always were: submit documentation to establish allowability.

16

Minnesota argues the deferral is effectively final because Administrator Oz stated the money would be released only after a corrective action plan. CMS does not dispute that this statement was made. But press conferences are not agency actions. Political officials announcing the government's engagement with a state do not speak with the precision of a Federal Register notice. They never have.

The agency action here is the deferral notice because it invokes § 430.40, it identifies questioned claims, it requests documentation, and it conditions release on allowability. But, it says nothing about a corrective action plan. Courts review agency action on the grounds the agency invoked. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). The grounds are in the notice. And what the notice describes is a request for documentation with defined timelines and a built-in payment guarantee. That is preliminary by design.

### B.    Minnesota has an adequate alternative remedy.

Even if the deferral were final agency action—and it's not—APA review is unavailable where an adequate alternative remedy exists. *See* 5 U.S.C. § 704 ("agency action for which there is no other adequate remedy in a court" is subject to judicial review). The Medicaid regulatory framework provides exactly that. That structured path to payment is precisely the kind of adequate alternative remedy that forecloses resort to the APA in federal court. *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

### C.    The case is not ripe.

Minnesota's claims are not ripe because the administrative process Congress created for exactly this dispute has barely begun. Under the ripeness doctrine, courts decline to review administrative action when it is preferable for judicial review to await a more advanced state of

administrative consideration. *See Pub. Water Supply Dist. No. 10 of Cass Cnty., Mo. v. City of Peculiar, Mo.*, 345 F.3d 570, 572 (8th Cir. 2003).

That is precisely the situation here. The deferral notice was issued February 25, 2026, and Minnesota has submitted nothing in response to substantiate its claims for federal funds. If Minnesota were to respond by the deadline, CMS would need to review the submission, and it has ninety days to do so. *See* 42 C.F.R. § 430.40(c)(5). CMS has made no allowability determination, no claim has been disallowed, and no compliance measures have been imposed. Any anticipated harm is contingent on a cascade of future events—CMS declining to lift the deferral, a disallowance issuing, a DAB appeal failing—each of which could moot or narrow the dispute. This Court should decline to adjudicate claims whose contours remain unsettled by an administrative process Minnesota has not yet bothered to pursue.

### D.    The administrative scheme requires exhaustion.

The regulatory scheme provides a process: deferral, documentation, review, determination, and DAB appeal. And only then, judicial review. 42 U.S.C. § 1316(d); 42 C.F.R. §§ 430.40, 430.42. Courts do not permit litigants to bypass that scheme simply because they would prefer a faster forum. *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). Minnesota is at step one. It has submitted nothing. The Court should reject Minnesota's request to skip to step six.

CMS may lift the deferral in whole or in part based on what the State supplies. Immediate judicial intervention would collapse the administrative process Congress built for exactly this kind of dispute—particularly where the deferral is only a temporary pause to permit CMS to investigate claims in service areas with documented fraud. *See Darby v. Cisneros*, 509 U.S. 137, 146 (1993).

A deferral precedes the administrative review process Congress created for FFP disputes. 42 U.S.C. § 1316(e). Congress reserved judicial review for the end of the process. Minnesota has not reached it.

**E.    These threshold deficiencies apply to all claims.**

Minnesota styles its complaint to include non-APA claims—procedural due process (Count I), the Spending Clause (Count IV), and ultra vires (Count V)—apparently to avoid the finality requirement of 5 U.S.C. § 704 or excuse its failure to exhaust remedies. But these claims lack independent substance. Each challenges the same agency action (the deferral), relies on the same factual predicate (the deferral notice and press conference), and seeks the same relief (vacatur and release of $243 million). The due process claim is an APA procedural challenge in constitutional clothing; it argues that the deferral should have been processed as a compliance action, which is the same argument Count III makes under 5 U.S.C. § 706(2)(D). The Spending Clause claim is an APA ultra vires argument dressed as a structural constitutional claim; it argues that CMS exceeded its authority, which is the same argument Counts II and V make. The ultra vires claim is expressly about compliance with the deferral regulation and therefore in the heartland of the APA.

Where, as here, the standing and substantive basis for a constitutional claim arise under a federal statute, the claim must be channeled through the administrative review process Congress created. *Weinberger v. Salfi*, 422 U.S. 749, 760–61 (1975); *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 11–13 (2000). Minnesota cannot evade that requirement by relabeling its APA challenges as constitutional claims.

## III.    MINNESOTA HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.

Even if the Court reaches the merits, Minnesota cannot demonstrate a likelihood of success on any of its claims.

A.    **Minnesota's APA claims fail.**

a.    *The press conference is not the operative agency rationale.*

Minnesota's APA theory rests on the February 25 press conference. There, Administrator Oz stated: "[W]e will give them the money, but we're going to hold it and only release it after they propose and act on a comprehensive corrective action plan." Vice President Vance also stated the purpose was to "turn the screws." Taken in isolation, these statements could be read to suggest the deferral is conditioned on plan compliance rather than documentation. But three points are critical in understanding why the press conference is *not* CMS's operative decision or rationale for deferring the funds in dispute.

*First,* the agency action is the deferral notice, not the press conference. "No court has ever found a press release to be a final agency action under the APA." *Trudeau v. FTC*, 384 F. Supp. 2d 281, 289 (D.D.C. 2005). The rule is simple: courts review agency action based on the grounds the agency invoked. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Here, the notice at issue invokes 42 C.F.R. § 430.40, identifies questioned claims, requests documentation, says nothing about corrective action plans, and conditions release on documentation. Just as the regulation provides.

*Second,* the press conference addressed both the compliance action (corrective action plans) and the deferral (documentation of past claims). These are parallel tracks. When Administrator Oz described the plan, he described the compliance track. CMS acknowledges the overlap: both target the same fourteen areas. But the law permits overlap. Areas with systemic compliance concerns naturally also present retrospective documentation questions. A state that has acknowledged fraud cannot bar CMS from taking steps to determine whether past claims are allowable.

20

Connolly's declaration confirms this. He states that the January 6 compliance action "targeted 14 Medicaid service areas that Minnesota had identified as 'high-risk' for fraud in October of 2025, and which the state was already taking intensive action to remedy." Connolly Decl. ¶ 11. The overlap between the compliance action and the deferral is not evidence of pretext. It is the consequence of both mechanisms targeting the same unprecedented, documented fraud vulnerabilities that *Minnesota* identified. CMS did not manufacture these concerns. Minnesota did.

*Third, Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), is inapposite. There the Court found pretext from an extensive administrative record—memoranda, emails, and documented timelines. Minnesota has no comparable record. It has not obtained the administrative record. Inferring pretext from political rhetoric at one press conference could subject every enforcement action to invalidation based on a plaintiff's mischaracterization of officials' contemporaneous public statements.

Notably, the Notice itself confirms its production through CMS's normal process. The Notice was signed by Dorothy Ferguson, Director of CMS's Division of Financial Operations West, a career staff member. The designated contact is a branch chief in CMS's Financial Management Group. The same letter includes three routine deferrals unrelated to the fourteen high-risk service areas: $4.3 million for administrative cost allocation, $11 million for immigration-status documentation, and $323,000 for FMAP return discrepancies dating to 2020. The notice bears the hallmarks of a financial management division processing a quarterly expenditure report in the ordinary course.

Finally, Vice President Vance holds no delegated Medicaid related authority. His statements are political commentary and have no weight relevant under the APA.

       *b.* *CMS has a legitimate basis to defer claims notwithstanding its ongoing review of prior submissions.*

Minnesota argues that CMS cannot "need additional information" under 42 C.F.R. § 430.40(a)(1) because CMS has not yet reviewed data Minnesota provided on February 5, 2026. Hultman Decl. ¶ 3. The argument seems to be that that CMS cannot simultaneously claim it needs more information and admit it has not finished reviewing what it already has. This misreads both the regulation and the record.

Section 430.40(a)(1) authorizes a deferral when CMS "questions [the] allowability" of a claim "and needs additional information to resolve the question." The regulation does not require CMS to exhaust review of all existing materials before requesting additional documentation. CMS analysis identified specific variances across $164 million in claims and specific high-risk providers associated with $79.5 million in claims. Those analytics are the basis for the deferral. The Notice requests "additional state and provider documentation to support the allowability of these claims, including through CMS sample-based reviews." Notice at 2. That requests documentation beyond what CMS currently possesses, regardless of the status of CMS's review of prior submissions.

Hultman's own declaration confirms. He acknowledges that the Notice seeks "more information" from Minnesota. Hultman Decl. ¶ 3. He does not claim that the February 5 submission contained all documentation necessary to establish the allowability of $243 million in claims across fourteen service areas. Indeed, a partial data submission responsive to earlier CMS inquiries is not a comprehensive documentation package establishing allowability across an entire quarter's expenditures in the State's highest-risk service categories.

Moreover, CMS's review of the February 5 data and the deferral serve the same purpose: they are part of the same investigative process. CMS's review of previously submitted materials progressed far enough to identify specific concerns — the variances and billing anomalies reflected

in the deferral notice. But the review did not go far enough to resolve them. The deferral is the regulatory mechanism for formalizing those concerns and requesting the comprehensive documentation needed to determine allowability. That CMS's review was "ongoing" hardly means it lacked a basis to defer. It means CMS's preliminary analysis had identified questions that required the State to produce documentation—which is precisely what § 430.40 contemplates.

CMS's data analytics provide a concrete, documented basis for both components of the deferral. CMS's review team identified a significant variance between expenditures reported on Form CMS-64 quarter-over-quarter (Q3 FY 2025 to Q4 FY 2025) and year-over-year (Q4 FY 2024 to Q4 FY 2025) on three service lines: other practitioner services, personal care services, and home and community-based services The $164,198,916 deferral represents the unsupported increase in claimed expenditures between Q3 and Q4 on those service lines. The review team could not explain the anomaly without additional information from the State. Ferguson Decl. ¶¶ 28-30. Separately, CMS's Center for Program Integrity identified 113 specific billing providers flagged by the Fraud Prevention System based on historical utilization and billing anomalies over the preceding twelve months. CMS cross-referenced these providers against the State's detailed claims data for the quarter, and the $79,591,344 deferral represents the claims associated with those 113 providers. *Id.* ¶¶ 31-33. The review team recommended both deferrals because it could not determine allowability without additional documentation from the State. That is precisely the circumstance § 430.40(a)(1) addresses.[3]

---

[3] Minnesota catalogs actions by other agencies—SNAP, SBA, childcare, CDC, voter registration, Title IX. Br. 9 n.1. These involve different agencies, authorities, and subjects. None of it has any bearing on CMS's § 430.40 deferral process and Minnesota alleges no plausible link.

*c.  The regulation imposes no scale limitation.*

Minnesota argues the deferral's size transforms it into a compliance action under *Commonwealth of Massachusetts v. Departmental Grant Appeals Board of HHS*, 698 F.2d 22, 27 (1st Cir. 1983). Not so. Section 430.40 imposes no scale limitation. It authorizes deferral of "a claim or any portion of a claim" whenever CMS "questions its allowability." *Ga. Dep't of Cmty. Health v. HHS*, 79 F. Supp. 3d 269, 276 & n.3 (D.D.C. 2015) (discussing $90 million deferral). The regulation speaks to the nature of the inquiry—whether a claim is documentarily supported— not to volume.

The *Departmental Grant Appeals Board* test examines the nature of the dispute, not the dollar amount. A deferral asks whether past claims are documented. That question does not become a compliance matter because many claims in fraud-afflicted areas are at issue. The compliance action asks a different question: does the State meet federal requirements going forward? Minnesota's reading produces a perverse result: the worse the fraud, the less authority CMS can use its primary auditing tool. Such an interpretation would undermine Medicaid and the regulation.

Nor does recognizing CMS's deferral authority at this scale render the compliance mechanism superfluous. Deferrals and compliance actions serve fundamentally different functions. A deferral is retrospective and temporary: CMS questions whether past claims are documentarily supported, the state responds, and the money is either paid or disallowed. A compliance action is prospective and structural: CMS determines whether the state's systems meet federal requirements and can require programmatic changes. A deferral cannot restructure a state's Medicaid program or mandate new oversight processes. A compliance action can. The two mechanisms address different problems through different means.

Notably, Hultman concedes that CMS's data analytics identified "variances" and "aberrant billing practices" in the fourteen service areas. Hultman Decl. ¶ 4. His objection does not assert

24

that CMS fabricated these concerns but that they would "normally" trigger a review or audit rather than a deferral. But that's an argument about CMS's choice of mechanism, not about whether CMS has a legitimate basis to question the allowability of claims. CMS does, and Hultman's declaration confirms it.

> ### d.  The deferral notice satisfies § 430.40's requirements.

Minnesota argues that the deferral notice is fatally vague. Br. 30-32. But the notice plainly satisfies the regulation's requirements.

Section 430.40(b)(1)(i) requires CMS to "identif[y] the type and amount of the deferred claim" and "specif[y] the reason for deferral." The notice does both. It identifies two categories of deferred claims with specific dollar amounts: $164,198,916 in claims for "other practitioner, personal care, and home and community-based services lines that have questionable variances and raise concerns about allowability," and $79,591,344 in claims "associated with reimbursement claims submitted to the state by specific providers that [CMS has] identified as high-risk for fraud or aberrant billing practices based on historical billing and CMS data analytics." Notice at 2. Each category identifies the type of claim (service lines in the first; provider-specific claims in the second), the amount, and the reason for deferral (questionable variances; aberrant billing patterns identified through analytics).

Section 430.40(b)(1)(ii) requires the notice to "request[] the State to make available all the documents and materials the regional office then believes are necessary to determine the allowability of the claim." The Notice does this too: it requests "additional state and provider documentation to support the allowability of these claims, including through CMS sample-based reviews." Notice at 2.

The Notice also provides Minnesota with the option of resolving the matter by filing "decreasing Line 10B adjustments on the next quarterly CMS-64 submission." Notice at 1. This is

the standard mechanism for a state to concede that claimed expenditures were not allowable. And it cites the governing regulation, provides the 60-day response window with an extension option, and identifies career CMS staff as contacts for further communication.

Minnesota reads § 430.40(b) to require claim-by-claim itemization, *i.e.*, the identity of every provider, every claim number, every specific variance. *See* Br. 31-32. It appears to conflate its "claim" for federal financial participation with the underlying provider claims of which the state claim is composed. But the regulation operates at the level of the State's CMS-64 submission, *not* at the provider level. *See* 42 C.F.R. § 430.40(b)(1). In other words, the regulation requires identification of the "type and amount" of the deferred claim and the "reason" for deferral. Accordingly, CMS has identified types, amounts, and reasons for the deferral. Although Minnesota's declarant complains that CMS has not told Minnesota which specific providers are flagged or what the specific variances are, Hultman Decl. ¶ 7; *id.* at n.2, the regulation does not require that level of granularity as a precondition to deferral. If it did, no deferral based on data analytics could ever be issued until the analytics were fully translated into claim-level findings, which would defeat the purpose of a mechanism designed to pause payment while documentation is gathered.  To the extent Minnesota is unsure of what documentation CMS needs to determine whether the deferred amounts are allowable, it can seek clarity during the back-and-forth provided for in the deferral process.

Neither is the deferral, as Minnesota suggests, a categorical withholding of funds across entire service areas based on generalized suspicions. It is the product of quantitative analysis. The $164 million component represents a measured variance, *i.e.*, the difference between Q3 and Q4 expenditures on identified service lines that the review team could not reconcile. The $79.5 million component is tied to 113 identified providers whose billing patterns triggered Fraud Prevention

System alerts. These are not "vague" concerns. They are anomalies identified through audit procedures. That the deferral notice describes these findings in summary terms ("questionable variances" and "high-risk providers identified through data analytics") does not mean the underlying analysis lacks specificity. It means the notice communicated the conclusions of the analysis rather than reproducing the analysis itself. The State's remedy, if it wants the underlying detail, is to engage the deferral process, not run to federal court and seek emergency relief to end-run it.

**B.    Minnesota's non-APA claims fail independently.**

As discussed in Section II.E, Minnesota's non-APA claims—due process, the Spending Clause, and ultra vires—are repackaged APA challenges that should not be permitted to circumvent the finality requirement. But even if the Court reaches the merits of these claims, each fails.

    *a.    Due process*

"The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court." *South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966); *see S. Dakota v. U.S. Dep't of Interior*, 665 F.3d 986, 990 (8th Cir. 2012) ("The State is not a "person" within the meaning of the Fifth Amendment's Due Process Clause."). That ends the due process inquiry.

Even if the State were a "person" (it's not), *Clarinda Home Health v. Shalala*, 100 F.3d 526 (8th Cir. 1996), would foreclose the claim. In that case, the Eighth Circuit held that temporary suspension of Medicare payments pending a fraud investigation satisfies due process because "[t]he withholding is nothing more than a temporary measure necessary to maintain the status quo while the necessary facts are gathered and evaluated." *Id.* at 530. The court further held that because even permanent exclusion does not require a pre-deprivation hearing, a temporary

27

withholding certainly does not. *Id.* at 531; *see Alliance*, 2025 WL 607326, at *3–7 (no protected interest "in uninterrupted Medicaid reimbursements generally" or in government "acting according to specific statutes and regulations" and "*Clarinda*'s principles from the Medicare context apply to this case in the Medicaid context"). And Minnesota has argued similarly when faced with due-process challenges to its own temporary suspensions and withholdings.[4]

The deferral here is structurally identical. CMS has temporarily withheld funds while it gathers documentation. Hearing rights are provided after CMS renders a determination. That is constitutionally adequate.

### b.  *Spending Clause*

Minnesota's Spending Clause argument rests on a characterization of the deferral as a "retroactive" "post-acceptance" condition that Minnesota did not contemplate when it elected to participate in Medicaid. Br. 34. But Minnesota's own brief defeats this claim. It concedes it knew CMS could "defer paying the State until it provided sufficient documentation to substantiate those claims." Br. 34 (citing 42 C.F.R. § 430.40). It also concedes it knew CMS could "withhold federal dollars following the administrative procedures" for noncompliance. *Id.* (citing 42 U.S.C. ch. 1396c). Those are the two things CMS is doing: the deferral exercises §430.40 authority, and the compliance action exercises § 430.35 authority. Both have been part of the Medicaid regulatory framework for decades. Nothing new has been imposed.

What Minnesota characterizes as a "new condition" is the scale of the deferral and the alleged motivation behind it. But scale and motivation are arbitrary and capricious arguments under the APA; they are not Spending Clause arguments. A Spending Clause challenge asks whether the conditions attached to federal funding were part of the bargain the state knowingly

---

[4] *See* Minn. *Alliance* Br. 22–27 (no protected property or liberty interest in Medicaid reimbursement, and no pre-deprivation hearing required).

accepted. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (conditions must provide "clear notice" so states can "exercise their choice knowingly"); *see* Compl. ¶¶ 14–15 (Minnesota "elected to participate" and therefore "must comply with the requirements of the federal statutes and rules"). Here, the condition for release of deferred funds has always been documentation of allowability—and that condition has not changed.

*NFIB v. Sebelius*, 567 U.S. 519 (2012) does not help Minnesota. In *NFIB*, Congress threatened to revoke all of a state's existing Medicaid funding if the state refused to participate in the ACA's Medicaid expansion to 138% of the federal poverty level. *Id.* at 580–81. The Court found this coercive as "a shift in kind, not merely degree." *Id.* at 583. The new condition of covering a vastly expanded population was not part of the original bargain.

Nothing comparable is occurring here. CMS has not created a new program. Neither has it imposed a new coverage requirement. Nor has it conditioned Minnesota's continued participation in Medicaid on acceptance of obligations that differ in kind from those Minnesota originally accepted. CMS has deferred 7.2% of one quarter's federal share pending documentation review under a longstanding regulatory mechanism. That is merely enforcing the kind of "restrictions on the use of [federal] funds" that *NFIB* "upheld." *Id.* at 580. Minnesota's real complaint is not that the rules changed. It is that CMS is enforcing them.

### c.    Ultra vires

CMS concededly possesses deferral authority. Minnesota's dispute is not with whether CMS has the power to defer, but with how CMS exercised that power. *See* Compl. ¶¶ 72–76 (citing 42 C.F.R. § 430.40). Again, this is the province of APA review, not the ultra vires doctrine. *NRC v. Texas*, 605 U.S. 665, 681-82 (2025), and other cases limit ultra vires relief to action "entirely in

excess of" delegated powers. An agency that exercises a power it possesses in a manner a plaintiff considers improper has not acted ultra vires; it acts, at most, arbitrarily.

Minnesota's ultra vires argument, advanced entirely in a footnote, Br. 30 n.12, simply restates the APA argument. The claim has no merit, let alone likelihood of success.

## IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR CMS.

When the government opposes preliminary relief, the balance-of-harms and public-interest factors merge. *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023).

The asymmetry here favors the government, as Minnesota has argued when it is the one temporarily suspending or withholding Medicaid funds for potentially fraudulent claims.[5] If the Court denies the TRO and the deferral is ultimately resolved in Minnesota's favor, Minnesota receives full payment and loses nothing. If the Court grants the TRO and the claims are ultimately determined to be unallowable, the federal government will have disbursed $243 million for claims that appear to be fraudulent and harmed to the integrity of the program. *See Alliance*, 2025 WL 607326, at *9 (federal government's "interest in preserving the integrity of the Medicaid program and protecting the public from fraud is strong.").

The balance of hardships favors the party whose potential loss is permanent over the party whose potential loss is temporary. The federal government has a compelling interest in ensuring that $243 million in Medicaid claims in service areas with documented fraud vulnerability are reviewed before payment. That interest exists regardless of the political context in which the deferral was announced.

---

[5] Minn. *Alliance* Br. 42–43 (being "barred from protecting public funds and carrying outs legal obligations to suspend Medicaid payments" and being "deprive[d] of one of its primary tools to combat Medicaid fraud" tip balance in the enforcing entity's favor).

## V.    MINNESOTA'S REQUESTED PRELIMINARY RELIEF IS INAPPROPRIATELY BROAD.

Even if Minnesota could satisfy the preliminary injunction standard, the relief it seeks exceeds what any court could award. The APA's remedial structure is straightforward: when agency action is deficient, the court sets it aside and remands for the agency to try again. It does not dictate the outcome. *See* 5 U.S.C. § 706(2).

In *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1907–08 (2020), for example, the Supreme Court vacated and remanded the DACA rescission rather than ordering reinstatement of DACA. So too here. If the deferral notice is deficient, the proper remedy is to set it aside and remand to CMS to issue a compliant one. Not to order the immediate release of $243 million in federal funds. What Minnesota seeks is mandamus by another name, which is extraordinary relief available only where the plaintiff's right to issuance is clear and indisputable. *See Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023); *see also Mitchael v. Colvin*, 809 F.3d 1050, 1054 (8th Cir. 2016). Minnesota has not sought mandamus, of course, and it could not meet that standard even if it tried. The Court should not grant emergency relief that would be unavailable even after full merits adjudication.

The distinction matters. Vacatur and remand preserves CMS's authority to question the allowability of claims through a properly issued notice. Ordering release of the funds eliminates that authority entirely and pays claims that have not been reviewed. Even if the process were to take more time than Minnesota would prefer, that does not justify releasing more than $243 million in questionable payments. Delay-related hardship is part of the price of participating in a massive, complex health and safety program governed by hundreds of pages of statutes and thousands of pages of often interrelated regulations. *Illinois Council*, 529 U.S. at 13. If the concern is that CMS will not follow the regulatory process, the Court can address that when it arises.

Lastly, if the Court does not deny Plaintiffs' motion in its entirety, Plaintiffs should be required to post security commensurate with any injunctive relief. Fed. R. Civ. Proc. 65(c). Minnesota has conceded as much in a similar context.[6] And the Court should stay any such relief pending the disposition of any appeal that is authorized by the Solicitor General or at least for a period of seven days to allow Defendants to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## CONCLUSION

Minnesota's motion for a temporary restraining order should be denied. Minnesota has not demonstrated irreparable harm—this is a money dispute with an adequate post-deprivation remedy. The deferral is not final agency action, and none of Minnesota's claims—APA, constitutional, or otherwise—are ripe for judicial review. Minnesota cannot show a likelihood of success on the merits. And the balance of equities favors allowing the administrative process to function in a state with the one of the largest Medicaid frauds in American history. Should the Court nevertheless find a deficiency in the deferral notice, the ultimate remedy would be at most vacatur and remand, not a mandatory release of $243 million in unreviewed claims.

---

[6] Minn. *Alliance* Br. 43–44 (injunction "from protecting Medicaid funds" from fraud allegations requires bond).

Respectfully submitted,

Dated: March 9, 2026

OF COUNSEL:

MICHAEL B. STUART
General Counsel

ELIZABETH C. KELLEY
Deputy General Counsel
Chief Legal Officer for CMS

MATTHEW C. ZORN
Deputy General Counsel

JOCELYN S. BEER
Acting Deputy Associate General
   Counsel for Litigation

U.S. Department of Health
   and Human Services

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHELLE R. BENNETT
Assistant Director
Federal Programs Branch

CHARLES E.T. ROBERTS
Counsel to the Assistant Attorney General
Civil Division

DANIEL N. ROSEN
United States Attorney

 s/ David W. Fuller

BY:  DAVID W. FULLER
Assistant United States Attorney
Attorney ID Number 390922
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415
(612) 664-5600
David.fuller@usdoj.gov

Attorneys for Defendants

*Counsel for Defendants*

33