UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by and through its Attorney General Keith Ellison, and Shireen Gandhi, in her official capacity as the Commissioner of the Minnesota Department of Human Services,<br><br>    Plaintiffs,<br><br>v.<br><br>Dr. Mehmet Oz, in his official capacity as Administrator for the Centers for Medicare and Medicaid Services; the Centers for Medicare and Medicaid Services; Robert F. Kennedy, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services; U.S. Department of Health and Human Services,<br><br>    Defendants. | Case No. 26-CV-01701 (ECT/DTS)<br><br>**BRIEF OF AMICUS CURIAE AUTISM TREATMENT ASSOCIATION OF MINNESOTA** |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

INTEREST OF AMICUS CURIAE ............................................................................... 1

BACKGROUND ........................................................................................................... 2

ARGUMENT ................................................................................................................. 6

    I.     CMS's Broad-Brush Deferral of Payments is Arbitrary and Capricious and Contrary to Law. ................................................................. 6

    II.    Plaintiffs' Requested Injunction Is In the Public Interest. .......................... 8

CONCLUSION ............................................................................................................ 12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Linea Latina de Accidentes, Inc.*,
   781 F. Supp. 2d 837 (D. Minn. 2011) ............................................................................ 11

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ......................................................................................................... 6

*In re Claims for No-Fault Benefits Against Progressive Ins. Co.*,
   720 N.W.2d 865 (Minn. App. 2006) .............................................................................. 11

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ......................................................................................................... 7

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*,
   591 U.S. 1 (2020) ............................................................................................................. 7

*Louisiana v. Biden*,
   No. 2:21-cv-778, 2021 WL 4312502 (W.D. La. Aug. 23, 2021) .................................... 8

*Progressive N. Ins. Co. v. Alivio Chiropractic Clinic, Inc.*,
   No. 05-cv-951, 2005 WL 2739304 (D. Minn. Oct. 24, 2005) ....................................... 11

*Saavedra v. Ill. Farmers Ins. Co.*,
   No. A10-2139, 2011 WL 2519214 (Minn. App. June 27, 2011) .................................. 11

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ......................................................................................................... 8

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ......................................................................................................... 8

**Statutes**

2013 Minn. Laws ch. 108, art. 7, § 14, subd. 1 ..................................................................... 2

2025 Minn. Laws Spec. Sess. ch. 9, art. 6, §§ 1, 9, 13 ......................................................... 4

Minn. Stat. § 256B.0949, subd. 13(a) ................................................................................... 2

**Other Authorities**

42 C.F.R. § 430.35(a) ................................................................................................... 7

42 C.F.R. § 430.40(a) ................................................................................................... 6

42 C.F.R. § 430.40(b)(1)(i) ........................................................................................... 7

## INTRODUCTION

The Autism Treatment Association of Minnesota ("ATAM") represents autism service providers in Minnesota. Its members include 23 autism treatment organizations serving more than 2,500 children with autism throughout the state.

ATAM supports state and federal efforts to combat Medicaid fraud, but Defendants' actions here are regulatory overkill. Everyone acknowledges the many powerful tools Defendants may wield to address fraud: deferral of payments during focused review of specific claims, criminal prosecutions of lawbreakers, and, if warranted, formal withholding of payments to a state using defined regulatory procedures. Not content to exercise these lawful authorities, Defendants go further by seeking to indiscriminately suspend payments for wide swaths of claims based on the categories of services at issue—including autism services—in defiance of applicable regulations. Defendants' actions violate the Administrative Procedure Act for the reasons described by Plaintiffs. More troubling for ATAM, the potential outcomes for autism service providers are catastrophic. Many of ATAM's members could lose their businesses and the patients they serve will lose longstanding providers and access to vital services. The Court should grant Plaintiffs' motion.

## INTEREST OF AMICUS CURIAE

ATAM is a nonprofit organization with a mission to make effective therapy accessible to all Minnesota families affected by autism spectrum disorders. To realize its mission, ATAM works to assure a sustainable service delivery system that supports the high-quality, research-backed intervention that is required to improve the lives of people

with autism and their caregivers. ATAM also advocates for the enactment of laws to advance the interests of its members and the people it serves.

ATAM's members provide autism therapy under the state-authorized and federally approved Early Intensive Developmental and Behavioral Intervention ("EIDBI") Benefit, which offers medically necessary services and supports to people under the age of 21 with autism or related conditions, and which is one of the fourteen services for which Defendants have apparently deferred payments to the State of Minnesota. ATAM has an interest in this litigation because its members and their patients depend on timely and reliable Medicaid reimbursement from both the state and federal government.

## BACKGROUND

The Minnesota Legislature created the EIDBI benefit in 2013 to "provide coverage for diagnosis, multidisciplinary assessment, ongoing progress evaluation, and medically necessary treatment of autism spectrum disorder." 2013 Minn. Laws ch. 108, art. 7, § 14, subd. 1. Services eligible for reimbursement under the program target improvement in "functional communication, including nonverbal or social communication, social or interpersonal interaction, restrictive or repetitive behaviors, hyperreactivity or hyporeactivity to sensory input, behavioral challenges and self-regulation, cognition, learning and play, self-care, and safety." Minn. Stat. § 256B.0949, subd. 13(a). Defendant

Centers for Medicare and Medicaid Servies ("CMS") approved multiple amendments to the State's Medicaid Plan incorporating the EIDBI benefit.[1]

The demand for EIDBI services is high, and the Minnesota Department of Human Services ("DHS") has recognized that there is a shortage of qualified EIDBI providers in Minnesota and across the nation.[2] In Minnesota, approximately 30,000 children with autism are covered by Medical Assistance, but less than 7,000 received EIDBI services in 2025. Many families have no choice but to spend months or years on waitlists for services. Early intervention is most effective when it is delivered early in life, during a child's key developmental stages.[3] Forcing a child to wait months or years can have profound, lifelong impacts. Since the advent of the EIDBI program, ATAM's members have done their best to address these needs, providing medically necessary and research-backed services to Medical Assistance enrollees throughout the state.

---

[1] *See, e.g.*, Letter from Ruth A. Hughes, Ctrs. for Medicare & Medicaid Servs., to Marie Zimmerman, Minn. Dep't of Hum. Servs. (Dec. 11, 2017), https://mn.gov/dhs/assets/17-06-spa_tcm1053-320336.pdf; Letter from Todd McMillion, Ctrs. For Medicare & Medicaid Servs., to Marie Zimmerman, Minn. Dep't of Hum. Servs. (June 6, 2019), https://mn.gov/dhs/assets/EIDBI-Dec2018-SPA_tcm1053-400362.pdf; Letter from Ruth A. Hughes, Ctrs. for Medicare & Medicaid Servs., to Julie Marquardt, Minn. Dep't of Hum. Servs. (Nov. 13, 2023), https://www.medicaid.gov/medicaid/spa/downloads/MN-23-0017.pdf.

[2] *Building EIDBI Provider Capacity*, Minn. Dep't of Hum. Servs., https://mn.gov/dhs/partners-and-providers/news-initiatives-reports-workgroups/long-term-services-and-supports/eidbi/building-capacity.jsp (last updated July 29, 2024).

[3] *Early Intervention for Autism*, Nat'l Inst. of Health, https://www.nichd.nih.gov/health/topics/autism/conditioninfo/treatments/early-intervention#:~:text=Early%20interventions%20occur%20at%20or,effective%20in%20the%20longer%20term (last visited Mar. 9, 2026).

Autism therapy providers in Minnesota face significant baseline operational challenges. Many are small businesses or nonprofit organizations and get by on narrow margins even during times of relative stability. Factors like burnout and low reimbursement rates make it difficult to recruit and retain a sufficient number of qualified staff. Autism providers depend on regular, predictable Medicaid reimbursement to remain operational.

The widely publicized allegations of human-services fraud that have captured public attention in recent months and years have not made things easier for legitimate providers who seek only to serve their patients in compliance with the law. As noted in Plaintiffs' submissions, Minnesota has adopted a number of significant measures to address these allegations, and many of those steps have specifically affected autism service providers:

- In late 2024, DHS began a "top-to-bottom, on-site audit process of all autism service providers enrolled in the State of Minnesota." Decl. of Nate Brennaman, Ex. 7 at 1 [ECF No. 5-1].

- In early 2025, DHS designated the EIDBI program as "high-risk" to "provide additional program integrity tools, including unannounced on-site visits." *Id.*

- In the 2025 Special Session, the Minnesota Legislature passed a package of EIDBI program integrity tools which, among other things, required providers to complete a new provisional licensing process, adjusted provider qualifications, and authorized DHS to withhold payments from providers who did not submit to unannounced site visits or who otherwise "failed to comply fully with applicable laws or rules." 2025 Minn. Laws Spec. Sess. ch. 9, art. 6, §§ 1, 9, 13.

- In September 2025, Governor Walz issued Executive Order 25-10, which directed DHS and other state agencies to take a wide range of actions to address fraud, including instituting a "temporary licensing moratorium" for new providers and subjecting providers of certain services to "prepayment review." Brennaman Decl., Ex. 1 at 2.

- Effective November 1, 2025, DHS began a moratorium on licensing new EIDBI provider agencies.[4]

- DHS is now subjecting *all* EIDBI providers—as well as providers in thirteen other service areas deemed "high risk"—to "prepayment review." This means that DHS is suspending "all fee-for-service claims" in these programs pending review by a third-party vendor. The pause can extend for up to 90 days.[5]

ATAM supports strong and effective efforts to prevent fraud, waste, and abuse in public programs. But the State's aggressive anti-fraud efforts have placed many legitimate and law-abiding providers in a precarious financial position. In an informal survey ATAM conducted of Minnesota autism services providers, for example, responding providers consistently reported that they depend on regular, predictable Medicaid payment cycles to fund their business operations. Most responding providers reported that they could only survive a payment suspension for a matter of weeks or months. And nearly all responders reported they would be forced to terminate services for children after 90 days of suspended payments, with some reporting that cuts would need to start much sooner than that.

---

[4] *Early Intensive Developmental and Behavioral Intervention (EIDBI) Provider Enrollment Criteria and Forms*, Minn. Health Care Programs Provider Manual, Minn. Dep't of Hum. Servs., https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=dhs16_195656 (last updated Dec. 12, 2025).

[5] *Pre-Payment Review Process for Minnesota Health Care Programs Fee-for-Service Claims*, Minn. Dep't of Hum. Servs., https://mn.gov/dhs/partners-and-providers/news-initiatives-reports-workgroups/minnesota-health-care-programs/provider-news/pre-payment-review-faq.jsp (last updated Feb. 11, 2026); *All Claims For High-Risk Services Will Be Held for Pre-Payment Review*, Minn. Dep't of Hum. Servs.: MHCP Provider News and Updates (Dec. 31, 2025), https://mn.gov/dhs/partners-and-providers/news-initiatives-reports-workgroups/minnesota-health-care-programs/provider-news/.

In short, the State of Minnesota is already using maximum, aggressive enforcement tools to address concerns about fraud. Additional payment deferrals by CMS are unnecessary, unlawful, and risky.

## ARGUMENT

### I. CMS'S BROAD-BRUSH DEFERRAL OF PAYMENTS IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW.

As explained in detail in Plaintiffs' memorandum of law, Plaintiffs are likely to succeed on their claim that CMS's deferral of payments violates the Administrative Procedure Act. ATAM will not duplicate those arguments here, but it will emphasize three points.

First, CMS's deferral of payments is arbitrary and capricious because of the obvious mismatch between the agency's stated intentions and the procedure it invokes. Deferral of payments is an administrative audit tool that is used to cure identifiable paperwork deficiencies for specific claims. *See* 42 C.F.R. § 430.40(a) (authorizing CMS to defer payment of "a claim or any portion of a claim" "only if" CMS "questions its allowability and needs additional information to resolve the question"). Deferral is related to the procedure of disallowance, which is by its nature "an isolated and highly focused inquiry," not a mechanism for "termination of [federal financial participation] for entire categories of state assistance." *Bowen v. Massachusetts*, 487 U.S. 879, 885 (1988). But here, CMS appears to be withholding payment for entire categories of claims, not based on any actual defect with specific claims, but instead based on vaguely articulated statements that the claims relate to "service areas," including EIDBI, that it believes are "vulnerable to fraud

6

or abuse." Brennaman Decl., Ex. 6 at 2. And it is doing so, according to the CMS Administrator, to extract forward-looking, program-wide policy changes from Minnesota. If that is its goal, CMS must (as it already has) initiate a formal withholding of payments and honor the increased procedural protections that come with that choice. *See* 42 C.F.R. § 430.35(a). It cannot use deferral as an end-run around its own regulations.

Second, CMS's efforts to suggest it is deferring payments based on genuine questions about specific claims are transparent and unpersuasive. The agency asserts in its deferral notice that the deferred claims relate to "services lines that have questionable variances and raise concerns about allowability of the claimed expenditures" or "specific providers that [CMS] ha[s] identified as high-risk for fraud," and it purports to invite Minnesota to provide additional documentation to support the claims. Brennaman Decl., Ex. 6 at 2. But given Defendants' threats to defer payments on future claims they have not even reviewed, as well as their stated focus on Minnesota's prospective anti-fraud policies, CMS's statements in the deferral notice are "more of a distraction" than a genuine "explanation for [its] action." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

Third, the deferral notice is bereft of information that would allow the State or any other interested party to identify the basis for the agency's action. *See* 42 C.F.R. § 430.40(b)(1)(i). The agency cannot now rely on a post-hoc declaration submitted in litigation to backfill its rationale; the Court must look to "the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 20 (2020) (citation omitted). Notably absent from the deferral notice is any statement that the agency has reason to believe the specific provider claims at issue were

7

themselves fraudulent. Instead, the agency states at the highest levels of generality that it has "concerns" based on the services or providers involved. Brennaman Decl., Ex. 6 at 2. These statements offer the State no guidance which would reasonably allow it to identify documents to allay the agency's concerns. But they also suggest that there may be no fire behind the smoke, and that the agency is simply deferring payment on fully substantiated claims. To providers on the ground, including ATAM's members, this sends the troubling message that legitimate providers cannot count on payment even when they submit well-documented claims for medically necessary services. In effect, CMS is applying a collective punishment against EIDBI providers, rather than undertaking the investigation and adjudication effort necessary to remove a few "bad apples."[6]

## II. PLAINTIFFS' REQUESTED INJUNCTION IS IN THE PUBLIC INTEREST.

ATAM agrees with Plaintiffs that the public interest supports injunctive relief here. As Plaintiffs have explained, the "massive" amount of funding at issue "is equivalent to

---

[6] ATAM also agrees that CMS's payment deferral is a final agency action. Courts take a "pragmatic" approach to finality, *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation omitted), and an agency's "behavior" can show that its action is final even when it "has not dressed its decision with the conventional procedural accoutrements of finality," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001); *see also Louisiana v. Biden*, No. 2:21-cv-778, 2021 WL 4312502, at *14 (W.D. La. Aug. 23, 2021) (concluding that agency's decision to "cancel and postpone various onshore and offshore lease sales" based on executive order requiring a "pause" of such sales pending review of permitting and leasing practices was final agency action), *report and recommendation adopted*, 2021 WL 4314795 (Sept. 22, 2021). Defendants' public statements and the broader context show that, no matter how thoroughly well-intentioned providers have documented their claims, Defendants intend to treat this deferral—and others in the future—as concrete action to provide leverage for forward-looking policy changes, not as a genuinely interlocutory audit mechanism.

cutting off all federal funding for multiple Medicaid programs" and could leave DHS no choice but to "cut Medicaid programs," particularly if Defendants follow through on their threats to defer future payments. Mem. in Supp. of Pls.' Mot. for TRO 35 [ECF No. 4]. That outcome would be catastrophic for ATAM's members, autism providers throughout Minnesota, and the patients who rely on them for medically necessary services. Moreover, such a broad deferral of payments is not necessary to achieve the federal government's goals of recouping the specific funds paid to individual providers engaged in fraudulent activity.

At worst, such cuts could functionally end the EIDBI Benefit, a program that serves thousands of vulnerable Minnesota children. Those children would lose access to time-sensitive early intervention services with permanent health impacts that cannot be reversed later. Parents may be forced to leave the workforce to care for children whose serious needs cannot be met in school or other settings. And clinicians could lose their jobs, exacerbating an already dire shortage of qualified providers.[7]

Avoiding this worst-case scenario is not the only public interest at play. Even if DHS is not forced to eliminate the EIDBI Benefit entirely in response to Defendants' payment deferral, the deferral nonetheless places another weight of uncertainty on the shoulders of legitimate providers who are already facing extremely difficult circumstances. Many such providers of autism services—particularly those who are small businesses or

---

[7] Of course, EIDBI is only one of fourteen programs targeted by CMS's action and thus accounts for only a fraction of the potential harm to the public.

9

nonprofit organizations—are concerned about their long-term survival under Minnesota's stringent anti-fraud measures.[8] If Defendants' payment deferral is permitted to stand, legitimate providers who have satisfied unannounced onsite inspections and rigorous prepayment review of their medically necessary claims—not to mention all the program controls already in place before 2025—may nonetheless find that DHS simply lacks the funds to pay them. Providers would have a legitimate fear about all their Medicaid payments if there are no meaningful due process checks on federal deferral of such payments. In the face of that uncertainty, some providers may decide continuing to operate is not worth the trouble. That is in no one's interest.

To the extent Defendants gesture toward the protection of taxpayer funds to suggest the public interest is on their side, their arguments fall flat. As Plaintiffs explain, the pending proceeding on CMS's notice of withholding offers CMS an opportunity to recover much more than it is attempting to withhold here—including much of the same funding implicated by the deferral notice—so long as the agency can substantiate its allegations of noncompliance. *See* Pls.' Mem. 22. Moreover, both the State and the federal government have ample other tools available to recoup specific payments to specific providers when those payments are procured by fraud. Any public interest in the protection of taxpayer

---

[8] *See Public Statement from the Autism Treatment Association of Minnesota on DHS Pre-Payment Review and Payment Suspension*, Autism Treatment Ass'n of Minn. (Jan. 14, 2026), https://atamn.org/news-%26-updates/f/public-statement-on-dhs-pre-payment-review-and-payment-suspension.

funds cannot justify the sort of unilateral and unaccountable action Defendants have taken here.

In some ways, this scenario is reminiscent of another occasion on which allegations of pervasive insurance fraud captured Minnesota's attention—albeit on a smaller scale. In the 2000s and 2010s, no-fault automobile insurers began suing health care providers, personal injury attorneys, and others for allegedly conspiring to defraud them by billing for services not provided, violating the prohibition on the corporate practice of medicine, or improperly recruiting patients. *See, e.g.*, *Allstate Ins. Co. v. Linea Latina de Accidentes, Inc.*, 781 F. Supp. 2d 837 (D. Minn. 2011); *Progressive N. Ins. Co. v. Alivio Chiropractic Clinic, Inc.*, No. 05-cv-951 (PAM/RLE), 2005 WL 2739304 (D. Minn. Oct. 24, 2005).[9] In state-court actions brought by patients whose medical claims had been deemed reasonable and necessary in arbitration, insurers sought to delay their obligations to pay the arbitration awards, citing their fraud allegations against the providers and their pending federal civil actions. But Minnesota courts rejected these arguments, noting specifically that the insurers had an "alternative remedy" with which to recoup any improper payments and that the requested delay would simply leave patients "in limbo." *Saavedra v. Ill. Farmers Ins. Co.*, No. A10-2139, 2011 WL 2519214, at *2–3 (Minn. App. June 27, 2011); *see also In re Claims for No-Fault Benefits Against Progressive Ins. Co.*, 720 N.W.2d 865, 873–74

---

[9] Multiple federal convictions showed that the problem was a real one. *See, e.g.*, Press Release, *Federal Jury Convicts Minneapolis Chiropractor on Fraud Charges*, U.S. Attorney's Office, Dist. of Minn. (Oct. 16, 2017), https://www.justice.gov/usao-mn/pr/federal-jury-convicts-minneapolis-chiropractor-fraud-charges.

(Minn. App. 2006).  The context now is different, but the principle is the same: Defendants should not be permitted to unilaterally and categorically delay payment obligations based on vague allegations of fraud when an alternative remedy allows them to recoup those payments (and more) through an adversarial process.

Allowing Defendants' deferral to remain in effect for the duration of this action will not solve the problem of fraud.  It will only harm legitimate providers and vulnerable patients.

## CONCLUSION

For the foregoing reasons, ATAM respectfully requests that the Court grant Plaintiffs' motion for a preliminary injunction.

Dated:  March 10, 2026                          Respectfully submitted,

*s/R. David Hahn*
R. David Hahn, MN #401262
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:    (612) 339-6900
Fax:    (612) 339-0981
rdhahn@locklaw.com

**ATTORNEY FOR AMICUS CURIAE AUTISM TREATMENT ASSOCIATION OF MINNESOTA**