UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, *by and through its Attorney General Keith Ellison*, and Shireen Gandhi, *in her official capacity as the Commissioner of the Minnesota Department of Human Services*, | File No. 26-cv-1701 (ECT/DTS) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| Dr. Mehmet Oz, *in his official capacity as Administrator for the Centers for Medicare and Medicaid Services*; the Centers for Medicare and Medicaid Services; Robert F. Kennedy, Jr., *in his official capacity as Secretary of the U.S. Department of Health and Human Services*; and U.S. Department of Health and Human Services, | |
| Defendants. | |

Nathan Brennaman, Emily Doyle, Scott H. Ikeda, and Brandon L. Boese, Minnesota Attorney General's Office, St. Paul, MN, for Plaintiffs State of Minnesota and Shireen Ghandi.

Matthew C. Zorn, Office of the General Counsel, U.S. Department of Health and Human Services, Washington, D.C.; and David W. Fuller, United States Attorney's Office, Minneapolis, MN, for Defendants Dr. Mehmet Oz, the Centers for Medicare and Medicaid Services, Robert F. Kennedy, Jr., and U.S. Department of Health and Human Services.

The Centers for Medicare and Medicaid Services ("CMS") deferred more than $259 million in federal funding for amounts the State of Minnesota paid out under its Medicaid program. This deferral initiated an ongoing back-and-forth administrative process through

which Minnesota may produce documentation showing that deferred amounts were paid out to reimburse legitimate claims.  For Minnesota, the primary problem is that, during this process, it will not have access to these funds.

Minnesota brought this case to challenge the deferral.[1]  It seeks a preliminary injunction that would, if issued, require CMS to determine Minnesota's entitlement to the deferred amounts using different administrative procedures and restore the deferred funding pending a final agency or judicial decision regarding whether Minnesota is legally entitled to the deferred amounts.

The motion will be denied for four primary reasons: (1) The law ordinarily requires a federal court to wait until a federal agency's proceedings are final before deciding whether the agency's actions are lawful.  Here, the proceedings Minnesota challenges have just started.  They are not final in the sense the law requires.  (2) Some of the legal theories Minnesota asserts are novel, and the law does not support them.  (3) Though Minnesota credibly complains that the federal government's deferral is historically unprecedented in its size and timing, I conclude on this record that the deferral likely complies with the controlling federal regulations.  (4) Minnesota's request for a preliminary injunction depends on assuming that predicted future events come to pass.  As a rule, the law does not allow a preliminary injunction to be issued based on assumptions like these.  All of this is not to say that Minnesota cannot prevail.  Minnesota has identified reasonable legal

---

[1]    Minnesota has a co-Plaintiff, the Commissioner of Minnesota's Department of Human Services, Shireen Gandhi.  For simplicity's sake, they will be referred to together here as "Minnesota."

concerns regarding the deferral's nature and scope and the federal government's motivations for initiating it. It is possible the record may support these concerns in the future. Today it does not.

I

A

A description of the relevant legal background places the dispute in context. The Medicaid program is a cooperative endeavor between the federal government and participating states to provide medical care to low-income individuals. *Harris v. McRae*, 448 U.S. 297, 308 (1980); *see* 42 U.S.C. § 1396-1. Medicaid was enacted pursuant to Congress's spending power, *Medina v. Planned Parenthood S. Atlantic*, 606 U.S. 357, 369 (2025), and is designed so that the federal government shares financial responsibility with participating states for the cost of health care, *Harris*, 448 U.S. at 309. "[I]f a State agrees to establish a Medicaid plan that satisfies [statutory requirements], which include several mandatory categories of health services, the Federal Government agrees to pay a specified percentage of 'the total amount expended . . . as medical assistance under the State plan . . . .'" *Id.* at 308 (quoting 42 U.S.C. § 1396b(a)(1)). "The cornerstone of Medicaid is financial contributions by both the Federal Government and the participating State." *Id.* "Historically, the federal government has provided on average about 57% of the funds required to implement Medicaid, and States have supplied the balance." *Medina*, 606 U.S. at 364.

The federal government provides funds to each participating state through a series of quarterly grant awards. 42 C.F.R. § 430.30. The quarterly awards are advance payments

based on an estimate of the state's anticipated Medicaid expenditures for the upcoming quarter. *See id.* § 430.30(a)(2). At the end of each quarter, the state must submit an "accounting of actual recorded expenditures." *Id.* § 430.30(c)(2). The reports of actual expenditures are then used to adjust the grant award by increasing or decreasing the estimate for the next quarter according to the "underestimate or overestimate for prior quarters." *Id.* § 430.30(d)(2).

B

Medicaid provides three enforcement mechanisms by which the federal government can address concerns it may have regarding state Medicaid expenditures. Each of these includes somewhat distinct procedural processes.

The first enforcement mechanism is a deferral of claims for federal financial participation (or "FFP"). *See* 42 C.F.R. § 430.40. As its name suggests, a deferral allows CMS to "defer a decision on the allowability of claims submitted by a state until further evidence is submitted." *Americana Healthcare Corp. v. Schweiker*, 688 F.2d 1072, 1080 (7th Cir. 1982). A deferral is a retrospective mechanism in that it pauses federal reimbursement for a state's past expenditures. *See Perales v. Sullivan*, 948 F.2d 1348, 1357 (2d Cir. 1991). The regulations provide for deferral of "a claim or any portion of a claim for FFP," provided the Administrator "questions its allowability and needs additional information to resolve the question," and "CMS takes action to defer the claim (by excluding the claimed amount from the grant award) within 60 days after the receipt of" the claim. 42 C.F.R. § 430.40(a). Within 15 days after CMS decides to defer a claim, CMS must send the state "a written notice of the deferral that": (1) "[i]dentifies the type

4

and amount of the deferred claim and specifies the reason for deferral," and (2) "[r]equests the State to make available all the documents and materials the regional office then believes are necessary to determine the allowability of the claim." *Id.* § 430.40(b). The state must make the requested documentation available within 60 days of the notice of deferral, or 120 days if the state seeks an extension. *Id.* § 430.40(c)(1). If CMS determines that the materials submitted by the state "are not in readily reviewable form or that additional information is needed," it must "promptly notif[y] the State that it has 15 days to submit the readily reviewable or additional materials." *Id.* § 430.40(c)(3). If the state fails to provide the requested materials within 15 days, the claim will be disallowed. *Id.* § 430.40(c)(4). In theory, the regulations impose a time limit on the administrative process for deferrals. CMS has 90 days "after all documentation is available in readily reviewable form, to determine the allowability of the claim," and if CMS cannot complete the review within 90 days, "CMS pays the claim, subject to a later determination of allowability." *Id.* § 430.40(c)(5)–(6). However, CMS can delay the start of the 90-day period by requesting additional materials, and the regulation contains no explicit limit on the number of additional requests CMS may make. *See id.* § 430.40(c)(3). The burden is on the state to establish that a deferred claim is allowable. *Id.* § 430.40(b)(2). The deferral regulation includes no mechanism by which a state may gain access to deferred amounts during the pendency of this process.

The second enforcement mechanism is a disallowance. A disallowance is a determination that "a claim or portion of [a] claim is not allowable." 42 C.F.R. § 430.42(a). A disallowance may follow a deferral or be pursued without a deferral. *See id.*

§ 430.40(e)(2); *id.* § 430.42. A disallowance is a "retrospective refusal to share in an unauthorized expenditure." *Massachusetts v. Departmental Grant Appeals Bd. of HHS*, 698 F.2d 22, 25 (1st Cir. 1983). When a disallowance determination is made, CMS must "promptly send[] the State a disallowance letter." 42 C.F.R. § 430.42(a). A state has two options in seeking review of a disallowance: (1) It may request that the Administrator reconsider a disallowance determination. *Id.* § 430.42(b). (2) A state may also seek review from the Departmental Appeals Board, and it may do so regardless of whether it sought reconsideration of the disallowance determination. *Id.* § 430.42(b)(4)–(5), (f)(1); 42 U.S.C. § 1316(e)(2)(A). The regulations provide that "[t]he Board's decision . . . shall be the final decision of the Secretary and shall be subject to reconsideration by the Board only upon a motion by either party that alleges a clear error of fact or law and is filed during the 60–day period that begins on the date of the Board's decision or to judicial review." 42 C.F.R. § 430.42(f)(3); *accord* 42 U.S.C. § 1316(e)(2)(B). It appears that a state may retain the disallowed federal funds pending a final decision. *See* 42 C.F.R. § 433.38(c)(1) ("If the [state] Medicaid agency has requested administrative reconsideration to CMS or appeal of a disallowance to the Board and wishes to retain the disallowed funds until CMS or the Board issues a final determination, the agency must notify the CMS Regional Office in writing of its decision to do so."). A state may seek judicial review of the Board's decision by bringing an action in a United States District Court. *Id.* § 1316(e)(C).

The third Medicaid enforcement mechanism is a withholding. Unlike a deferral and a disallowance, a withholding is not focused on a "claim" for federal funding but is intended to address broader non-compliance. *See* 42 C.F.R. § 430.35; 42 U.S.C. § 1396c;

*Massachusetts*, 698 F.2d at 25 ("Whereas a finding of noncompliance can (although it need not) lead to the cessation of federal participation altogether, a disallowance is merely a retrospective refusal to share in an unauthorized expenditure."). CMS may withhold payments to a state, in whole or in part, if the Administrator finds that the state's plan "no longer complies with the provisions of [42 U.S.C. § 1396a]" establishing minimum requirements for state plans or "[t]hat in the administration of the plan there is a failure to comply substantially with any of those provisions." 42 C.F.R. § 430.35(a); *accord* 42 U.S.C. § 1396c. Under the regulations, "[a] question of noncompliance of a State plan may arise from an unapprovable change in the approved State plan or the failure of the State to change its approved plan to conform to a new Federal requirement for approval of State plans." 42 C.F.R. § 430.35(b). "A question of noncompliance in practice may arise from the State's failure to actually comply with a Federal requirement, regardless of whether the plan itself complies with that requirement." 42 C.F.R. § 430.35(c). Federal payments may not be withheld until the state is given "reasonable notice and opportunity for a hearing" and the Administrator determines that the withholding is appropriate. 42 C.F.R. § 430.35(a); *accord* 42 U.S.C. § 1396c. The regulations contemplate that a "reasonable effort" be made to resolve any issues that could lead to a withholding "through conferences and discussions" prior to any hearing. 42 C.F.R. § 430.35(a). If the Administrator finds the state is noncompliant, no further FFP is provided to the state for those portions of the program affected by the finding, and the withholding continues "until the Administrator is satisfied that the State's plan and practice are, and will continue to be, in compliance with Federal requirements." *Id.* § 430.35(d); *accord* 42 U.S.C. § 1396c. Any state that receives

7

a finding of noncompliance may petition for review with the U.S. Court of Appeals for the circuit in which the State is located.  42 C.F.R. § 430.38(a)–(b); 42 U.S.C. § 1316(a)(3).

II

Turn now to the background and suit-prompting facts.  This suit was brought by the State of Minnesota by and through its chief legal officer, Attorney General Keith Ellison, and by Shireen Ghandi, Commissioner of the Minnesota Department of Human Services ("DHS"), the agency responsible for administering Minnesota's Medicaid program.  Compl. [ECF No. 1] ¶¶ 7–8.  There are four Defendants.  *See id.* ¶¶ 9–12.  Defendant United States Department of Health and Human Services ("HHS") is "responsible for overseeing state compliance with federal standards for implementing Medicaid programs."  *Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d 129, 135 (2d Cir. 2014).  Defendant Robert F. Kennedy, Jr., is sued in his official capacity as the Secretary of HHS.  Compl. ¶ 11.  As HHS's highest-ranking official, Secretary Kennedy is responsible for the "supervision and management of all decisions and actions of [HHS]."  *Id.*  Defendant CMS is an agency housed within HHS.  *Id.* ¶ 10.  CMS is "responsible for exercising the delegated authority to oversee state compliance with federal Medicaid requirements."  *Shah*, 770 F.3d at 135 (citation modified).  And finally, Dr. Mehmet Oz, the Administrator of CMS, is sued in his official capacity.  Compl. ¶ 9.  Administrator Oz is "charged with the supervision and management of all decisions and actions of [CMS]."  *Id.*

On September 17, 2025, Minnesota Governor Tim Walz issued an Executive Order directing DHS and other Minnesota agencies to take action to combat fraud in the use of public funds.  ECF No. 5-1 at 2–5.  Among other things, the Executive Order required DHS

to "[i]mplement a temporary licensing moratorium" by requesting that CMS "allow DHS to implement moratoria," to "[i]mmediately disenroll all Minnesota Health Care Program enrolled providers who have not billed Medicaid in the last 12 months," and to "[h]ire an external consultant to assess DHS and make recommendations on reorganization to more effectively serve as the State's Medicaid agency." *Id.* at 3. "Minnesota also identified providers of 14 total service types as high-risk based on programmatic vulnerabilities, investigations, and analysis." ECF No. 6 ¶ 6. DHS "initiated enhanced prepayment review for all fee-for-service claims involving these services, a 24-month licensing moratorium for Home and Community Based Services providers, an additional moratorium for Adult Day Services, and ended enrollment of new autism service providers." *Id.*

In correspondence dated December 5, 2025, CMS informed Minnesota Deputy Commissioner of DHS and State Medicaid Director, John Connolly of CMS's position that Minnesota's efforts to fight fraud "are insufficient to adequately address" the issue, and "urge[d]" Minnesota to take several actions including (1) meeting with CMS to provide weekly updates regarding its progress in addressing fraud, (2) imposing a six-month Medicaid enrollment moratorium for Home and Community Based Services providers, (3) developing a corrective action plan to address fraud, and (4) initiating an off-cycle[2] revalidation effort for all provider enrollments currently in place. ECF No. 5-1 at 8–9. In its December 5 letter, CMS explained that, if Minnesota refused to take the requested steps

---

[2] Medicaid service providers "are periodically reviewed and revalidated by the state to ensure that they continue to be eligible for receipt of Medicaid dollars. Off-cycle revalidation simply means that such review is happening now—not on the normal cycle." ECF No. 6 at 4 n.1.

"and/or make adequate progress to address fraud," then "**CMS may use its authority to withhold future [FFP], in whole or in part**." *Id.* at 9 (emphasis in original). Minnesota agreed to take all the actions listed in the December 5 letter. ECF No. 6 ¶ 8.

On December 31, 2025, Minnesota provided CMS with a corrective action plan. ECF No. 5-1 at 55–59. At a meeting with CMS on January 6, 2026, DHS sought CMS's response to the corrective action plan. ECF No. 6 ¶ 9. CMS did not provide substantive comments on the plan but "expressed willingness to work with [Minnesota] after reviewing the plan in detail." *Id.* "At no time did CMS staff suggest" that the corrective action plan "was deficient or would form the basis for withholding [FFP] absent any notice to the State of alleged deficiencies." *Id.* ¶ 10.

That same day (January 6), Administrator Oz sent Governor Walz a letter notifying him that CMS considered Minnesota to be operating in substantial noncompliance with 42 U.S.C. § 1396a(a)(64). ECF No. 5-1 at 16. That statute requires participating states to provide a mechanism by which to "receive reports from beneficiaries and others and compile data concerning alleged instances of waste, fraud, and abuse." 42 U.S.C. § 1396a(a)(64). In his January 6 letter, Administrator Oz explained that, subject to Minnesota's opportunity for a hearing, CMS would withhold an estimated $515 million in FFP from Minnesota's quarterly claim of expenditures. ECF No. 5-1 at 17. Administrator Oz asserted that the $515 million represented the quarterly expenditures for the fourteen high-risk services identified by Minnesota. *Id.* Administrator Oz explained that, if DHS "plans to come into compliance with the federal requirements, [it] should submit, by January 30, 2026 a revised [corrective action plan]." *Id.*

On January 9, Deputy Commissioner Connolly wrote to Administrator Oz, notifying him of Minnesota's disagreement with the conclusions in Administrator Oz's January 6 letter and requesting a hearing. ECF No. 5-1 at 20; *see also* ECF No. 6 ¶ 13 ("Minnesota appealed the noncompliance decision on January 9, 2026"). As of March 2, no hearing had been scheduled in the noncompliance matter. ECF No. 6 ¶ 14. According to Minnesota, it "has asked CMS repeatedly for information and detail regarding the claimed noncompliance, but CMS has refused to provide any information regarding which specific statutes or regulations with which Minnesota is noncompliant or how it is noncompliant." *Id.* Regardless, on January 30, Minnesota sent CMS a revised corrective action plan. ECF No. 5-1 at 31–50. In a declaration he filed in this case, Deputy Commissioner Connolly testified that he asked CMS for comment on the revised corrective action plan, and on February 25, he was told CMS had no response, "but that written feedback would be forthcoming at some point in the future." ECF No. 6 ¶ 16.

That same day (February 25), CMS informed Minnesota via letter that it was deferring over $259 million in FFP. ECF No. 5-1 at 52. According to Minnesota's Deputy Medicaid Director, Patrick Hultman, as far as he can recall, this deferral is more than fifteen times larger than any other deferral Minnesota has received in the past. ECF No. 7 ¶¶ 1–2. Of the $259 million, the notice explained that approximately $243 million is "attributable to CMS's ongoing review of state expenditures, with a focus on fourteen high-risk Medicaid service areas identified as particularly vulnerable to fraud or abuse." ECF No. 5-1 at 53. This $243 million represents 1.8% of Minnesota's projected federal funding for this year, and 7.2% of estimated quarterly funds. ECF No. 8 ¶ 3. According to the

notice, "CMS . . . identified $164,198,916 FFP for other practitioner, personal care, and home and community-based services lines that have questionable variances and raise concerns about allowability of the claimed expenditures." ECF No. 5-1 at 53. The notice also explained that CMS had "identified $79,591,344 FFP claimed by the state associated with reimbursement claims submitted to the state by specific providers that [CMS] ha[s] identified as high-risk for fraud or aberrant billing practices based on historical billing and CMS data analytics." *Id.* In the notice, CMS requested that Minnesota "either provide additional state and provider documentation to support the allowability of these claims, including through CMS sample-based reviews, or make decreasing . . . adjustments on the next quarterly CMS-64 submission." *Id.*

The deferral was the subject of a press conference on February 25, at which Administrator Oz and Vice President Vance spoke. The White House, *Vice President Vance and Administrator Oz Announce Actions to Address Fraud, Waste, and Abuse* (YouTube, Feb. 25, 2026), https://www.youtube.com/watch?v=mRJN72K2lYw. During the press conference, Administrator Oz stated that "this quarter-billion-dollar deferment is hopefully going to get on the radar screen for the State of Minnesota, and make sure they are responsive to our requests." *Id.* at 11:24. He explained that CMS had notified Minnesota that CMS would retain the deferred amount "and only release it after [Minnesota] propose[s] and act[s] on a comprehensive corrective action plan to solve the problem." *Id.* at 11:37. He stated that "if Minnesota fails to clean up the systems, the state

will rack up a billion dollars of deferred payments this year." *Id.* at 11:46.  When asked

what actions Minnesota must take to obtain the deferred funding, Administrator Oz stated:

> So on December the 7th, we sent a letter to Governor Walz asking for a corrective action plan, which is a mechanism for us to extract from the state what they think they can do to fix the problems.  The answer we got back at the end of the month, which is what the deadline was, was inadequate.  We alerted them to this.  We issued guidance that we were going to defer income based on an audit of last quarter's money.  We actually looked dutifully through all of the bills that were sent to us. We found that of these high-risk services, roughly half of them, you really couldn't trust the data we were looking at.  It's not that the numbers don't add up, the backup to the numbers is not there. So, what do we need to have happen? We need to know that the providers actually are the real providers. Oftentimes there's no person that you can associate with the treatment itself.  We need you, after you adjudicate who these providers are, make sure they're not already in trouble for doing bad stuff, and then re-evaluate all the current providers to make sure they're supposed to be able to provide these services. And there's a whole slew of tools that we can use including checking before you pay the bill, that the bill is legitimate. That prepayment review is incredibly important.

*Id.* at 21:27.  For his part, Vice President Vance stated that the federal government doesn't

"want to be in a situation where the State of Minnesota is being so careless with federal tax

dollars that we have to turn the screws on them a little bit so that they take this fraud

seriously." *Id.* at 18:53.  He also stated that to obtain the deferred funds, Minnesota needs

to take "some affirmative steps to make sure that the people who are billing us for Medicaid

services are actually providing those Medicaid services." *Id.* at 20:48.

On March 4, CMS provided Minnesota with a document explaining that CMS had

identified a "sample of 330 claims from the Fee-For-Service (FFS) data that requires

additional information within each sample."  ECF No. 25-1 at 2; ECF No. 25 ¶ 10.  The

document included a chart identifying the information needed for each sampled item. *See* ECF No. 25-1 at 2–7. The document asserted that this information is needed "to continue to determine the allowability of claims for the quarter ending September 30, 2025."[3] *Id.* at 2. On March 11, CMS provided Minnesota with a document explaining that CMS had "selected a sample of 160 claims from the managed care (MC) data that requires additional information within each sample," and that this additional information was needed "continue to determine the allowability of claims for the quarter ending September 30, 2025." *Id.* at 9; ECF No. 25 ¶ 11. As with the March 4 document, the March 11 document provided a chart indicating the information needed for each sampled item. *See* ECF No. 25 at 9–11. On March 12, Minnesota advised CMS that it anticipated requesting a 60-day extension of the deadline to provide CMS with requested documentation pursuant to 42 C.F.R. § 430.40(c)(1). ECF No. 38-1 ¶ 9.[4]

At a regularly-scheduled meeting between DHS and CMS on March 10, Deputy Commissioner Connolly requested a response from CMS regarding Minnesota's revised corrective action plan. ECF No. 25 ¶ 13. "CMS said that it had no information for Minnesota about the proposed Corrective Action Plan, and that CMS could not commit that it would *ever* provide Minnesota with feedback on the Corrective Action Plan." *Id.* CMS additionally informed DHS that it would be meeting with Minnesota less frequently.

---

[3]    The $243 million deferral is for expenditures claimed for the quarter ending September 30, 2025. ECF No. 5-1 at 52.

[4]    It is not clear whether Minnesota anticipated requesting a 60-day extension to submit some or perhaps all documentation requested by CMS.

*Id.* However, Rory Howe, Director of the Financial Management Group within the Centers for Medicaid and CHIP Services at CMS, testified that CMS has in fact met with Minnesota weekly since January 22, with the last meeting taking place March 26.  ECF No. 38-1 ¶ 8.

On March 19, CMS notified the State of Minnesota of its decision to approve the January 30 revised corrective action plan.  ECF No. 32 at 3; ECF No. 33-1 at 1.  As a result of the approval, CMS asked that the administrative hearing on Minnesota's January 9 appeal of CMS's January 6 determination of noncompliance be stayed "pending complete implementation of the approved [corrective action plan], as" in its view "successful completion would moot the appeal."  ECF No. 32 at 4; ECF No. 33-1 at 2.

III

Minnesota asserts five claims in the Complaint.  (1) Minnesota claims the deferral violates its procedural-due-process rights under the Fifth Amendment.  Compl. ¶¶ 40–48 (Count I).  (2) Minnesota claims the deferral violates the Administrative Procedure Act ("APA") because it is arbitrary, capricious, and contrary to law.  *Id.* ¶¶ 49–57 (Count II). (3) Minnesota claims the deferral violates the APA because it was implemented "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Compl. ¶¶ 58–65 (Count III).  (4) Minnesota claims the deferral reflects a spending power violation because it "imposes post-acceptance or retroactive conditions on Plaintiffs' Medicaid funding."  *Id.* ¶¶ 66–71 (Count IV). (5) Minnesota claims the deferral is the product of ultra vires agency action. *Id.* ¶¶ 72–76 (Count V).  For relief, Minnesota seeks "an order vacating Defendants' deferral notice and its immediate withholding of $243,790,260 from Plaintiffs"; "[a]

15

declaration that Defendants' action is unlawful"; and an award of attorneys' fees and costs. Compl. at 21–22 (following 'WHEREFORE" clause).

Minnesota filed its preliminary-injunction motion on March 2. ECF No. 2.[5] It seeks an order "blocking the deferral and restoring Medicaid funding to the State." ECF No. 4 at 3. Minnesota does not at this time challenge the lawfulness of the withholding procedure and seems to suggest that it is the exclusive mechanism by which CMS may seek to investigate or deny Minnesota federal Medicaid funding. Supplemental briefing on the motion was completed on April 2.

IV

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The Eighth Circuit's familiar *Dataphase* decision describes the list of considerations applied to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the

---

[5] To clarify, Minnesota described its motion as seeking "a temporary restraining order and expedited preliminary injunction." ECF No. 2 at 1. Under Federal Rule of Civil Procedure 65(b), temporary restraining orders are issued "without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing … why [notice] should not be required." Fed. R. Civ. P. 65(b)(1). Here, Minnesota acknowledged in its motion that it "do[es] not seek an *ex parte* temporary restraining order, and [it does] not object to Defendants responding before a hearing on the motion." ECF No. 2 at 2. The motion will be treated as a motion for a preliminary injunction. *See Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 838 (D. Minn. 2011) (stating that because the defendants received notice and the motion for a temporary restraining order was fully briefed, "the Court w[ould] treat [the motion] as one for a preliminary injunction").

movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112–14 (8th Cir. 1981) (en banc)).  The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.  "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation modified).  A movant must show it has a "fair chance of prevailing" on the merits of a claim to obtain a preliminary injunction. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008); *see CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (recognizing that the movant "need only show likelihood of success on the merits on a single cause of action, not every action it asserts").  Under the "fair chance of prevailing" standard, a movant "need not show that it has a greater than fifty per cent likelihood of success." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016–17 (8th Cir. 2022) (citation modified).  "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

17

1

Minnesota is not likely to prevail on its Fifth Amendment procedural-due-process claim. A state, and by logical extension a state agency, are not "persons" for purposes of the Fifth Amendment. *South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966) ("The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court."); *see South Dakota v. U.S. Dep't of Interior*, 665 F.3d 986, 990 (8th Cir. 2012) ("The State is not a 'person' within the meaning of the Fifth Amendment's Due Process Clause."); *see also In re Jazz Casino Co., L.L.C. v. J.C.C. Holding Co.*, Nos. 03–3018 and 03–3245, 2004 WL 2095616, at *6 (E.D. La. Sept. 7, 2004) (recognizing that "[a] State or state agency is not entitled to constitutional due process protection" under the Fifth Amendment).

At the hearing, Plaintiffs cited one case, *West Virginia v. EPA*, 669 F. Supp. 3d 781 (D.N.D. 2023), to support their due-process claim. In that case, as Plaintiffs described it, "the court . . . did find that a due process concern was a valid basis to avoid the agency action that took place." ECF No. 30 at 6. Fair enough. *See West Virginia*, 669 F. Supp. 3d at 806. But as far as the court's opinion shows, the defendants did not raise, and the court did not address, whether the state plaintiffs were "persons" for purposes of the Fifth Amendment's Due Process clause. *See id.* It would be a mistake to construe the decision as authority opposing controlling Supreme Court and Eighth Circuit precedents.

2

a

Minnesota is not likely to prevail on its APA claims.[6] There are two problems. The first is that the agency action Minnesota challenges is not "final." 5 U.S.C. § 704. The APA defines "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "[T]he word 'action' . . . is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). The Supreme Court has described the requirements for agency action to be "final":

> First, the action must mark the "consummation" of the agency's decisionmaking process, *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970).

---

[6]     The withholding regulations contain special procedures limiting review to a petition filed "with the U.S. Court of Appeals for the circuit in which the state is located." 42 C.F.R. § 430.38(b)(1). The presence of such review procedures may preclude a district court from exercising a challenge to federal agency action. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). Defendants do not argue that the special review procedures in the withholding regulations preclude jurisdiction here. *See* ECF No. 22. This makes sense. Minnesota is not challenging anything that is happening in the withholding proceeding. Its claims concern only the deferral proceeding, and, unlike the withholding regulations, the deferral regulations contain no special review scheme. *See* 42 C.F.R. § 430.40.

19

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified).  "To constitute a final agency action, the agency's action must have inflicted 'an actual, concrete injury' upon the party seeking judicial review."  *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. United States Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018) (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001)).  Courts take a "'pragmatic' and 'flexible' approach to the question of finality."  *Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 997 n.1 (8th Cir. 2015) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–50 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)), *aff'd*, 578 U.S. 590 (2016).  "When an agency 'has issued a definitive statement of its position, determining the rights and obligations of the parties, that action is final for purposes of judicial review despite the possibility of further proceedings in the agency to resolve subsidiary issues.'"  *Union Pac. R.R. Co. v. U.S. R.R. Ret. Bd.*, 162 F.4th 908, 917–18 (8th Cir. 2025) (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006)).

i

Minnesota claims the deferral notice is final agency action, *see* ECF No. 4 at 25, but assuming the deferral notice is "agency action," I conclude it does not meet *Bennett*'s first element—that is, it does not "mark the 'consummation' of the agency's decisionmaking process."  520 U.S. at 177 (citation omitted).  A deferral notice communicates the agency's questions regarding a claim's allowability, not a definitive statement that a claim is disallowed.  Under the regulations, a deferral occurs when the Administrator "questions" the "allowability" "of a claim or any portion of a claim for FFP" and then excludes the

20

questioned amount from a quarterly grant award.    42 C.F.R. § 430.40(a)(1)–(2).

Questions—at least when they are genuine—seek to elicit information, not provide

definitive answers.  And a deferral notice initiates procedures that may or may not provide

a definitive answer regarding a claim's allowability.  Under the regulations, a deferral

notice "[i]dentifies the type and amount of the deferred claim and specifies the reason for

deferral," and "[r]equests the State to make available all the documents and materials the

[agency] then believes are necessary to determine the allowability of the claim."  42 C.F.R.

§ 430.40(b)(i)–(ii).  From there, several things might happen.  The agency might request

additional information.  42 C.F.R. § 430.40(c)(3).  The agency might pay the claim "subject

to a later determination of allowability" if the agency fails to complete its review within 90

days after receiving the requested documentation from the State.  42 C.F.R. § 430.40(c)(5)–

(6).  The agency might decide to pay the claim on its merits.  42 C.F.R. § 430.40(e)(1).

The agency might disallow the claim, either because the State failed to provide requested

documentation on time or because the agency determined the claim should be disallowed

on its merits.  42 C.F.R. § 430.40(c)(4), (e)(1).  With all these contingencies on the table,

it is difficult to understand how a deferral notice might represent the consummation of the

agency's decisionmaking process.[7]

---

[7]    It is true that "[t]he mere possibility that an agency might reconsider in light of informal discussion and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (citation modified).  We're not dealing with that kind of "mere possibility" here.  The deferral regulations establish what is in substance an investigative process that might lead to any of several outcomes, and the deferral process's investigative character contributes to showing why a deferral notice is not the consummation of the agency's decisionmaking process. That the agency might conceivably rethink its decision to issue the notice is irrelevant.

21

In this sense, CMS's issuance of the deferral notice seems comparable to an agency's decision to initiate an audit or similar investigative measures that courts find are nonfinal. *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (collecting cases from the Third, Fifth, Sixth, Ninth, and D.C. Circuits holding that investigative actions do not constitute final agency action), *cert. denied sub nom.*, *Harper v. Faulkender*, 145 S. Ct. 2867 (2025); *see also Gordon v. Norton*, 322 F.3d 1213, 1220 (10th Cir. 2003) (holding that letter indicating agency "was still in the decision-making process and was continuing to gather information" was nonfinal), *abrogation on other grounds recognized by*, *Purgatory Recreation I, LLC v. United States*, 157 F.4th 1173 (10th Cir. 2025); *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1238 (11th Cir. 2003) (holding agency's failure to discontinue private occupancy of certain structures did not constitute final agency action where the agency was still "actively planning the prospective management of" the area); *Or. Health & Sci. Univ. v. Engels*, No. CV 24-2184 (RC), 2025 WL 1707630, at *4 (D.D.C. June 17, 2025) (holding that an agency's decision to approve audit plans for a drug manufacturer was not final agency action), *dismissed sub nom. MaineGeneral Med. Ctr. v. Engels*, No. 25-5297, 2025 WL 2982893 (D.C. Cir. Oct. 21, 2025).

The February 25 deferral notice is consistent with this understanding of the governing regulations. As relevant here, the notice identified the type and amount of the deferred expenditures. As CMS explained, it identified expenditures totaling $164,198,916 "for other practitioner, personal care, and home and community-based service lines that have questionable variances and raise concerns about allowability of the claimed expenditures." ECF No. 5-1 at 53. CMS also explained it "identified $79,591,344 FFP

22

claimed by the state associated with reimbursement claims submitted to the state by specific providers that [CMS had] identified as high-risk for fraud or aberrant billing practices based on historical billing and CMS data analytics." *Id.* The notice asked Minnesota to "either provide additional state and provider documentation to support the allowability of these claims" or to write off these amounts. *Id.* CMS, in other words, identified concerns and requested documents. It did not express a conclusion that these claims or any part of them would be disallowed. It took no procedure or possible outcome off the table.

Minnesota argues that the deferral notice is "final" to the extent CMS opted to subject $243 million in federal financial participation to the "deferral process" rather than the withholding or disallowance processes. ECF No. 4 at 26. I do not agree. The deferral notice does not mark the consummation of the agency's decision-making process to treat the FFP (once and for all) as a deferral. For that to be so, the deferral procedures would be self-contained or distinct from withholdings and disallowances. Those lines do not exist, or at least I have not found them. The deferral procedures are not separate from disallowance—the regulations make clear that a deferral might result in a disallowance of all or part of the FFP subject to the deferral. *See* 42 C.F.R. § 430.40(e). Though it is true that deferrals and withholdings seem designed to address different problems at a high level, nothing in the regulations prohibits the agency from commencing a withholding based on information learned through the question-and-answer process associated with a deferral. Put differently, a deferral notice marks the commencement of a back-and-forth investigative process that could lead to many possible results, including disallowance or

withholding of FFP implicated by the agency's questions. A deferral notice does not mark the consummation of the agency's decision-making process regarding how the State's entitlement to the FFP will be determined. [8]

Minnesota cites several cases to support its position that the deferral notice is final agency action, but these cases address materially different circumstances or are unpersuasive for other reasons. In two of the cases, the contested agency action imposed new or additional obligations on a state that went beyond complying with an investigation. *See Minnesota v. USDA*, No. 25-cv-4767 (LMP/JFD), 2026 WL 125180, at *1, *9 n.6 (D. Minn. Jan. 16, 2026) (finding USDA's letter requiring Minnesota to recertify all SNAP beneficiaries by a certain date or face noncompliance procedures was final agency action because it "determines Minnesota's obligations and the consequences flowing from a failure to comply therewith"); *Texas v. Brooks-LaSure*, 680 F. Supp. 3d 791, 805–06 (E.D. Tex. 2023) (finding there was final agency action where the challenged notice issued by CMS "state[d]—for the first time—a clear and definitive [legal] position [regarding whether certain arrangements constitute prohibited hold-harmless agreements] that has immediate impact on Texas." (citation modified)). Nor is the court's analysis in *California v. USDA* helpful here. 800 F. Supp. 3d 1015 (N.D. Cal. 2025), *modified on other grounds*, 2025 WL 2772872 (N.D. Cal. Sept. 29, 2025). There, the court held that the USDA's

---

[8]   Defendants sometimes misconstrue Minnesota's claim. They argue, for example, that the claims are not ripe because "Minnesota has submitted nothing" to CMS "to substantiate its claims for federal funds" and CMS has yet to make an allowability determination. ECF No. 22 at 24–25. To be clear, Minnesota does not contend the at-issue claims are allowable (at least not in this case). It challenges CMS's decision to subject $243 million to the deferral procedures.

demand for data regarding California's SNAP program constituted final agency action, reasoning that the relevant statutory authority required the USDA to withhold funds from California if it did not comply. *California*, 800 F. Supp. 3d at 1024. The analysis is unhelpful because the USDA did not disagree that the challenged agency action was final, meaning the court's discussion of the issue was truncated. *See id.* ("Plaintiff States assert, and USDA has not disagreed, that the demand for SNAP data constitutes final agency action.").[9] And like here, the statutory provisions provided for review of any withholding of funds, *see* 7 U.S.C. § 2023, and the request for information was essentially an investigative act.

ii

Minnesota identifies three consequences flowing from the deferral notice that it says meet *Bennett*'s second requirement that the agency action must have determined "rights or obligations," 520 U.S. at 154, 177–78, but the better answer is they don't. Minnesota first points out that the deferral notice means it will lack access to the $243 million worth of deferred funds during the deferral process. ECF No. 4 at 26. Again, if the agency challenged this sum directly through withholding or disallowance instead of going through the deferral process first, Minnesota would have access to the funds pending a final decision on the merits. *See* 42 C.F.R. § 433.38(c) (setting forth procedures with which a state must comply in order to retain disallowed FFP pending a final decision); 42 C.F.R. § 430.35(a) (providing that FFP may not be withheld until the state is given "reasonable

---

[9]     The same was true of *Minnesota*. There, the parties did not dispute that the challenged agency action was final. *Minnesota*, 2026 WL 125180, at *9 n.6.

25

notice and opportunity for a hearing" and the Administrator determines withholding was appropriate).  For Minnesota, this is a significant problem.  The State's contention is nonetheless difficult to square with an Eighth Circuit case, *In re: SAC & Fox Tribe of the Miss. in Iowa / Meskawaki Casino Litig.*, 340 F.3d 749 (8th Cir. 2003).  There, representatives of the Tribe sued to challenge a National Indian Gaming Commission ("NIGC") order temporarily closing a casino operated by the Tribe.  *Id.* at 753–54.  Though an administrative procedure was available to challenge the closure order, the Tribe's representatives argued that the temporary closure determined "rights or obligations" because it prevented the Tribe from continuing to earn revenue through the casino's operations during the pendency of the administrative proceedings.  *See id.* at 756.  The court rejected this contention, explaining:

> Although the Chairman's closure order is effective immediately and impacts the parties, it does so only on a temporary basis.  A temporary closure order inherently is not "the consummation of the agency's decisionmaking process," even though it may have an immediate effect on the Tribe's finances in the near term.  The [Indian Gaming Regulatory Act ("IGRA")] by its express terms makes the actions of the Chairman in issuing [a] . . . temporary closure order preliminary and intermediate.  The IGRA contains no language making a temporary closure order by the Chairman judicially reviewable.  As already discussed, the detailed appeal process to the NIGC as a whole is another "adequate remedy."  Accordingly, the Chairman's action is not a final agency action under *Bennett.*

*Id.*  Essentially the same could be said of the deferral notice at issue here.  It deferred funds on a temporary basis, pending completion of the deferral process.  *See* 42 C.F.R. § 430.40.  And the deferral notice's financial impact on Minnesota, albeit substantial, seems

26

comparable to the casino-closure order's impact on the Tribe's finances. If there is a reason to distinguish these monetary consequences, it has not been identified.[10]

Minnesota next argues that the deferral notice determined rights or obligations because "it initiates a process where the burden is on the State to establish the allowability of a deferred claim." ECF No. 4 at 26. According to Minnesota, a withholding procedure is different because the Administrator has the burden to "show the state is in 'substantial noncompliance' with federal law." *Id.* (quoting 42 C.F.R. § 430.35(a)(2)). As best I can tell, this contention misconstrues the withholding regulations. Those regulations do not identify or imply who has the burden to show that the state is or is not in compliance with Medicaid requirements. *See* 42 C.F.R. § 430.35. It is true that the regulation Minnesota quoted requires the Administrator to "find" that a state is not in Medicaid compliance before withholding payments, but that's after "notice and [an] opportunity for a hearing." 42 C.F.R. § 430.35(a)(1)–(2). In other words, the provision requires the agency to make this finding as the adjudicator. *Id.*; *see* 42 C.F.R. § 430.38(a). The regulation does not answer who has the burden of proof in that proceeding. Independent research has not identified a case that answers the question, either. And if the regulation placed the burden on the state, Minnesota has cited no case holding that an agency decision shifting a burden

---

[10]    Minnesota identifies a prospective concern—that CMS may prolong the deferral process unnecessarily or perhaps in bad faith or serve additional deferral notices thus increasing the amounts subject to the deferral procedures. Under the pragmatic, case-specific rules governing the final-agency-action question, if they come to pass, these developments would be relevant and might lead to a different outcome on the final-agency-action question. At this point, they are hypothetical.

of proof determines "rights and obligations," thereby making it final for the APA's purposes. *Union Pac. R.R. Co.*, 446 F.3d at 813.

Third and finally, Minnesota argues that the deferral notice determined rights or obligations because it "deprives Minnesota of a discovery period and a contested hearing where the State can present evidence and examine witnesses." ECF No. 4 at 26. This characterization is imprecise. The withholding regulations, through their incorporation of the subpart D hearing regulations, explicitly authorize discovery in the same manner authorized by Rules 26 through 37 of the Federal Rules of Civil Procedure. *See* 42 C.F.R. §§ 430.35(a), 430.86. The deferral regulations do not mention discovery specifically. *See* 42 C.F.R. § 430.40. At the same time, however, the deferral regulations require CMS to share information with a state, including "the type and amount of the deferred claim and . . . the reason for deferral," 42 C.F.R. § 430.40(b)(1)(i), and they enable a state to produce information supporting its claims, 42 C.F.R. § 430.40(c). It is not correct to say that the deferral regulations do not allow for "a contested hearing." ECF No. 4 at 26. The deferral regulations permit a state to request fair hearing procedures if a deferral results in a disallowance. *See* 42 C.F.R. § 430.40(e)(2); 45 C.F.R. §§ 16.1–16.23. The upshot is that the differences between the deferral and withholding procedures are not as significant as Minnesota claims. Regardless, Minnesota identifies no authority supporting the contention that these differences determine rights or obligations in a way that makes the deferral notice "final" agency action.[11]

---

[11]     If the agency's commencement of the deferral were "final," I would conclude that no other statutory bar prevents consideration of the APA claims' merits. Section 704 of

b

Finality aside, Minnesota has not shown on this record that it is likely to prevail on the APA claims' merits. Minnesota asserts two APA theories. The first theory is that the agency's decision to defer FFP was "arbitrary, capricious" and "contrary to law," in violation of § 706(2)(A) because the agency's stated reasons for the deferral were pretextual. *See* Compl. ¶¶ 49–57. The second theory is that the agency's deferral notice independently violated § 706(2)(A) and was "without observance of procedure required by law" in violation of § 706(2)(D) because it "[did] not provide sufficient specificity for Minnesota to understand what additional documentation CMS will deem sufficient." Compl. ¶¶ 53, 59; *see id.* ¶¶ 49–65.

The general rules governing § 706(2)(A) claims are familiar. Section 706(2)(A) imposes a "highly differential standard" of review. *Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 459 (8th Cir. 2018). A court reviews "whether the agency's

the APA "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (citation modified). "An alternative remedy is adequate so as to preclude a cause of action under the APA if, though not 'identical to relief under the APA,' it is at least 'of the same genre.'" *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 778 F. Supp. 3d 56, 80 (D.D.C. 2025) (quoting *Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1244 (D.C. Cir. 2018)); *accord Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty.*, 6 F.4th 633, 642 (5th Cir. 2021); *Rimmer v. Holder*, 700 F.3d 246, 262 (6th Cir. 2012). This is a "case-specific evaluation." *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018). "[T]he alternative remedy must actually result in a determination of the underlying legal question, rather than a peripheral issue." *Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 13 (D.D.C. 2020). Here, Defendants argue the Medicaid regulatory framework provides an adequate alternative remedy—judicial review of a decision to disallow a claim. ECF No. 22 at 24; 42 U.S.C. § 1316(e)(2)(C). This misses the mark. This case isn't about a hypothetical disallowance; it is about CMS's decision to commence deferral procedures. No statute or regulation provides a mechanism to review that decision.

29

decision was 'based on consideration of the relevant factors and whether there has been a clear error of judgment.'" *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). "If an agency's determination is supportable on any rational basis," it must be upheld. *Id.* This is particularly the case "when an agency is acting within its own sphere of expertise." *Id.*

Claims that an agency decision violated § 706(2)(A) because it was pretextual are analyzed under the framework the Supreme Court applied in *Department of Commerce v. New York*, 588 U.S. 752 (2019). There, the Court considered whether the Secretary of Commerce violated § 706(2)(A) by reinstating a question about citizenship on the 2020 census questionnaire. *Dep't of Com.*, 588 U.S. at 758–59, 773–77, 780–85. The Court began by identifying "settled propositions" that guided its analysis. *Id.* at 780. These included the general rule that when reviewing agency action, "a court is limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Id.* And, the Court observed, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons," including political reasons. *Id.* at 781. As the Court explained, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities. Agency policymaking is not a rarified technocratic process, unaffected by political considerations or the presence of Presidential power." *Id.* (citation modified). There is, however, a "narrow exception" to the rule barring "inquiry into the the mental processes of

administrative decisionmakers" such that "[o]n a 'strong showing of bad faith or improper behavior,' such an inquiry may be warranted and may justify extra-record discovery." *Id.* (quoting *Volpe*, 401 U.S. at 420).

The Court applied these rules to affirm the district court's decision that the agency's action should be set aside because the "sole stated reason" for the decision "seem[ed] to have been contrived." *Id.* at 784. In a memorandum, the Secretary claimed his decision to reinstate the citizenship question was based on a request from the Department of Justice, which sought the data for purposes of enforcing the Voting Rights Act ("VRA"). *Id.* at 761. After the case was filed, the Commerce Department filed its administrative record, which it later supplemented with a memorandum from the Secretary indicating the Secretary had initially reached out to DOJ to ask if "DOJ would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act. According to the Secretary, DOJ formally requested reinstatement of the citizenship question after that inquiry." *Id.* at 764–65. Based on the memorandum, the plaintiffs claimed the agency had not submitted a complete record of materials considered by the Secretary, and the district court granted their request to compel the government to complete the administrative record. *Id.* at 765. Among an additional 12,000 pages of materials were records confirming that the Secretary "attempted to elicit requests for citizenship data from other agencies, and eventually persuaded DOJ to request reinstatement of the question for VRA enforcement purposes." *Id.* The plaintiffs also moved the district court for extra-record discovery, which the court granted, "authorizing expert discovery and depositions of certain DOJ and Commerce Department officials." *Id.*

31

The Court determined the district court erred in ordering extra-record discovery when it did but that the additional 12,000 pages of materials "largely justified such extra-record discovery as occurred." *Id.* at 782. Considering the entirety of the record—including the extra-record discovery—the Court held that "unlike a typical case in which an agency may have both stated and unstated reasons for a decision, here the VRA enforcement rationale— the sole stated reason—seems to have been contrived." *Id.* at 784. The Court ordered the matter remanded to the agency. *Id.* at 785.

Here, Minnesota identifies essentially three reasons why the agency's justifications for the deferral are pretext for political retribution, but none has sufficient support in this record to conclude that Minnesota is likely to prevail on the merits of its § 706(2)(A) claim. Minnesota first alleges that evidence shows the deferral was unnecessary because CMS already possessed the information it needed and hadn't reviewed that information before issuing the deferral notice. ECF No. 4 at 28; *see* ECF No. 7 ¶ 3 ("The Deferral states that more information is needed from the state, but CMS has told us that it has not been able to review what has been provided."). CMS says something different. In a declaration, its Director of the Division of Financial Operations West, Dorothy Ferguson, testified that "CMS, with contractor support, conducted an initial analysis of the data" Minnesota submitted "before issuing the deferral," that the deferral was grounded in concerns identified through that analysis, and that "CMS could not determine the allowability of the associated claims without further information from the State." ECF No. 23 ¶¶ 27, 29. In other words, Director Ferguson testified that CMS reviewed at least some of the data Minnesota submitted and required additional information to assess the claims' allowability.

*See id.*  No specific reason has been identified to question or reject Director Ferguson's testimony.

Second, Minnesota argues that Administrator Oz and Vice President Vance's public comments show the deferral—which is intended to be backward-looking—was motivated by future considerations.  *See* Compl. ¶ 53 ("Defendant Oz and Vice President Vance made clear that the only way for Plaintiffs to recoup the withheld money is for Plaintiff DHS to act on a corrective action plan that meets their approval, with CMS deferring a billion dollars this year if Defendants withhold their approval.").  Administrator Oz and Vice President Vance's comments concern the possibility of future deferrals and sometimes seem to muddle the regulatory distinctions between deferrals and withholdings.  Their comments do not support "a strong showing of bad faith or improper behavior," and, if they did, under *Department of Commerce*, that would show only that an inquiry and extra-record discovery may be warranted, not a preliminary injunction.  588 U.S. at 781.

Third, Minnesota argues that the deferral's historical uniqueness shows pretext.  To support this contention, Minnesota alleges that the deferral's amount is "unprecedented" and that a deferral ordinarily is intended to serve as an auditing tool focused on a specific "claim or any portion of a claim," "not . . . wide swaths of Medicaid funding."  ECF No. 4 at 15.  Minnesota also claims that it is unusual for CMS to have initiated a withholding and a deferral at the same time.  Compl. ¶ 38; *see also* ECF No. 4 at 22.  I have no reason to doubt Minnesota's assertions regarding the historical uses or character of deferrals.  These facts do not warrant finding pretext because, whatever the historical practice, the regulations do not limit the amount of funds CMS may subject to a deferral.  Nor do they

33

prohibit CMS from pursuing deferral and withholding concurrently with respect to the same state.

Minnesota's second theory—that the deferral notice was insufficient—would not justify entry of a preliminary injunction, either.  The regulation imposes only high-level requirements regarding the notice's content.   Under the regulations, the notice must (1) "[i]dentif[y] the type . . . of the deferred claim"; (2) "[i]dentif[y] the . . . amount of the deferred claim"; (3) "specif[y] the reason for deferral"; and (4) "[r]equest[] the State to make available all the documents and materials [CMS] then believes are necessary to determine the allowability of the claim."  42 C.F.R. § 430.40(b)(1)(i)–(ii).  Regarding the amounts that are the subject of this case, the deferral notice (1) identified the types of claims subject to the deferral as "practitioner, personal care, and home and community-based services lines" and claims submitted by specific providers;[12] (2) identified the amounts associated with these categories as $164,198,916 and $79,591,344, respectively; (3) identified fraud and abuse as the reasons for the deferrals; and (4) requested Minnesota "provide additional state and provider documentation to support the allowability of these claims, including through CMS sample-based reviews."  ECF No. 5-1 at 53.

If the notice violated the regulation's content requirements—that is, if Minnesota required more information to respond—the appropriate recourse would be greater specificity from CMS, not a preliminary injunction forbidding CMS from proceeding with

---

[12]     The "fourteen high-risk Medicaid service areas" identified in the deferral notice, *see* ECF No. 5-1 at 53, are the same fourteen high-risk service types identified by Minnesota, *see* ECF No. 6 ¶ 6.  ECF No. 7 at 2 n.1.  At a high level, in other words, CMS and Minnesota were concerned about the same things.

the deferral and restoring the deferred funds to Minnesota.  Consistent with this idea, CMS has since provided Minnesota with additional information regarding the documents it seeks.  *See* ECF No. 25-1.

3

Minnesota is not likely to prevail on the merits of its spending-power claim.  "[I]n exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).  "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions."  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  A state must "voluntarily and knowingly accept[] the terms of the 'contract.'"  *Id.*  Naturally, there can "be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.  Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."  *Id.*; *accord Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

Minnesota has not shown that the deferral imposed a new condition on the federal government's grant of Medicaid funds to Minnesota.  The claim is based on the idea that the deferral is unlawful for many reasons.  *See* ECF No. 4 at 34 (arguing that Minnesota was unaware CMS "could immediately defer hundreds of millions of dollars every quarter, with no due process, based purely on Defendants' desire for Minnesota to create, and comply with, a corrective action plan that meets Defendants' ever-changing standards and regardless of DHS's relentless efforts to collaborate with CMS as encouraged by the

35

regulations"). These broad contentions seem ill-suited to showing a spending-power violation. Regardless, I've already concluded that, on this record, the deferral did not violate the governing regulations.

4

Minnesota is not likely to succeed on the merits of its ultra vires claim. A claim of ultra vires agency action is a claim to "equitable relief where an agency's action was ultra vires—that is, 'unauthorized by any law and . . . in violation of the rights of the individual.'" *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680 (2025) (alteration in original) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)). However, recognizing that ultra vires review is susceptible to becoming an "end-run" around limitations imposed by judicial-review statutes (like the APA), the Supreme Court has "strictly limited nonstatutory ultra vires review" to instances where "an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Id.* at 681 (citation modified). Ultra vires review is not available "simply because an agency has arguably reached 'a conclusion which does not comport with the law.'" *Id.* (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). "Ultra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Id.* (citation modified). The Eighth Circuit understands the specific-prohibition rule to require a "plain violation of an unambiguous and mandatory provision of the statute." *Key Med. Supply,*

36

*Inc. v. Burwell*, 764 F.3d 955, 962 (8th Cir. 2014) (quoting *Neb. State Legis. Bd., United Transp. Union v. Slater*, 245 F.3d 656, 659 (8th Cir. 2001)).

Minnesota's ultra vires claim likely does not meet these standards. Minnesota addresses this claim only in a footnote in its brief. ECF No. 4 at 30 n.12. There, it argued that the "specific prohibition" essential to the claim appears in the deferral regulation. *Id.* As Minnesota put it, "[t]he regulation . . . prohibits CMS from conditioning the lifting of a deferral on anything other than the state providing documentation for the claim." *Id.* (citing 42 C.F.R. § 430.40(a)). The cited provision does not say that. It says CMS may initiate a claim deferral if it "questions its allowability and needs additional information to resolve the question." 42 C.F.R. § 430.40(a)(1). The provision does not address what happens after CMS receives documentation, and subsequent provisions make clear that deferred amounts may be disallowed. *See id.* § 430.40(c)(4), (e)(2). Put differently, the provision Minnesota cited does not prohibit the deferral, much less specifically or plainly.

B

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "To show irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quoting *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022)). A plaintiff must show "the harm is 'not merely a possibility' but is likely to occur absent

preliminary injunctive relief." *Id.* (quoting *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022)). "Speculative harm does not support a preliminary injunction." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012); *see Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) ("[A] plaintiff cannot simply establish a risk of irreparable harm. There must be a 'clear showing of immediate irreparable injury.'" (quoting *Internet Inc. v. Tensar Polytechnologies, Inc.*, No. 05-cv-317 (RHK/AJB), 2005 WL 2453170, at *5 (D. Minn. Oct. 3, 2005))). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *see Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

Though purely monetary harm is not ordinarily irreparable, there are exceptions. For example, courts find monetary harm to be irreparable when it risks putting an organization out of business, *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986), where "the defendant is likely to be insolvent at the time of judgment," *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52 (1st Cir. 1986) (citing *Deckert v. Indep. Shares Corp.*, 311 U.S. 282 (1940)), or where a damages amount cannot be ascertained, *see Triebwasser & Katz v. Am. Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2d Cir. 1976). And courts have recognized that the follow-on effects of a federal-funding freeze may constitute irreparable harm. For example, in *New York v. Trump*, the First Circuit upheld a district court's finding of irreparable harm where a funding freeze would result in "catastrophic disruption to

38

student instruction; possible layoffs, reductions in service, and closures of childcare programs; and significant impediments to the delivery of basic health care services to vulnerable populations, and upending state budgets and leading states to incur debts due to the unanticipated loss of obligated funds." --- F.4th ---, Nos. 25-1236 & 25-1413, 2026 WL 734941, at *14 (1st Cir. Mar. 16, 2026) (citation modified).   Other courts have made comparable findings. *See, e.g.*, *Maine v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 200, 234 (D. Me. 2025) (finding irreparable harm where federal funding freeze risked "loss of program integrity, including inconsistent meal quality and reduced outreach to low-income families, thus widening the gaps in access to healthy meals for children who depend on these programs"); *Washington v. U.S. Dep't of Transp.*, 792 F. Supp. 3d 1147, 1188–91 (W.D. Wash. 2025) (finding irreparable harm where funding freeze threatened the existence of state's electronic vehicle infrastructure program); *New York v. Admin. for Child. & Fams.*, No. 26-CV-172 (VSB), 2026 WL 673848, at *25–26 (S.D.N.Y. Mar. 10, 2026) (finding irreparable harm where "states' budgets rely on the prompt disbursement of . . . funds" and "[d]elays or the specter of a potential loss of funding could exclude participants from services . . . and effectively end certain social services programs"); *City and County of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1186 (N.D. Cal. 2025) (finding irreparable harm where at-issue federal funding "ke[pt] many of [plaintiffs'] safety-net services afloat," including "healthcare, disease control, emergency management, public benefits, and law enforcement programs").

Whether Minnesota has shown irreparable harm on this record is a close issue, but I conclude it has not.  Much of Minnesota's evidence shows possible future harm, not likely

39

imminent harm.   For example, Deputy Medicaid Director Hultman testified that he is "concerned" that CMS will prolong the deferral process.  ECF No. 7 ¶ 8.  He testified that "CMS regularly evades the 90-day deadline by claiming that the state's submissions are insufficient or by demanding additional information so that the 90-day deadline never begins," inferring he is concerned that will happen here also.  *Id.*  Without more, the possibility of these events occurring is too uncertain to show a likelihood of irreparable harm.  Also uncertain are the effects the deferral may have on the State's budget and Medicaid services.  There is no question the deferred amounts fund vital services.  Deputy Commissioner Connolly testified that the entire deferred amount—$259 million— represents "a complete quarterly federal funding for Assertive Community Treatment Mental Health Services, Adult Rehabilitative Mental Health Services, Intensive Residential Treatment Services, and Nonemergency Medical Transportation Services," and that "[t]hese programs provide services to 160,000 Minnesotans."  ECF No. 6 ¶ 18.  But Minnesota's witnesses testified that cuts to these services would depend on a variety of considerations.  These include the deferral proceeding's duration, whether further deferrals occur, and whether the legislature appropriates amounts to cover the shortfall.  *See id.*; *see also* ECF No. 8 ¶ 3.

To the extent the record evidence shows present harms, those harms are not great and somewhat difficult to assess.  Though a large sum, the deferred amount represents roughly 1.8% of projected federal Medicaid funding in 2026.  ECF No. 8 ¶ 3.  It is not difficult to understand why that percentage poses problems for Minnesota.  It is difficult to understand how that percentage shows irreparable harm.  And Minnesota at least shares

40

the blame for ongoing service cuts.  Minnesota's "aggressive anti-fraud efforts have placed many legitimate and law-abiding providers in a precarious financial position."  ECF No. 24 at 9.  Put another way, it is difficult to separate the present consequences of Minnesota's own actions from what service-related consequences may follow from the deferral.  The better answer is that the record does not show injunction-worthy irreparable harm.

C

The final two *Dataphase* factors are neutral and do not change things.  The balance-of-harms factor involves "assess[ing] the harm the movant would suffer absent an injunction," as well as the harm the other parties "would experience if the injunction issued."  *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015).  For practical purposes, the public interest and balance of harm factors "merge" when a plaintiff seeks injunctive relief against the government.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *accord Morehouse Enters.*, 78 F.4th at 1018.

"[T]here is a substantial public interest in ensuring that the poor and uninsured receive [necessary] healthcare services."  *Cedar-Riverside People's Ctr. v. Minn. Dep't of Hum. Servs.*, No. 09-cv-768 (DSD/SRN), 2009 WL 1955440, at *3 (D. Minn. July 6, 2009).  The public also has a "strong interest in ensuring that states use federal funds for their designated purpose," *id.*, not for fraudulent purposes.  These interests are equally weighty, especially considering that Minnesota has recognized it has a serious fraud problem.  *See* ECF No. 5-1 at 2–5.  Minnesota argues that "there is substantial public interest in a federal agency following its own regulations . . . and in Americans trusting their own government to follow the rule of law."  ECF No. 4 at 36 (quoting *Shaik v. Noem*, No. 25-cv-1584

41

(JRT/DJF), 2025 WL 1170447, at *3 (D. Minn. Apr. 22, 2025)).  At least at this stage, Minnesota has not shown that Defendants have failed to follow the rule of law.

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Plaintiffs' Motion for Temporary Restraining Order and Expedited Preliminary Injunction [ECF No. 2] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: April 6, 2026

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court